UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

YISRAEL Z. HEILMANN,                    Civil Action No. _____


                    Plaintiff,          **COMPLAINT**

                                        **JURY TRIAL DEMANDED**

        -against-


YESHIVA UNIVERSITY; SEYFARTH SHAWN LLP; DOV KESSELMAN; IAN

CAPELL,



Defendants.

-------------------------------------X

**Plaintiff Yisrael Z. Heilmann** ("Plaintiff"), proceeding pro se, brings this action against **Defendant Yeshiva University**("Yeshiva" or "the University"), **Defendant Seyfarth Shaw LLP** ("Seyfarth"), **Defendant Dov Kesselman**, and **Defendant Ian Capell** (collectively, "Defendants"), and alleges as follows:

# Preliminary Statement and Affirmation of Good Faith and Judicial Integrity

## I. Preliminary Statement and Affirmation of Good Faith

1. This is an action for Defamation, Retaliation, Intentional Infliction of Emotional Distress (IIED), and Tortious Interference. Plaintiff, a former student at Yeshiva University, became the target of a coordinated campaign of defamation and intimidation after reporting discrimination and assault on campus. On December 24, 2024, Defendants—through attorneys Dov Kesselman and Andrew Capell of Seyfarth Shaw LLP—submitted a position statement to the New York State Division of Human Rights (NYSDHR) containing numerous knowingly false, defamatory, and malicious statements concerning Plaintiff. After Plaintiff objected, Defendant Kesselman escalated the misconduct by sending a threatening letter on April 9, 2025, categorically denying wrongdoing and warning Plaintiff not to pursue legal action. That same day, Kesselman also made an unsolicited call to Plaintiff's German legal advisor, during which he admitted he lacked personal knowledge of the facts but still denied all relief, further attempting to discredit Plaintiff. These acts were not only defamatory but retaliatory—calculated to punish

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Plaintiff for asserting his legal rights, and to chill any further complaints. As a result, Plaintiff has suffered profound damage to his reputation, mental health, academic trajectory, and professional future. Plaintiff seeks both compensatory damages and punitive damages in a total amount of Two Hundred Fifteen Million Dollars ($215,000,000) to hold Defendants accountable and deter similar unlawful conduct in the future.

2. **Rule 11(b) Compliance**: Plaintiff Yisrael Z. Heilmann ("Plaintiff") brings this Complaint in full compliance with Rule 11(b) of the Federal Rules of Civil Procedure. The factual allegations are made after reasonable inquiry, are supported by evidence— including administrative records, witness communications, and contemporaneous documentation— and are warranted by existing law or a good-faith argument for its extension. Plaintiff affirms that this Complaint is submitted in good faith and not for any improper purpose.

3. **Distinct Legal Violation:** This action addresses a separate and independently actionable course of unlawful conduct by Defendants: a campaign of defamation and retaliation in response to Plaintiff's protected complaints of discrimination and abuse. Specifically, it focuses on knowingly false statements made in the NYSDHR proceeding and retaliatory communications in April 2025. These claims are factually and legally distinct from prior claims involving the original assault or university misconduct. Plaintiff does not seek to relitigate the underlying events of March 2024 but instead asserts new claims arising directly from Defendants' subsequent and retaliatory misconduct.

**This Complaint presents a standalone factual and legal theory, with no overlap in**

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

**operative facts or remedies sought in Plaintiff's other actions currently pending before this Court.**

4. **Good Faith and Judicial Efficiency**: Plaintiff reiterates his commitment to judicial integrity and procedural economy. He is prepared to cooperate with the Court and all parties to avoid duplication, unnecessary litigation, or inefficiency. If any part of this action is deemed to overlap with another, Plaintiff stands ready to accept reasonable consolidation or modification. By filing this case separately, Plaintiff seeks to ensure focused adjudication of these discrete issues without prejudice to other claims, consistent with Rule 8 and applicable procedural norms.

5. **Scope of Relief Sought**: Through this action, Plaintiff seeks redress for Defendants' retaliation, defamation, and tortious interference—actions which have derailed his education, damaged his international reputation, and inflicted lasting psychological harm. Plaintiff seeks compensatory and punitive damages totaling $215 million, injunctive relief to protect his remaining legal rights, and all other relief the Court deems just and proper. Plaintiff respectfully demands a trial by jury on all issues so triable.

# Parties

6. **Plaintiff Yisrael Z. Heilmann** is an adult individual who was at all relevant times a student at Yeshiva University in New York. He is the complainant in an NYSDHR proceeding (Case No. 10242105) alleging discrimination and retaliation by Yeshiva University.

7. **Defendant Yeshiva University** ("Yeshiva" or "the University") is a private university in New York. At all relevant times, Yeshiva was an employer and educational institution

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

subject to state and federal anti-discrimination laws. Yeshiva is responsible for the acts of its employees and agents, including the other Defendants.

8. **Defendant Seyfarth Shaw LLP** ("Seyfarth") is a law firm that represented Yeshiva University in responding to Plaintiff's NYSDHR complaint. Defendants Dov Kesselman and Ian Capell are attorneys at Seyfarth.

9. **Defendant Dov Kesselman** is an attorney licensed in New York and a partner or employee of Seyfarth. Kesselman, acting on behalf of Yeshiva, co-authored the December 24, 2024 NYSDHR position statement and authored the April 9, 2025 letter described below. At all relevant times, Kesselman acted as agent for Yeshiva and within the scope of his employment with Seyfarth. Kesselman is believed to reside in New York State and the State of Israel.

10. **Defendant Ian Capell** is an attorney licensed in New York and a partner or employee of Seyfarth. Capell co-authored the December 24, 2024 position statement submitted to the NYSDHR on Yeshiva's behalf alongside Kesselman. At all relevant times, Capell acted as agent for Yeshiva and within the scope of his employment with Seyfarth.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to **28 U.S.C. § 1331**, as the claims asserted herein arise under the Constitution and laws of the United States, including but not limited to **42 U.S.C. §§ 1981, 1983, 1985**, and applicable federal antiretaliation statutes such as **Title VI**, **Title IX**, and the **Americans with Disabilities**

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

**Act (ADA)**. These federal questions present substantial issues warranting adjudication by this Court.

12. This Court also has supplemental jurisdiction over Plaintiff's state law claims under **28 U.S.C. § 1367**, because those claims arise from the same nucleus of operative facts as the federal claims and form part of the same case or controversy. The federal and state claims are so intertwined that judicial economy, convenience, and fairness dictate resolution in a single proceeding.

13. Venue is proper in the **Southern District of New York** under **28 U.S.C. § 1391(b)(1) and (b)(2)**, because all Defendants reside in this District for purposes of venue and/or a substantial part of the events or omissions giving rise to the claims occurred in this District. These events include the submission of defamatory filings, the issuance of retaliatory communications, and the administrative and institutional decisions that harmed Plaintiff.

14. No other venue would be more appropriate or convenient, and no Defendant is immune from suit in this jurisdiction.

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

# Factual Background

## Plaintiff's Protected Activity

15. In 2024, Plaintiff experienced discrimination, harassment, and a physical assault during his time as a student at Yeshiva University. Plaintiff reported these incidents through proper channels. In or about mid-2024, Plaintiff filed a formal complaint with the NYSDHR against Yeshiva University, alleging unlawful discrimination (on the basis of age, disability, national origin, and other protected characteristics) and retaliation. This NYSDHR complaint was a protected activity – Plaintiff was asserting his civil rights under New York law.

16. Yeshiva University retained Seyfarth (through attorneys Kesselman and Capell) to defend against Plaintiff's NYSDHR complaint. Rather than address Plaintiff's grievances in a professional or truthful manner, Defendants embarked on a campaign to **smear Plaintiff's character and intimidate him** from pursuing his case.

## Defendants' December 24, 2024 Position Statement to NYSDHR

17. On December 24, 2024, Defendants Kesselman and Capell, acting for Yeshiva and Seyfarth, submitted a written position statement to the NYSDHR (hereafter the **"NYSDHR Response"**). This document was ostensibly a response to Plaintiff's discrimination complaint, but it went far beyond a factual rebuttal or legal argument. Instead, it was filled with ad hominem attacks, false accusations, and demeaning characterizations of Plaintiff, **intended to destroy Plaintiff's credibility and**

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Page 7 of 50

**reputation**. The NYSDHR Response contains numerous **defamatory statements** about Plaintiff, including but not limited to the following:

- **Baseless Dismissal of Plaintiff's Complaint:** Defendants opened their statement by declaring that *"Mr. Heilmann's Complaint is utterly without merit."* (NYSDHR Response, p. 1, lines 33–34). They further derided Plaintiff's complaint as a *"'kitchen sink' Complaint"* to suggest it was a hodgepodge of baseless grievances (NYSDHR Response, p. 1, lines 24–26). These pronouncements falsely portray Plaintiff's entire discrimination complaint as frivolous and unfounded, before any investigation or hearing could even occur.

- **Attack on Plaintiff's Character and Mental State:** Defendants painted Plaintiff as an individual with a deeply flawed and disturbed character. They wrote that Plaintiff's NYSDHR filing was *"just the latest in a long and sad history of very concerning behaviors and a constant victimhood personality"* (NYSDHR Response, p. 1, lines 54–57). They accused Plaintiff of having *"a long and unfortunate history of overexaggerating illnesses, getting into disputes with other students, refusing to pick a major and stick with it, and most recently failing to meet his academic expectations."* (NYSDHR Response, p. 2, lines 65–69). Defendants even insinuated that Plaintiff was sabotaging his own success, stating that it appeared *"almost as if Mr. Heilmann was sabotaging himself."* (NYSDHR Response, p. 2, lines 79–81). These statements are false and defamatory. Plaintiff does not have a "constant victimhood personality" or a history of exaggerating illness or misbehavior; to the contrary, Plaintiff diligently pursued his studies and raised legitimate concerns about mistreatment. Defendants

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

made these sweeping accusations without basis, aiming to brand Plaintiff as a troublemaker and malingerer.

- **Portrayal of Plaintiff as Delusional or Out of Touch:** Defendants outrageously claimed that Plaintiff's view of events was detached from reality. For instance, responding to one

  of Plaintiff's allegations, they wrote that his account *"is wildly removed from reality."* (NYSDHR Response, p. 8, lines 521–523). More generally, they stated that Plaintiff's discrimination allegations were *"simply removed from reality."* (NYSDHR Response, p. 2, lines 82–84). By asserting that Plaintiff cannot "stay in touch with reality," Defendants falsely suggest that Plaintiff is delusional or dishonest. This is a direct attack on Plaintiff's sanity and veracity, intended to ridicule and discredit him.

- **False Accusation of Dishonesty in Evidence:** Defendants concluded their invective by asserting that Plaintiff's entire complaint *"is completely unsupported and even discredited by [his] own exhibits."* (NYSDHR Response, p. 2, lines 123–124). In other words, they told the NYSDHR that not only is Plaintiff's case baseless, but that his own evidence proves it to be baseless. This statement is patently false. Plaintiff's evidence in fact corroborates his claims. Defendants' characterization is a malicious misrepresentation designed to ensure Plaintiff's complaint would be dismissed and that Plaintiff himself would be viewed as a liar.

18. The foregoing statements from the NYSDHR Response are **false** in substance and were known to be false by Defendants (or made with reckless disregard for the truth). Defendants had access to Yeshiva's internal records and knew, or should have known,

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

that Plaintiff's complaints were not "utterly without merit." They knew Plaintiff had genuine medical issues and conflicts not of his own making, contrary to the portrayal of him as an exaggerator and constant victim. They knew that Plaintiff's allegations (including the incident involving Ms. Lopez and Dr. Levy on March 25, 2024) were not "wildly" fictitious; indeed, Plaintiff had reported that incident immediately and it was corroborated in part by circumstances. Nonetheless, Defendants chose to distort the truth and heap scorn on Plaintiff's character.

19. These defamatory statements were published in an official document submitted to a government agency. Defendants Kesselman and Capell intended and expected that the NYSDHR officials reviewing the case would read these remarks. Thus, the statements were **published to third parties** (the NYSDHR, and by extension other individuals involved in the process). The statements are not privileged in any way that would permit the malicious defamation of a complainant. Defendants were not content to simply deny liability; instead they went out of their way to **humiliate and vilify Plaintiff** in a public record. Such extreme false allegations — claiming Plaintiff is essentially a liar, a crank, mentally unwell, and wholly unworthy of belief — constitute defamation **per se** under the law. They impute to Plaintiff serious character defects and dishonesty that would deter others from associating with him academically or professionally.

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

corroborated in part by circumstances. Nonetheless, Defendants chose to distort the truth and heap scorn on Plaintiff's character.

20. These defamatory statements were published in an official document submitted to a government agency. Defendants Kesselman and Capell intended and expected that the NYSDHR officials reviewing the case would read these remarks. Thus, the statements were **published to third parties** (the NYSDHR, and by extension other individuals involved in the process). The statements are not privileged in any way that would permit the malicious defamation of a complainant. Defendants were not content to simply deny liability; instead they went out of their way to **humiliate and vilify Plaintiff** in a public record. Such extreme false allegations — claiming Plaintiff is essentially a liar, a crank, mentally unwell, and wholly unworthy of belief — constitute defamation **per se** under the law. They impute to Plaintiff serious character defects and dishonesty that would deter others from associating with him academically or professionally.

21. The timing and tone of the NYSDHR Response make clear that these statements were also intended as **retaliation**. Plaintiff had dared to file a civil rights complaint, and Defendants responded by attacking him personally. The position statement did not confine itself to legitimate arguments or explanations; it set out to **punish and embarrass** Plaintiff for asserting his rights. This was the first salvo in Defendants' retaliatory campaign.

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

## Plaintiff's Objection and Defendants' April 9, 2025 Response Letter

22. Understandably aggrieved by the defamatory NYSDHR Response, Plaintiff took action. On or about April 1, 2025, Plaintiff sent a letter to Defendants (via email on April 3, 2025) objecting to the false statements made by Kesselman and Capell. In that correspondence, Plaintiff detailed the defamatory nature of Defendants' remarks and the harm they caused. He requested that the attorneys retract the false statements and cease their retaliation, and he warned that he would pursue legal remedies if the defamation continued.

23. Rather than show any contrition or caution, Defendant **Dov Kesselman** answered Plaintiff's letter with open hostility and threats. On April 9, 2025, Kesselman, on Seyfarth letterhead, sent Plaintiff a two-page letter (hereafter the **"April 9, 2025 Letter"**). This response letter flatly denied any wrongdoing, belittled Plaintiff's complaints, and explicitly threatened Plaintiff with severe consequences should he attempt to seek justice in court. In this April 9, 2025 Letter, Kesselman (writing on behalf of himself, Capell, and their firm) made several retaliatory statements and **threats**:

- **General Denial and Dismissal:** Kesselman wrote that Plaintiff's allegations of defamation "are totally without basis in fact or in law." (April 9, 2025 Letter, p. 1, lines 27–29). This blanket denial not only rejects Plaintiff's grievances, it implies that Plaintiff's accusations are frivolous and unfounded. Defendants thus refused to acknowledge any impropriety in their conduct, doubling down on the position that *they did nothing wrong and Plaintiff's concerns are baseless*.

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

- **Claim of Absolute Immunity:** In the letter, Kesselman proceeded to lecture Plaintiff that courts *"routinely reject these kinds of claims because filing a position statement with the NYSDHR is subject to absolute privilege."* (April 9, 2025 Letter, p. 1, lines 35–43). He cited multiple court decisions for the proposition that statements made in NYSDHR proceedings are immune from defamation suits. This legal argument was presented as a **threatening shield**, essentially telling Plaintiff that no matter how false or malicious Defendants' statements were, Plaintiff *could not* hold them liable. Kesselman's message was clear: **"We can defame you with impunity, and you are powerless to do anything about it."** Such an assertion goes beyond a mere legal opinion; it was intended to intimidate Plaintiff from further pursuit of his defamation claims. (Plaintiff notes that this assertion of absolute privilege is not a foregone conclusion under the circumstances, especially given the malice and extraneous nature of Defendants' attacks, but Defendants invoked it to scare Plaintiff.)

- **Personal Attacks and Baseless Accusations (Again):** Rather than tone down the rhetoric, Kesselman's letter continued to malign Plaintiff. He characterized Plaintiff's April 1 letter (in which Plaintiff sought redress) and its requests as nothing more than *"baseless threats"* that are *"frivolous and [in] bad faith."* (April 9, 2025 Letter, p. 2, lines 96–97). In other words, Defendants accused Plaintiff of acting in bad faith and making meritless, malicious threats simply because Plaintiff asserted his legal rights. This is a direct insult to Plaintiff's integrity and an obvious act of retaliation: a victim

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

who complains is painted as a villain. Kesselman's choice of words — "baseless," "frivolous," "bad faith" — are calculated to demean Plaintiff and cast his efforts to protect himself as illegitimate.

- **Accusation of Harassment:** Kesselman went so far as to accuse Plaintiff of *harassing* the Defendants. He stated that Plaintiff's efforts amounted to *"attempts at harassment."* (April 9, 2025 Letter, p. 2, lines 98–99). By this, Kesselman reframed Plaintiff's legitimate pursuit of justice as an improper abuse aimed at them. This is an outrageous role-reversal: the **perpetrators of defamation label the victim as a harasser**. Such a claim has no basis in fact; Plaintiff's communications and legal filings have been warranted and measured. The only "harassment" present is Defendants' relentless attacks on Plaintiff. Kesselman's purpose in accusing Plaintiff of "harassment" is plainly to intimidate — to create a false narrative that Plaintiff is the aggressor, thereby justifying further punitive action against him.

- **Threat of Legal Sanctions and Ruinous Costs:** Most alarming, the April 9, 2025 Letter explicitly threatens Plaintiff with severe financial and legal consequences if he dares to sue or "in any other way continue [his] attempts at harassment." The letter warns that if Plaintiff persists, *"we will seek all costs and fees incurred in responding to any unmeritorious filing and may seek monetary and other sanctions against you."* (April 9, 2025 Letter, p. 2, lines 98–102). This is an unambiguous threat. Defendants essentially told Plaintiff that pursuing his claims would result in them demanding that Plaintiff pay **all of their legal expenses** and also pay additional monetary penalties. The reference to "other sanctions" implies even more punitive measures. The intent was to terrorize Plaintiff into silence by invoking the specter of crushing financial liability. Any

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

reasonable person reading this would feel fear and pressure to abandon their claims. Defendants wielded their superior resources and legal knowledge as a weapon to bully Plaintiff, an individual with far fewer resources.

> The April 9, 2025 Letter, taken as a whole, is a stunning display of retaliation and intimidation. Kesselman sent it **in direct response** to Plaintiff's complaints about defamation; its timing (immediately after Plaintiff's April 1 letter) and content leave no doubt that it was motivated by Plaintiff's protected activity (his filing with NYSDHR and objections to defamation). The letter's purpose was twofold: **to retaliate** (by heaping more insults on Plaintiff and denying his truthfulness) and **to chill** Plaintiff's resolve (by threatening dire consequences if he continues to seek justice). This conduct is unlawful retaliation under any reasonable standard – it is the sort of action **likely to deter a person of ordinary firmness from pursuing his civil rights**.

15. Moreover, the April 9 letter itself contains additional defamatory content. By labeling Plaintiff's claims "frivolous" and in "bad faith," and by accusing him of "harassment," Defendants maligned Plaintiff's character and honesty once again, now in a communication directed to Plaintiff (and also shared with Plaintiff's legal advisors). These statements impugn Plaintiff's reputation as a good-faith complainant and portray him as a vexatious litigator or someone engaged in wrongful conduct. They are false and defamatory per se, as they charge Plaintiff with unethical behavior and dishonesty in the pursuit of his claims.

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

## Kesselman's April 9, 2025 Phone Call to Dr. Gottwald

17. On the same day Kesselman sent the threatening letter, he also took the extraordinary step of personally calling **Dr. Wolfgang Gottwald**, a German attorney who has been advising or assisting Plaintiff. Dr. Gottwald was surprised to receive a call from New York attorney Dov Kesselman on April 9, 2025 (Gottwald is not counsel of record in the U.S. matter, but Kesselman apparently obtained his contact information from prior communications). Following this phone conversation, Dr. Gottwald documented the substance of the call in an email to Plaintiff, time-stamped April 9, 2025 at 16:29 (the **"Gottwald Email"**). The Gottwald Email summarizes Kesselman's admissions and statements during the call, which are telling:

- Kesselman's apparent purpose in calling was to verify Dr. Gottwald's existence and involvement. As Dr. Gottwald wrote, *"mich hat gerade, etwas überraschend, ein Rechtsanwalt Kesselman aus New York angerufen. Offenbar wollte er nur überprüfen, ob es mich überhaupt gibt."* – meaning *"Mr. Kesselman just called me, somewhat unexpectedly, apparently only to check if I actually exist."* (Gottwald Email, p. 1, lines 8–11). This indicates that Kesselman was probing Plaintiff's support system, possibly testing whether Plaintiff truly had legal help or would be intimidated if contacted through a third party.

- During the call, **Kesselman categorically denied Plaintiff's claims**. Dr. Gottwald reports: *"Er lehnt Ihre Zahlungsansprüche vollumfänglich ab. An den Vorwürfen sei nichts dran, sagte er."* (Gottwald Email, p. 1, lines 12–14). In English, this means: "He completely rejects your monetary demands. He said there is nothing to the allegations."

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Kesselman thus reiterated to Dr. Gottwald that Yeshiva (or its counsel) would **never pay** Plaintiff anything and that they believe Plaintiff's underlying allegations are  meritless ("nothing to them"). This mirrors the dismissive tone of the written communications and further demonstrates Defendants' unified stance of total denial and non-accountability.

- Dr. Gottwald challenged Kesselman on how he could be so sure nothing happened, given that Kesselman was not present for the events at issue. Dr. Gottwald states: *"Außerdem habe ich ihn gefragt, woher er denn eigentlich wissen will, was passiert ist oder nicht. Er selber war doch sicher auch nicht dabei."* – "I asked him how he could even know what happened or not. He himself certainly was not there." (Gottwald Email, p. 1, lines 18–20). **Confronted with this reality, Kesselman conceded the point.** The email notes: *"Das musste er einräumen, es änderte aber nichts an seiner Haltung."* (Gottwald Email, p. 1, line 21). Translated: "He had to admit that, but it changed nothing in his stance." In other words, Kesselman **admitted he had no first-hand knowledge** of the incidents (and thus cannot truly know that Plaintiff's claims are false), yet he stubbornly maintained his complete denial of wrongdoing. This is a remarkable admission — it shows that Defendants' blanket denials are not grounded in actual knowledge or investigation, but in a willful refusal to even consider Plaintiff's side of the story. Despite effectively acknowledging that he lacks personal basis to refute Plaintiff's allegations, Kesselman and Yeshiva still refuse to credit anything Plaintiff says.

- Kesselman floated a potential **concession** during the call, but one carefully limited to placate Plaintiff without any accountability from Defendants. Dr. Gottwald writes: *"Die Uni wäre gegebenenfalls bereit, Ihre Entlassung rückgängig zu machen, wenn ich Herrn*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

*Kesselman richtig verstanden habe. Aber Zahlungen werden kategorisch abgelehnt."* (Gottwald Email, p. 1, lines 22–24). This translates to: "The university would possibly be willing to undo your dismissal, if I understood Mr. Kesselman correctly. But payments are categorically refused." This statement indicates that Yeshiva (through Kesselman) suggested they might reinstate Plaintiff as a student (reverse his expulsion) as a way to resolve the dispute, **but** they absolutely would not compensate him financially in any way. The offer to consider reinstatement is telling – it tacitly acknowledges that Yeshiva did, in fact, dismiss Plaintiff (an adverse action) and that they might be inclined to undo that if Plaintiff drops his claims. However, by "categorically" refusing any monetary payment, Defendants show that their primary concern is to avoid any admission of wrongdoing or legal liability. Essentially, they offered Plaintiff *nothing of value that he didn't already have a right to (his student status)*, while insisting that he forego any damages or legal claims. This comes across as a token gesture aimed at persuading Plaintiff to walk away, without making him whole for the damage suffered. Notably, even this minimal olive branch was not extended to Plaintiff directly in writing; it was hinted at verbally to Dr. Gottwald, which suggests Defendants did not want to formally record any offer or admission.

18. The April 9, 2025 phone call to Dr. Gottwald underscores Defendants' retaliatory and manipulative strategy. Kesselman reached out behind Plaintiff's back to a person he thought might influence Plaintiff, attempting to undermine Plaintiff's resolve. The call had no legitimate purpose in the litigation; its purpose was to **isolate Plaintiff and pressure him indirectly**. Kesselman's admissions during the call — that he personally

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

cannot know what happened, yet he will never concede or compensate — reveal an unapologetic mindset of impunity.

19. In sum, from December 2024 through April 2025, Defendants engaged in a continuous pattern of **defamation and retaliation** against Plaintiff. They used official proceedings and communications as vehicles to wage personal attacks on Plaintiff's character, to falsely portray him as a liar and bad actor, and to threaten him with reprisals if he continued to seek justice. This conduct was undertaken willfully and maliciously, with the intent to injure Plaintiff's reputation, cause him emotional distress, and bully him into abandoning his legal rights.

20. As a direct result of Defendants' actions, Plaintiff has suffered significant harm. Plaintiff's personal and professional reputation has been severely damaged by the false statements circulated in the NYSDHR process – these statements, being part of an official record, could surface to tarnish Plaintiff's name in academic or employment background checks, and they have certainly marred Plaintiff's standing with those officials who read them. Plaintiff has experienced intense emotional distress, including humiliation, anxiety, depression, and a deep sense of betrayal and injustice. The deliberate character assassination by Defendants, and the fear instilled by their threats, have exacerbated Plaintiff's pre-existing trauma from the underlying events. Plaintiff also suffered interference with his education and career: Yeshiva's actions (facilitated and justified by Defendants' defamatory narrative) led to his dismissal from the University, loss of student status (impacting his visa and educational trajectory), and derailment of his academic progress. Furthermore, Plaintiff has had to divert time and resources to defend his reputation and pursue this legal action in response to Defendants' wrongful conduct.

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

21. Defendants' egregious conduct was not accidental or negligent – it was a **targeted campaign of retaliation and defamation**. Each Defendant played a role: Yeshiva officials authorized or approved the strategy to "go after" Plaintiff's credibility; Seyfarth as a firm enabled and ratified the malicious tactics of its attorneys; Kesselman and Capell authored the lies and threats. All did so with actual malice toward Plaintiff.

22. Plaintiff now seeks relief from this Court for the wrongs committed against him. He incorporates by reference all preceding paragraphs into each of the causes of action below.

# Count I: Defamation (Libel) – Against All Defendants

23. **Defamatory Statements:** Defendants made and published false statements of fact about Plaintiff, as detailed above. These statements include, without limitation: calling Plaintiff's complaint "utterly without merit" (NYSDHR Response, p. 1, lines 33–34); describing it as a "kitchen sink" complaint (NYSDHR Response, p. 1, lines 24–26); asserting Plaintiff has a "long and sad history" of troubling behavior and a "constant victimhood personality" (NYSDHR Response, p. 1, lines 54–57); accusing Plaintiff of chronically "overexaggerating illnesses" and other misconduct (NYSDHR Response, p. 2, lines 65–69); claiming Plaintiff's allegations are "removed from reality" or "wildly removed from reality" (NYSDHR Response, p. 2, lines 82–84; p. 8, lines 521–523); branding his claims "unsupported" and "discredited" by his own evidence (NYSDHR Response, p. 2, lines 123–124); accusing Plaintiff of making "baseless threats" in "bad faith" (April 9, 2025 Letter, p. 2, lines 96–97); and accusing Plaintiff of "harassment"

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

(April 9, 2025 Letter, p. 2, lines 98–99). Each of these statements is defamatory **per se** insofar as they impugn Plaintiff's honesty, sanity, morality, or competence in a manner injurious to his reputation.

24. **Falsity:** The defamatory statements are false. Plaintiff's discrimination complaint was not without merit or a random "kitchen sink" compilation – it was a serious grievance supported by evidence. Plaintiff does not have a history of concerning behaviors or a pathological victimhood mindset – this was a baseless caricature. Plaintiff has not exaggerated illnesses or conflicts – if anything, he has under-reported the harm he suffered. His allegations are not "removed from reality" – they are grounded in actual events. Far from being discredited by his evidence, his claims are corroborated by evidence (Defendants' claim to the contrary is false). Plaintiff has not engaged in "harassment" or acted in bad faith; to the contrary, he has legitimately sought relief through legal channels. All in all, Defendants' portrayal of Plaintiff was a fabrication.

25. **Publication:** Defendants published the defamatory statements to at least one third party other than Plaintiff. The December 24, 2024 statements were published to the NYSDHR (a state agency) and its staff, and potentially to other persons involved in that proceeding. Those statements may also have been shared within Yeshiva University or elsewhere under the guise of the legal defense. The April 9, 2025 statements (in Kesselman's letter) were published to Plaintiff and also to Plaintiff's advisors (e.g., Dr. Gottwald) who read the letter. Additionally, by their nature, the April 9 letter's threats and accusations were intended to be shared with anyone Plaintiff might consult (indeed, Plaintiff shared it with advisors, and Defendants would have expected that). There is no applicable privilege that immunizes these communications: the NYSDHR Response, while part of an

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

administrative proceeding, was defamatory overreach not strictly related to the subject matter under investigation (including gratuitous personal attacks beyond any qualified privilege). Moreover, Defendants acted with **actual malice**, which defeats any conditional privilege even if one were argued to exist.

26. **Fault (Actual Malice):** Defendants made the defamatory statements with actual malice, or at minimum with negligence as to the truth. Given Plaintiff's status as a private individual and a student, the standard of care required is at least negligence; however, the evidence shows Defendants acted intentionally or recklessly. They either knew the statements were false or recklessly disregarded obvious indications of falsity. For example, Defendants had access to Plaintiff's academic and medical records, which would have disproven the claim that he simply failed out due to his own shortcomings – yet they chose to ignore that and blame him entirely. They knew that labeling someone as having a "victimhood personality" was not a factual report but a smear. They deliberately chose extreme language ("removed from reality," "ridiculous," "constant victimhood," etc.) to maximize the damage to Plaintiff's reputation. The coordinated nature of the defamation (in official filings and follow-up letters) indicates a willful plan to malign Plaintiff. This exceeds mere negligence and demonstrates malice.

27. **Injury:** The defamatory statements have caused Plaintiff significant injury. Plaintiff's reputation in the community, especially the academic and professional community, has been severely harmed. The NYSDHR Response with its false claims could prejudice the state agency (risking an unjust outcome in that proceeding), and if that document or its content is ever disclosed or known to others (potential employers, other schools, etc.), it would cause them to shun or avoid Plaintiff. Even within Yeshiva University, those who

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

read the position statement would view Plaintiff as a problematic individual, effectively poisoning any chance of Plaintiff continuing or returning there (indeed, Yeshiva has refused to reinstate him so far, except as a conditional offer with no compensation). The April 9 letter's contents likewise harm Plaintiff's reputation by branding him as a badfaith litigant or harasser – this could deter attorneys from representing him or supporters from assisting him, out of fear or suspicion that his cause lacks merit. Additionally, Plaintiff has experienced humiliation, extreme stress, and mental anguish from knowing that these vicious falsehoods have been spread about him.

28. **Defendants Liable:** All Defendants are liable for defamation. Kesselman and Capell are directly liable as the individuals who authored and published the statements. Seyfarth Shaw LLP is vicariously liable for the actions of its attorneys committed within the scope of their employment and in furtherance of the firm's representation of Yeshiva. Yeshiva University is vicariously liable for the actions of its agents (the attorneys) and also directly liable because it ratified and adopted the defamatory statements as its official position in the NYSDHR case. It is reasonable to infer Yeshiva's officials reviewed or approved the content of the position statement and authorized the aggressive stance taken by counsel. Thus, Yeshiva itself published and endorsed the defamation. Each Defendant acted in concert with the others, and the defamation was part of a joint effort to discredit Plaintiff.

29. **Damages:** Plaintiff seeks general damages for defamation in an amount to be determined at trial, including compensation for the harm to his reputation, emotional distress, and other actual injuries suffered. Because Defendants acted willfully, maliciously, and with wanton disregard for Plaintiff's rights, Plaintiff also seeks **punitive damages** on this

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

claim to punish Defendants and deter such conduct. (It bears noting that Defendants explicitly attempted to use the notion of punitive financial consequences against Plaintiff; thus it is fitting that they themselves face punitive consequences for their wrongful conduct.)

# Count II: Unlawful Retaliation – Against All Defendants

30. **Protected Activity:** Plaintiff engaged in protected activity under federal and state law by complaining about discrimination and harassment. Specifically, Plaintiff filed an official complaint with the NYSDHR against Yeshiva University (alleging discrimination on the basis of age, disability, national origin, etc., and alleging retaliation for prior complaints). Such activity is protected by laws including the New York State Human Rights Law (NYSHRL) which forbids retaliation against individuals who oppose discrimination or file complaints (see N.Y. Exec. Law § 296(7)), as well as analogous federal statutes (e.g. Title VI, Title IX, ADA and Rehabilitation Act anti-retaliation provisions) to the extent applicable. Plaintiff's April 1, 2025 letter to Defendants complaining of defamation and retaliation was also protected activity, as it was an effort to oppose and remedy unlawful conduct.

31. **Adverse Actions:** Defendants took adverse actions against Plaintiff that would deter a reasonable person from engaging in protected activity. These adverse actions include, inter alia: (a) **Defaming and vilifying Plaintiff in the NYSDHR Response** (as detailed in Count I) – this was done in retaliation for Plaintiff filing the NYSDHR complaint, with the intent to punish Plaintiff and dissuade him (and others) from making such complaints;

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

*Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York*

(b) **Threatening Plaintiff with legal and financial harm in the April 9, 2025 Letter** – explicitly warning that if Plaintiff files a lawsuit or "in any other way" continues to press his claims, Defendants would seek attorneys' fees and sanctions against him (April 9, 2025 Letter, p. 2, lines 98–102); (c) **Insulting and undermining Plaintiff's credibility and motives** in that same letter – accusing him of bad-faith "baseless threats" and "harassment" (April 9, 2025 Letter, p. 2, lines 96–99) solely because he asserted his rights; and (d) **Surreptitiously contacting Plaintiff's advisor (Dr. Gottwald) to sow doubt and exert pressure** – Kesselman's April 9, 2025 phone call, where he attempted to verify if Plaintiff had support and made it clear the University might only relent slightly (reinstatement) if Plaintiff dropped any claims for compensation (Gottwald Email, p. 1, lines 22–24). Furthermore, Yeshiva University's ongoing refusal to reinstate Plaintiff or resolve his grievances can be seen as part of the retaliation: even when offering the idea of reinstatement, it was conditional and paired with a refusal of any remediation (essentially a gesture to make Plaintiff whole academically only if he gives up everything else, which is not a genuine remedy but a tactic).

32. **Causal Connection:** The temporal proximity and direct communication make the retaliatory intent unmistakable. The defamatory NYSDHR Response was submitted **in response to** Plaintiff's NYSDHR complaint; indeed, the document itself states it is a position statement addressing Plaintiff's charges. Its content goes far beyond a defense and instead attacks Plaintiff personally, which evidences a retaliatory animus ("shooting the messenger" of the complaint). The April 9, 2025 Letter was sent just days after Plaintiff's letter complaining about the defamation – a direct causal link. In that letter, Kesselman expressly references Plaintiff's letter and then launches into why Plaintiff's

allegations are purportedly meritless and followed by threats if Plaintiff proceeds. The retaliatory motive is essentially confessed by Defendants' own words; they considered Plaintiff's actions a form of "harassment" against them, revealing their mindset that Plaintiff should be punished for challenging them. The phone call to Dr. Gottwald occurred the very same day as the letter, further cementing the pattern of immediate retaliation. There is a clear **but-for** connection: but for Plaintiff's protected activities (filing the complaint, and later insisting on his rights), Defendants would not have engaged in this barrage of character assassination and intimidation. Conversely, once Plaintiff engaged in those protected acts, Defendants reacted with hostility.

33. **Violation of Law:** Defendants' conduct constitutes unlawful retaliation under the NYSHRL (N.Y. Exec. Law § 296(7)), which makes it an unlawful discriminatory practice for any person to retaliate against someone who has filed a complaint or opposed discrimination. It also violates any parallel anti-retaliation provisions that apply (for example, Title VI of the Civil Rights Act prohibits retaliation against individuals who complain of discrimination in programs receiving federal funds; the Americans with Disabilities Act and Section 504 of the Rehabilitation Act similarly prohibit retaliation for protected disability-rights activities). Yeshiva University, as an educational institution, and its agents, are subject to these provisions. Defendants Kesselman and Capell, even as attorneys, are not exempt from liability when they step outside the bounds of legitimate advocacy and engage in their own acts of retaliation and intimidation. Indeed, the law protects individuals from being retaliated against through *any* means, including defamatory statements and legal threats. Defendants' attempt to characterize their actions as legally privileged or protected "advocacy" fails because retaliation is not a protected

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

litigation tactic – it is a separate wrong. The First Amendment or litigation privilege does not shield defamatory or threatening conduct that is motivated by a desire to penalize someone for asserting civil rights.

34. **Injury:** As a result of Defendants' retaliation, Plaintiff has suffered and continues to suffer harm. The retaliatory defamation damaged his reputation and made it more difficult for him to seek redress (indeed, one of the intended effects was to prejudice the NYSDHR against him, which could lead to the dismissal of his discrimination complaint – an outcome that would deny him relief and vindication). The retaliatory threats caused Plaintiff severe emotional distress and fear; he was placed in fear of crippling financial sanctions and further harassment by Defendants, which could dissuade a person from pursuing valid claims. Plaintiff has had to expend additional effort and resources to combat Defendants' retaliatory tactics (such as initiating this lawsuit to hold them accountable). The stress and anxiety from these retaliatory acts have also impacted Plaintiff's health and well-being, compounding the original injury.

35. **Defendants Liable:** All Defendants are liable for retaliation. Yeshiva University is liable because the actions were taken by its authorized agents in response to Plaintiff's protected complaints about Yeshiva's conduct. Under NYSHRL §296(7), not only employers but "any person" can be liable for retaliation; thus Kesselman and Capell are individually liable for their retaliatory acts (drafting and publishing the defamation, sending the threat letter, etc.). Seyfarth Shaw, as their employer, is vicariously liable for the retaliation carried out by its attorneys in the course of representing a client, especially since those acts (though improper) were ostensibly done to serve the client's interests in the litigation. In addition, Seyfarth can be seen as directly facilitating retaliation by

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint
| Case No. [TBD] | U.S. District Court – Southern District of New York

allowing its letterhead and resources to be used to threaten Plaintiff. All Defendants acted in concert or with a common retaliatory purpose, making each jointly and severally liable.

36. **Damages:** Plaintiff seeks damages for retaliation, including compensation for emotional distress, any reputational or economic harm caused by the retaliatory acts, and any other losses attributable to Defendants' retaliation. Retaliation, being an intentional wrongdoing in the civil rights context, also warrants punitive damages to punish and deter. **Punitive damages** are particularly appropriate here, where Defendants' retaliation was willful and egregious – effectively attempting to shut down a civil rights complainant through fear. Plaintiff therefore seeks punitive damages in an amount to be determined (as noted below, Plaintiff specifically demands Fifty-Five Million Dollars in punitive damages in total across his claims, due in large part to the need to deter entities like a major university and a large law firm from engaging in such conduct).

# Count III: Intentional Infliction of Emotional Distress – Against All Defendants

37. **Extreme and Outrageous Conduct:** Defendants' conduct as described above was extreme, outrageous, and utterly intolerable in a civilized society. They did not merely defend themselves against allegations – they embarked on a vicious personal attack campaign. Publishing scandalous and deeply insulting falsehoods about Plaintiff (e.g., implying he is mentally unstable and a chronic liar) in an official proceeding is beyond the bounds of decency. Threatening a former student with financial ruin ("all costs and fees" and "monetary and other sanctions") simply for seeking to enforce his rights is

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

atrocious and coercive. The manner in which Defendants carried out this conduct – with cold, calculated precision, using formal channels (legal filings, attorney correspondence) to lend credibility to their cruelty – makes it even more outrageous. It is hard to imagine a more **deliberate attempt to inflict psychological harm** on a vulnerable individual who was simply trying to remedy past wrongs.

38. **Intent or Reckless Disregard:** Defendants intended to cause Plaintiff severe emotional distress, or at a minimum, acted in reckless disregard of the high probability that their actions would cause such distress. The language used by Defendants was not accidental; it was chosen for its derogatory and extreme character. Defendants knew that by maligning Plaintiff's sanity and honesty, they would deeply upset him. In fact, causing Plaintiff emotional pain was part of the retribution. Likewise, Defendants knew that threatening an individual with severe penalties would naturally cause fear, anxiety, and distress – that was the very point of the threat. Kesselman's letter and actions were calculated to "send a message" to Plaintiff that pursuing this matter would be personally devastating. Even if one could argue Defendants' primary goal was to protect their client or themselves, they clearly *accepted* and *intended* the collateral damage of traumatizing Plaintiff as a means to their end. At the very least, any reasonable person in Defendants' position would recognize that telling someone that his family could be killed anywhere (as Plaintiff alleged was said by Yeshiva staff and which Defendants then mocked as delusional), or telling someone "we will destroy you financially if you continue," is almost guaranteed to cause severe distress. Defendants proceeded regardless.

39. **Severe Emotional Distress:** Plaintiff has in fact suffered severe emotional distress as a result of Defendants' outrageous conduct. Plaintiff's distress is evidenced by, among

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

other things, his psychological anguish, sleeplessness, loss of appetite, persistent feelings of humiliation and fear, and exacerbation of prior trauma symptoms (Plaintiff had already been dealing with trauma from an earlier assault and academic pressure; Defendants' actions poured salt in those wounds). Plaintiff felt deeply degraded and helpless after reading the false narrative about himself in the NYSDHR Response – it is extremely traumatizing to see one's character assassinated in an official forum. The April 9, 2025 Letter induced panic and despair; Plaintiff genuinely feared that if he dared to file a lawsuit, he could face debilitating financial sanctions or other retaliation, as threatened. The combined effect of being vilified and threatened by powerful figures (a prestigious university and a large law firm) left Plaintiff feeling isolated, publicly shamed, and terrified of exercising his rights. Plaintiff's distress was so severe that it required him to seek additional counseling/therapy to cope. It has also impacted his daily functioning and his outlook on life, causing depression and a sense of injustice that is overwhelming. These are not trivial or fleeting emotions; they are profound and lasting harms directly caused by Defendants' conduct.

40. **Causation and Liability:** Defendants' actions were the direct and proximate cause of Plaintiff's emotional distress. But for the defamatory and threatening campaign orchestrated by Defendants, Plaintiff would not have suffered this level of psychological harm. Each Defendant is jointly and severally liable for IIED. Kesselman and Capell, as the individual actors who penned the words and delivered the threats, are obviously liable. Yeshiva University is liable because it sanctioned or allowed this misconduct (and the misconduct was committed in an effort to protect the university from Plaintiff's complaint – thus it was done in the interest of Yeshiva and with at least tacit approval). It

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

is outrageous for a university to treat one of its former students in this manner; Yeshiva cannot wash its hands of what its agents did on its behalf. Seyfarth Shaw LLP is liable as well, as it enabled its attorneys to engage in these tactics and is responsible for their actions taken in the course of representation. Notably, the use of Seyfarth's official letterhead and representation of Yeshiva throughout means the firm and the client were effectively acting as one – both the firm and the client benefited from intimidating Plaintiff. Accordingly, all Defendants should answer for the emotional distress inflicted.

41. **Damages:** Plaintiff seeks damages for the severe emotional distress inflicted by Defendants. This includes compensation for pain and suffering, mental anguish, and the cost of therapy or medical treatment required to address the distress. Given the willful and malicious nature of Defendants' conduct, Plaintiff also seeks punitive damages under this count. The extreme recklessness and spite exhibited by Defendants justify an award of punitive damages to punish this behavior and deter others from similar abuse of power.

# Count IV: Tortious Interference – Against All Defendants

42. **Existing and Prospective Relationships:** Plaintiff had both an existing contractual or economic relationship and prospective business/educational opportunities that have been interfered with by Defendants. At the time of Defendants' actions, Plaintiff was in a contractual relationship with Yeshiva University as a student (a relationship that includes rights and expectations under the university's policies and the law). Plaintiff also had a valid expectation of continuing his education and, upon completion, leveraging his degree for career opportunities in his field. Additionally, Plaintiff had an F-1 student visa status

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

reliant on his enrollment, and a reasonable expectation of maintaining that status through the completion of his studies. Beyond the university context, Plaintiff's personal and professional relationships (such as potential future employers, other academic institutions for transfer or further studies, and professional networks) constitute prospective advantageous relationships, all of which depend on his reputation and good standing.

43. **Defendants' Knowledge:** Defendants knew of Plaintiff's relationships and expectancies. Yeshiva obviously knew Plaintiff was a student (and in fact had dismissed him, which was one of the issues in dispute). Kesselman and Capell, through representing Yeshiva, were fully aware that Plaintiff's student status and academic future were at stake. They referenced Plaintiff's dismissal and academic record in their position statement, showing knowledge of the situation. They also were aware that Plaintiff was seeking to vindicate his rights likely in order to either be reinstated or to recover damages that would, among other things, compensate for the derailment of his education and career. Therefore, Defendants understood that Plaintiff had a stake in his educational and professional future that could be impacted by their actions.

44. **Intentional Interference by Improper Means:** Defendants intentionally interfered with Plaintiff's relationships and opportunities by wrongful means – namely, by defamation, retaliation, and other unlawful acts. The defamatory NYSDHR Response was a significant factor in cementing Plaintiff's dismissal from Yeshiva and destroying any chance of internal remedy; it painted Plaintiff as someone not worthy of being a student, thereby justifying the university's decision to terminate his enrollment. It also likely poisoned the well for any appeal or reconsideration within Yeshiva, thus interfering with Plaintiff's contractual relationship (his right to continued education absent legitimate

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

grounds for dismissal). The hostile and untruthful narrative propagated by Defendants would also discourage any other institution from admitting Plaintiff (if Yeshiva's official stance is that Plaintiff has a history of misconduct and false claims, another school would be very wary of accepting him as a transfer student or graduate applicant). This harms Plaintiff's prospective educational opportunities. Furthermore, Defendants' April 9, 2025 Letter threatened Plaintiff when he contemplated legal action; this can be seen as interference with Plaintiff's relationship with the judicial system or his attorneys – essentially attempting to "scare off" legal counsel or Plaintiff himself from pursuing his claims, which is a form of interference with contract (the contract being the attorneyclient relationship or the understood procedural contract that one may seek relief in court). The phone call to Dr. Gottwald can likewise be viewed as an interference in Plaintiff's advisory relationship with Dr. Gottwald, trying to influence an ally of Plaintiff to perhaps advise Plaintiff to drop the matter. All of these acts were **improper means** – defamation and extortionate threats are independently wrongful and not a legitimate form of competition or advocacy. Defendants' motive was not legitimate business competition but rather retaliation and self-protection through wrongful acts.

45. **Interference and Causation:** Defendants' actions had the effect of interfering with and damaging Plaintiff's relationships. Yeshiva University (through the acts of Kesselman and Capell) solidified its stance of not reinstating Plaintiff and treating him as persona non grata, thus effectively terminating any chance Plaintiff had to resume his studies there in good standing. But for the defamatory portrayal of Plaintiff as a failing, disruptive

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

student, Yeshiva might have been compelled (by truth or fairness) to reinstate or accommodate Plaintiff; instead, armed with Defendants' false narrative, Yeshiva felt justified in its termination of Plaintiff. The interference with Plaintiff's prospective relationship with other schools or employers is evidenced by the fact that any background inquiry to Yeshiva would likely result in those defamatory statements being echoed (since they are part of Yeshiva's official defense record). Thus, Plaintiff's ability to transfer or get a job in his field has been stymied. Additionally, Defendants' threats caused a delay and difficulty in Plaintiff's pursuit of his legal remedies – Plaintiff had to carefully consider the risk of crippling sanctions and this undoubtedly interfered with his timeline and strategy for legal action. In essence, Defendants attempted (and to a degree succeeded) to interfere with Plaintiff's access to legal relief, which if not addressed, would have left Plaintiff without recourse and thus without the ability to potentially restore his academic standing or obtain compensation enabling him to pursue alternate opportunities.

46. **Damages from Interference:** Plaintiff has suffered damages as a result of Defendants' tortious interference. These damages overlap with those previously stated: loss of educational opportunity (the inability to continue and graduate at Yeshiva, which is a lost contractual benefit and lost future income potential), loss of tuition or costs invested that went wasted, loss of visa status which required him to leave the U.S. or otherwise disrupted his life plans, and damage to reputation which has a monetary impact in terms of lost job prospects or the need to rehabilitate his name. Plaintiff also incurred additional expenses in fighting back (legal fees, though as a pro se some of that is in time and effort, but if he retains counsel or had counsel, those are costs incurred as a result of the

interference with his straightforward pursuit of rights). The emotional distress and health impact also have economic consequences (medical bills, etc.). In tortious interference claims, these intangible injuries to career and reputation can be compensated as they directly flow from the interference.

47. **Defendants Liable:** Each Defendant played a role in the interference. While it might seem counterintuitive to include Yeshiva for interference with Plaintiff's relationship with Yeshiva (since a party typically cannot tortiously interfere with its own contract), Yeshiva's liability here can be framed in two ways: (1) Yeshiva, acting through employees outside of normal scope (the attorneys engaging in unlawful means), conspired to interfere with Plaintiff's broader rights and opportunities beyond the immediate contract (for example, interfering with Plaintiff's prospective educational opportunities elsewhere by defaming him in the NYSDHR forum); and (2) the individual Defendants (Kesselman and Capell) and Seyfarth, who are third parties to the educational contract, induced or confirmed Yeshiva's decision to terminate Plaintiff and not reconsider it by providing false information and legal threats – thus, the attorneys and law firm are classic third-party interferers with the contract between student and university. They used wrongful means (lies and intimidation) to ensure that the University would not restore Plaintiff's status or would continue to oppose his readmission and deny his claims. Therefore, Kesselman, Capell, and Seyfarth are directly liable for tortious interference with the student-university relationship and with Plaintiff's future opportunities. Yeshiva can be held liable under a theory of conspiracy or aiding and abetting the tortious conduct of its agents, as it embraced and executed the result of that

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

conduct (the permanent severance of Plaintiff from the University and the tarnishing of his record). All

Defendants worked in concert to achieve the outcome that Plaintiff would be cast out and discredited, which is the very interference alleged.

48. **Damages:** Plaintiff seeks to recover all damages proximately caused by Defendants' tortious interference. This includes economic losses (such as lost earning capacity due to delayed or denied degree completion, lost scholarship or funding opportunities, etc.), restitution for expenses made futile by Defendants' actions (e.g., if Plaintiff paid tuition or expenses for an education that Defendants derailed, or legal expenses to counteract their interference), and damages for reputational harm that affects economic opportunities. Plaintiff also seeks punitive damages on this claim, because Defendants' interference was malicious. They intentionally sabotaged Plaintiff's pursuits through egregious means. Punitive damages are warranted to discourage parties (especially those in positions of power like universities and their lawyers) from abusing legal processes to interfere with individuals' life opportunities.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff **Yisrael Z. Heilmann** respectfully demands judgment in his favor and against **Defendants Yeshiva University, Seyfarth Shaw LLP, Dov Kesselman, and Ian Capell**, jointly and severally, as follows:

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

- Compensatory Damages: An award of compensatory damages in the total amount of $20,000,000 (twenty million U.S. dollars), to compensate Plaintiff for his economic losses, damage to reputation, emotional distress, and other actual injuries suffered due to

Defendants' conduct, with allocation of such amount among Defendants as follows: o

Yeshiva University: $8,000,000 – for the University's direct role in causing Plaintiff's losses (including lost educational opportunities, future earnings impairment, and emotional harm from betrayal and retaliation); o     Seyfarth Shaw LLP: $4,000,000 – for the law firm's role in facilitating and supporting the defamation and retaliation, which significantly harmed Plaintiff's reputation and well-being;

- Dov Kesselman: $4,000,000 – for Defendant Kesselman's personal role in defaming Plaintiff and inflicting emotional distress (holding him accountable in proportion to his prominent part in authoring false statements and engaging in harassing communications);

- Ian Capell: $4,000,000 – for Defendant Capell's personal role in the defamation and retaliation (holding him accountable for assisting in the preparation of the false position statement and related acts);

- Punitive Damages: An award of punitive (exemplary) damages in the total amount of $195,000,000 (one hundred ninety-five million U.S. dollars), to punish Defendants for their willful, malicious, and outrageous conduct and to deter similar conduct in the future, the total sum to be apportioned as the trier of fact sees fit in view of each

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

Defendant's degree of culpability, with the following suggested apportionment reflecting the relative roles:

- Yeshiva University: $100,000,000 – given the University's primary responsibility as the institution that orchestrated and benefited from the retaliatory scheme, and to meaningfully deter an organization of its size and influence from ever engaging in such conduct again;

- Seyfarth Shaw LLP: $50,000,000 – in light of the law firm's gross indifference to the rights of a non-client and the need to enforce standards of professional conduct; a large sum is warranted to get the attention of a global law partnership and discourage it and others from using abusive litigation tactics;

- Dov Kesselman: $25,000,000 – due to Kesselman's egregious personal behavior (including intentional defamation and a transnational intimidation attempt), amounting to willful misconduct that should be roundly condemned; this sum is calibrated to his role and to deter similarly situated individuals (partners in law firms) from such acts;

- Ian Capell: $20,000,000 – due to Capell's willful participation in the defamation and retaliation, to punish him individually and serve as a warning that junior attorneys who engage in malicious conduct at the behest of clients will face severe consequences;

- Injunctive Relief: Appropriate injunctive relief to restore Plaintiff's rights and prevent future harm, including but not limited to: (a) an order requiring Yeshiva University to expunge any record of Plaintiff's dismissal or any disciplinary findings from his transcript or files, and, in its place, reflect that Plaintiff was in good standing or allow

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

an annotation that he withdrew for health reasons, so as to mitigate ongoing reputational damage; (b) an order requiring Yeshiva University to reinstate Plaintiff as a student at his option and on terms that fully accommodate his disabilities (if Plaintiff elects to return to complete his education at YU), or alternatively to cooperate in good faith to assist with his transfer to another institution (for example, by providing a letter of explanation or recommendation that counters the earlier defamatory claims); (c) an injunction prohibiting all Defendants from making or publishing any further defamatory or retaliatory statements about Plaintiff, and requiring removal or retraction of the December 24, 2024 Position Statement from any public or administrative record to the extent possible (or at least issuing a written retraction to the NYSDHR and any others who saw it, clarifying that those statements were false); and (d) an injunction requiring Defendants to refrain from any contact with Plaintiff or his associates outside formal legal proceedings, to prevent further harassment.

- Attorneys' Fees and Costs: An award of Plaintiff's reasonable attorneys' fees and litigation costs incurred in this action, as permitted by law. (Such fees are recoverable, for example, under NYSHRL to a prevailing plaintiff, and under federal civil rights statutes like 42 U.S.C. § 1988 for claims under § 1981 or Title VI. To the extent a contractual or statutory provision allows fee-shifting, or under the court's equitable powers for the egregious bad faith shown by Defendants, Plaintiff seeks full reimbursement of fees and expenses.)

- Pre- and Post-Judgment Interest: An award of pre-judgment interest on all monetary damages awarded (at the statutory rate from the date of injury or as otherwise

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

calculated by the Court) and post-judgment interest at the legal rate from the date of judgment until paid, to fully compensate Plaintiff for the time value of money lost due to Defendants' actions.

- Such Other and Further Relief: Any other relief that the Court deems just, equitable, and proper, including but not limited to declaratory relief pronouncing Defendants' conduct unlawful.

JURY DEMAND: Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

## Basis for Requested Damages

Plaintiff recognizes that the total damages requested ($215 million) are substantial. This amount is neither arbitrary nor punitive beyond reason; rather, it is warranted by the facts of this case and consistent with constitutional and legal standards for damage awards. Plaintiff provides the following justification for the requested damages, to assist the Court and jury in understanding why such relief is appropriate:

I.   Ratio of Punitive to Compensatory Damages: The punitive damages sought (totaling

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

$195 million) represent a 9.75:1 ratio relative to compensatory damages ($20 million). This ratio falls within the single-digit range that the U.S. Supreme Court has indicated will generally satisfy due process . In State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003), the Supreme Court observed that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process" . Here, the ratio is just under 10:1. While the Court in State Farm also noted that when compensatory damages are substantial, a lesser ratio (potentially 1:1) might be the constitutional limit , that principle applies to cases where the compensatory award has fully addressed the plaintiff's harm, including emotional distress. In the case at bar, although $20 million is significant, it is intended to compensate not only economic loss but also profound intangible harms (reputation, mental anguish, loss of life opportunities) that are difficult to monetize. Thus, a higher-than-1:1 punitive ratio is justified because (a) much of Plaintiff's injury is non-economic and hard to quantify precisely (making punitive damages a vital tool to account for egregious conduct) , and (b) Defendants' conduct was particularly egregious and reprehensible, as detailed below, warranting a punitive award at the upper end of the single-digit range to achieve deterrence.

II.  Reprehensibility of Defendants' Conduct: Reprehensibility is "the most important indicium" of the propriety of a punitive award. The Supreme Court in State Farm and BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), outlined factors for reprehensibility: whether the harm caused was physical or merely economic; whether the conduct showed indifference to or reckless disregard for health or safety; whether the target of the conduct had financial vulnerability; whether the conduct was repeated

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

or isolated; and whether the harm was the result of intentional malice or mere accident

.

Here, virtually all factors point to extreme reprehensibility: ○      Plaintiff's harm began with a physical assault and continued with severe emotional and psychological harm inflicted by Defendants. This is not a pure economic tort; it involves personal safety and well-being. In State Farm, the Court

found the absence of physical harm a mitigating factor – in contrast, Plaintiff's case squarely involves physical and emotional trauma. ○      Defendants acted with indifference to Plaintiff's health and safety. They ignored his medical conditions, refused counseling, and arguably put him in danger by downplaying threats. Their retaliation showed a gross disregard for the effects on

Plaintiff's mental health, satisfying the indifference to safety factor. ○

Plaintiff was financially and socially vulnerable. He was a young student (essentially dependent on the University's decisions for his education and visa), with limited resources and far from home, suffering a disability. Defendants – a wealthy university and a major law firm – exploited this imbalance. This aligns with greater reprehensibility since they picked on someone who could least afford to fight back. ○

The conduct was not an isolated mistake; it was a pattern of repeated actions over many months, involving multiple actors and decisions. This extended campaign is far more culpable than a one-time lapse. Each instance of defamation or intimidation was a deliberate, separate blow, compounding the wrong. Repetition underscores the need for a strong punitive measure to address the systematic nature of the abuse. ○

Defendants' actions were driven by intentional malice, trickery, and deceit, not by

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*
Page 42 of 50

accident or mere negligence. They fabricated narratives, manipulated processes, and attempted cover-ups. This was intentional wrongdoing of the clearest sort, aimed at inflicting harm on Plaintiff to protect themselves.

Given these factors, Defendants' conduct ranks at the high end of the reprehensibility spectrum. Courts have upheld or imposed higher punitive ratios in cases with extreme facts, especially where vulnerable victims are targeted or defendants engage in cover-ups. The egregiousness here justifies a very substantial punitive award.

III. Comparison to Similar Cases: Recent high-profile verdicts in defamation and retaliation contexts demonstrate that juries and courts find large awards appropriate to vindicate victims and punish wrongdoers in cases of malicious, consequential harm: o        In Freeman v. Giuliani (D.D.C. 2023), a federal jury awarded two election workers a total of $148.1 million in damages against Rudolph Giuliani for defamation and intentional infliction of emotional distress . That award included $75 million in punitive damages and roughly $73 million in compensatory ($33 million for defamation, $40 million for emotional distress) . The Giuliani case, like this one, involved sustained reputational attacks on private individuals (falsely accusing them of misconduct related to elections) that unleashed harassment and wrecked their sense of safety . The jury's message was resounding – deliberate lies that upend lives warrant punitive sanctions in the tens of millions. Plaintiff's case shares similarities: while it may not have the same nationwide notoriety, the personal devastation and malicious lies are parallel. If anything, Defendants here (a university and lawyers) should be held to an equal or higher standard of conduct than a political figure hurling accusations. The Giuliani verdict confirms that a ninefigure

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

judgment is not out of line in defamation cases causing severe personal harm .  o  In Gibson's Bakery v. Oberlin College (Ohio Ct. Common Pleas 2019), a small family bakery was awarded $44 million (later judicially reduced to $25 million due to state caps) against Oberlin College for libel, intentional infliction of emotional distress, and tortious interference . The case arose from the college's involvement in amplifying false accusations of racism against the bakery,

> severely damaging its business. Notably, the jury's initial award included $33 million in punitive damages , reflecting their outrage at the college's conduct. Eventually, Oberlin College paid over $36 million including interest . Our case likewise involves a university siding against an innocent party and leveraging its resources to cause harm via false accusations. The scale of Yeshiva University's endangerment of Plaintiff's future is at least comparable to Oberlin's harm to the bakery (indeed, Plaintiff's personal well-being was at stake, not just business profits). The Gibson's Bakery outcome evidences societal condemnation of defamatory retaliation by educational institutions and supports a multimilliondollar punitive award in the instant case .

> o  Other Analogous Cases: While each case is fact-specific, consider that large institutions have faced large verdicts for cover-up or malicious conduct. For example, cases of workplace retaliation often result in significant punitive damages where malice is shown. The common theme is that when defendants in positions of trust betray that trust in a egregious manner, juries respond accordingly. Here, Plaintiff expects to show the same kind of egregious betrayal and cover-up as seen in some of the largest civil verdicts in recent memory. The

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

requested $215 million, though substantial, is in line with (and even modest compared to) the gravity of harm in cases like the above, once adjusted for the scope of harm.

IV. Defendants' Financial Condition: While details will be provided at trial, it is known that Yeshiva University and Seyfarth Shaw LLP have significant financial resources or insurance coverage. Yeshiva University, as a long-standing university, has substantial assets and an endowment (estimated in the hundreds of millions). Seyfarth Shaw is a global law firm with hundreds of attorneys and considerable revenue. Punitive damages must be large enough to capture the attention of such defendants; an amount that might bankrupt an individual will barely sting a well-heeled institution if too low. The U.S. Supreme Court has noted that wealth alone cannot justify an otherwise unconstitutional punitive award, but wealth is relevant to determine what level of award is necessary to deter and punish. Here, a punitive award totaling $195 million, spread across four defendants, is calibrated to their collective ability to pay and the need for deterrence. For YU and Seyfarth, eight- or nine-figure sums are likely less than a few years' operating budget or a malpractice insurance policy limit – significant but not crushing. Anything less might be shrugged off as a "cost of doing business," which would not achieve the goal of changing behavior. Thus, the requested amount is reasonable in context.

V. Constitutional Considerations: The requested award is consistent with due process. As noted, the ratio is within single digits . The award is grounded in the exceptionally reprehensible conduct and actual harm suffered, aligning with the BMW v. Gore guideposts (reprehensibility, ratio, and comparison to civil penalties – note that defamation and retaliation are torts for which significant penalties can apply, though not

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

easily quantified as a "civil fine"). Moreover, each Defendant's share of punitive damages can be adjusted by the jury, which provides flexibility to ensure fairness. The overall figure of $215 million, while high, is a sum of parts that each serve a specific compensatory or punitive function justified by evidence. Courts have upheld large awards when supported by detailed findings – Plaintiff here has made a point to detail the harm and justify the need for strong medicine.

VI. Public Policy Goals: Awarding $215 million in this case would serve important public interests. It would send a loud message to universities that retaliation against whistleblowers or victims is profoundly unacceptable, even more so when it comes from those expected to nurture and protect students. It would also signal to law firms that zeal for a client does not excuse defamatory or unethical conduct – attorneys are not above accountability. In an era where society is increasingly attentive to institutional abuse (be it universities mishandling assaults or companies silencing complainants), a powerful verdict would reinforce that victims who speak up must be protected, and those who retaliate in such a brazen manner do so at their peril. This case has implications beyond Plaintiff and Defendants; it will be watched as a barometer of how our justice system values the dignity and rights of individuals who stand up to wrongdoing. A $215 million judgment, while compensating Plaintiff, also effectuates the broader goal of deterrence required in cases of intentional civil rights violations. Indeed, as exemplified by the Gibson's Bakery and Freeman v. Giuliani cases, courts and juries are willing to impose large awards to uphold these principles .

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

In conclusion, the requested $215 million (with the suggested breakdown) is reasonable, proportionate, and constitutionally permissible given the unique confluence of factors in this case: egregious conduct, severe harm, need for deterrence, and comparative benchmarks. Plaintiff does not seek windfall profits; he seeks a measure of justice commensurate with what he has lost and what must be done to prevent such abuses in the future. The law entrusts the jury with calibrating damages to fit the wrong. Plaintiff has faith that a full presentation of evidence will firmly support the relief he asks this Court to award.

Plaintiff respectfully prays that the Court and jury, after due proceedings, grant him the relief sought herein and such other relief as is just and proper.

## 3. Injunctive / Equitable Relief:

Appropriate injunctive relief as the Court may deem necessary and just, including but not limited to:

- An order directing Defendants to publicly retract the defamatory statements and issue formal corrections and/or apologies in all forums where the defamatory statements were published, including the NYSDHR;
- An order enjoining Defendants from engaging in further defamatory, harassing, or retaliatory conduct against Plaintiff;

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

- An order requiring **Yeshiva University** to expunge from Plaintiff's academic record any reference to dismissal, academic failure, or disciplinary action based on false or retaliatory grounds, and to permit Plaintiff the option of resuming his studies in good standing, without prejudice.

## 4. Attorneys' Fees and Costs:

An award of Plaintiff's costs of suit and, to the extent permitted by law (including but not limited to N.Y. Exec. Law § 297 and applicable federal statutes), an award of reasonable attorneys' fees, notwithstanding that Plaintiff is currently pro se, with reservation of the right to seek such fees upon the retention of counsel or in future proceedings.

## 5. Pre- and Post-Judgment Interest:

An award of pre-judgment and post-judgment interest at the maximum rate allowed by law, calculated from the date of the injuries or from the filing of this action until the full satisfaction of judgment, to ensure that Plaintiff is made whole.

## 6. Such Other and Further Relief:

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

Granting such additional and further relief as this Court may deem just, proper, and equitable under the circumstances, including any necessary declaratory or ancillary remedies.

## JURY DEMAND, RIGHT TO AMEND, AND NON-WAIVER OF RIGHTS

### RIGHT TO AMEND

Plaintiff expressly reserves the right to amend this Complaint, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to conform to the evidence as it develops through discovery, to correct any technical or factual inaccuracies, and to assert additional claims, legal theories, or causes of action as may become necessary. This includes, without limitation, the right to add or substitute parties or claims that arise out of the same nucleus of operative facts. This reservation is asserted in the interest of justice, judicial economy, and full adjudication on the merits.

### NON-WAIVER OF RIGHTS

Nothing in this Complaint shall be construed as a waiver of any rights, remedies, or legal theories available to Plaintiff under the Constitution, statutes, common law, or international law. Plaintiff explicitly and unconditionally reserves the right to assert any and all claims, whether known or unknown, legal or equitable, arising from the events, facts, conduct, omissions, or retaliatory actions described herein or discovered through ongoing investigation or discovery. This includes—but is not limited to—rights under Title VI, Title IX, 42 U.S.C. § 1981, § 1983, § 1985, the Americans with Disabilities Act, New York Executive Law § 296, and applicable international conventions and human rights frameworks. Furthermore, Plaintiff reserves the right to seek legal, injunctive,

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*
Page 49 of 50

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

compensatory, punitive, or declaratory relief in any forum or jurisdiction, and nothing herein shall be interpreted to limit Plaintiff's pursuit of parallel remedies through civil, regulatory, or criminal proceedings.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right. Plaintiff respectfully invokes this constitutional entitlement with the utmost seriousness, recognizing that a jury of impartial peers is the proper authority to resolve the deeply factual, reputational, and retaliatory harms alleged herein. This demand applies to all claims, including those sounding in tort, statutory violations, and constitutional deprivations, and shall extend to any future amended or supplemental pleadings.

**PLAINTIFF PRO SE STATEMENT:**

Plaintiff, **Yisrael Z. Heilmann**, appears pro se in this action.

Respectfully submitted,

Dated: April 28, 2025

**/s/ Yisrael Z. Heilmann**

**Yisrael Z. Heilmann, Plaintiff Pro Se**

Address: 447 Broadway
         2nd FL 945
         New York, NY, 10013
Email:   yzh2@protonmail.com

*Filed in Good Faith Pursuant to Rule 11(b); Evidence Supporting All Claims Preserved for Production.*
Page 50 of 50

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

# *Exhibit  A*

**Title**: *Seyfarth Shaw LLP Response Letter (April 9, 2025)*

**Description**: This is a formal letter sent by Dov Kesselman of Seyfarth Shaw LLP to Mr. Yisrael Z. Heilmann, dated April 9, 2025. The letter responds to Mr. Heilmann's allegations of defamation and retaliation arising from statements made in a December 24, 2024 NYSDHR position statement. Seyfarth Shaw asserts that all statements made in the NYSDHR proceedings are protected by absolute privilege under New York law and federal case law, citing precedents such as *Sanderson v. Leg Apparel*, *Kamdem-Ouaffo v. Balchem Corp.*, and *Morales v. City of New York*. The letter further claims Mr. Heilmann's retaliation claims under NY Exec. Law § 296(7) lack legal merit and threatens to seek costs and sanctions if litigation proceeds.

 **Seyfarth**

**Seyfarth Shaw LLP**

620 Eighth Avenue

New York, New York 10018

**T** (212) 218-5500

**F** (212) 218-5526


dkesselman@seyfarth.com

T (212) 218-5507


www.seyfarth.com

December 24, 2024


**VIA FEDEX AND EMAIL (InfoUpperManhattan@dhr.ny.gov)**

David E. Powell
Regional Director
New York State Division of Human Rights
Adam Clayton Powell State Office Building
163 West 125th Street, Room 401
New York, NY 10027

**Re:**   *Yisrael Z. Heilmann v. Yeshiva University*, **Case No. 10242105**

Dear Regional Director Powell:

We submit this position statement on behalf of Yeshiva University ("Yeshiva" or the "University") in response to the above-referenced complaint of discrimination (the "Complaint") brought by Yisrael Heilmann ("Mr. Heilmann"), a former student of Yeshiva.  In his "kitchen sink" Complaint, Mr. Heilmann claims he was discriminated against on the basis of any protected class under which he might fall — his age, citizenship or immigration status, disability, and German national origin — and that he was retaliated against for complaining of discrimination, in violation of the New York State Human Rights Law ("NYSHRL").[1]

As set forth more fully below, Mr. Heilmann's Complaint is utterly without merit.  Indeed, as the very documents attached to Mr. Heilmann's Complaint themselves show (and as extensive additional documentation confirms), Yeshiva immediately responded to each of Mr. Heilmann's complaints and accommodated his requests for accommodation at every step, beginning even before Mr. Heilmann started at the University and continued through the very end of his academic career at Yeshiva.  Mr. Heilmann was dismissed from Yeshiva because, despite all of the accommodations given to him, he failed to meet Yeshiva's basic academic requirements as required by Yeshiva's policy of all students, including: (1) his failure to earn a minimum of 12 credits in each semester (he earned only 11 credits for Fall 2023, and 2 credits for Spring 2024); and (2) his failure to maintain the minimum required 2.0 GPA for each semester (he achieved only a 0.47 GPA for the Spring 2024 semester).

Indeed, the instant Complaint is just the latest in a long and sad history of very concerning behaviors and a constant victimhood personality exhibited by Mr. Heilmann throughout his time

---

[1]    Except as expressly admitted in this position statement, Yeshiva University denies each and every allegation set forth in the Complaint.



David E. Powell
December 24, 2024
Page 2

at Yeshiva. Mr. Heilmann has a long and unfortunate history of overexaggerating illnesses, getting into disputes with other students, refusing to pick a major and stick with it, and most recently failing to meet his academic expectations. Despite all of this, Yeshiva did **everything** in its power to put Mr. Heilmann in the best position to graduate. Mr. Heilmann was a regular presence at and subject of Yeshiva's Counseling Center, its Office of Disability Services, its Learning Success Center, its Office of International Services, its Security department, and numerous senior administrators, each of which and all of whom tried valiantly to help Mr. Heilmann succeed academically at Yeshiva. Unfortunately, the extraordinary efforts by Yeshiva did not help, and it appeared almost as if Mr. Heilmann was sabotaging himself.

In any event, Mr. Heilmann's allegations in the Complaint that the University discriminated against him is simply removed from reality. Every time Mr. Heilmann levied a complaint against another student, Yeshiva took the matter seriously, investigated such incident fully, and took action whenever necessary.

This includes the Complaint's much-discussed "assault" incident involving fellow student Sapir Amar ("Mr. Amar"). Following the incident, Yeshiva conducted a full investigation, issued a no-contact order preventing Mr. Amar from contacting Mr. Heilmann, and removed Mr. Amar from Yeshiva's dormitories, despite questionable circumstances regarding Mr. Heilmann's allegations. Yeshiva representatives **never** attempted to interfere with any criminal investigation or persuade Mr. Heilmann from bringing any criminal charges, and in fact told him **in writing** that he had every right to do so. In fact, Yeshiva representatives met with Mr. Heilmann on countless occasions, seeking to support him after this incident. Following the incident with Mr. Amar, Mr. Heilmann was granted generous accommodations, allowing him to defer all of his final exams until almost four months later. Despite requesting and agreeing to these accommodations, he never bothered to take the exams even though he was medically cleared to do so.

The simple reality is that Mr. Heilmann was dismissed from Yeshiva because he failed to meet the University's academic requirements despite all of its efforts to help him succeed. Tellingly, the Complaint utters not a word about his failure to meet these requirements. No matter how dramatic Mr. Heilmann tries to describe the incidents that he seemed to constantly become involved in, they are entirely irrelevant to his dismissal.

As set out in more detail below, there is no basis to conclude that Mr. Heilmann's dismissal or treatment was based upon anything other than legitimate, non-discriminatory reasons and Mr. Heilmann's own actions. Because the Complaint is completely unsupported and even discredited by his own exhibits, Yeshiva respectfully requests that this Complaint be dismissed in its entirety with prejudice.[2]

---

[2] This position statement is being provided to the New York State Division of Human Rights ("NYSDHR") on a confidential basis. Yeshiva respectfully requests, therefore, that it be used only for the purpose of the NYSDHR's investigation of the Complaint and that it not be disclosed to any person or entity other than the NYSDHR and its investigators. Yeshiva reserves the right to amend this statement in the event it discovers additional relevant information, or in response to any rebuttal statement made by Mr. Heilmann, disclosure of which is respectfully requested.



David E. Powell
December 24, 2024
Page 3

### FACTUAL BACKGROUND

**I.    <u>BACKGROUND AND YESHIVA'S POLICY AGAINST DISCRIMINATION</u>**

With origins dating back to 1886, Yeshiva is the oldest and most comprehensive educational institution under Jewish auspices in America.  With more than 6,800 students and several colleges and schools providing undergraduate, graduate, professional, and post-doctoral education and training (including law, social work, and psychology), Yeshiva is strongly committed to ensuring that it maintains a comprehensive anti-discrimination policy that prohibits all forms of discrimination, *including discrimination on the basis of age, national origin, disability and citizenship status*. Yeshiva's Non-Discrimination and Anti-Harassment Policy (the "Non-Discrimination Policy"), which is applicable to faculty, employees, and students alike, makes clear that:

> Yeshiva University is committed to maintaining an academic, work and living environment in which all individuals are treated with respect and dignity. Everyone at the University has the right to work and learn in an environment that promotes equal opportunities for all. Thus, this [Non-Discrimination] Policy prohibits discriminatory practices, harassment and sexual misconduct of any kind. Where discrimination, harassment or sexual misconduct has occurred, the University will act promptly to stop it, prevent its recurrence, and discipline and/or take other appropriate action against those responsible.

(Ex. A, at 2.) The Non-Discrimination Policy further defines unlawful discrimination and harassment to include:

> …discrimination or harassment based on race, religion, color, creed, **age, national origin or ancestry**, sex, marital or partnership status, **physical or mental disability**, veteran or disabled veteran status, genetic predisposition/carrier status, sexual orientation, gender identity and expression, **citizenship status (non-citizen or immigration status)**, sexual and other reproductive health decisions (in the case of employees), or any other characteristic protected by any applicable law, ordinance, or regulation.

(*Id.* at 3-4 (emphasis added).)

**II.    <u>MR. HEILMANN'S ACADEMIC EXPERIENCE AT YESHIVA</u>**

    A.    **Yeshiva Accepted Mr. Heilmann's Application for Admission and <u>Immediately Accommodated His Reported Disability.</u>**

Mr. Heilmann's was accepted to Yeshiva University to begin his undergraduate degree in the Fall semester of 2022.  Yeshiva was aware that Mr. Heilmann was a German citizen and would be attending the University on a visa.



Before the semester even began, Mr. Heilmann informed the University that he suffered from attention-deficit disorder ("ADD") and dyslexia and required testing accommodations. (Ex. B.) Abigail Kelsen ("Ms. Kelsen"), who works in Yeshiva's Office of Disability Services, immediately began working with Mr. Heilmann to ensure he received the necessary assistance. After months of communications and follow-ups by Ms. Kelsen requesting Mr. Heilmann to provide the required medical documentation to corroborate his disability, Mr. Heilmann eventually submitted such documentation. Ms. Kelsen immediately processed the documentation and confirmed his accommodations for the Fall 2022 semester. (Ex. C.)

B.     **Mr. Heilmann's Troubling Behavior & Academic
       <u>Struggles Begin Immediately.</u>**

In September 2022, Mr. Heilmann immediately distinguished himself to University staff with his erratic and exaggerated perceptions of reality. For example, in September 2022, Mr. Heilmann suffered from an ear infection, which led him to express exaggerated concerns to the Disability Services office that this routine illness may render him "deaf," (Ex. D, p. 1) notwithstanding his own doctor stating it would "clear up on [its] own in a couple of days." (*Id.*, p. 2.) Nevertheless, Ms. Kelsen met with Mr. Heilmann to discuss his concerns and collaborated with him to figure out any necessary solutions to ensure he met his academic requirements.

In November 2022, Mr. Heilmann filed a formal complaint against a fellow student, Yonatan Werta ("Mr. Werta"), who allegedly sent Mr. Heilmann a series of messages and voice notes containing references to Adolf Hitler and other Nazi ideologies. Mr. Heilmann believed that this was directed toward him because of his German national origin. Further, Mr. Heilmann alleges that Mr. Werta "jokingly claimed he had a gun and that he would be on the news." (NYSDHR Complaint ("Compl.") at p. 1.)

Yeshiva immediately began an investigation into the incident. Upon a thorough investigation into the matter, a no contact order was issued to Mr. Werta, directing him to cease all communications with Mr. Heilmann. Further, Mr. Werta (himself an orthodox Jewish student who clearly did not actually subscribe to Nazi ideologies but did inappropriately and immaturely make unacceptable comments) was promptly disciplined, with further action taken. Mr. Werta apologized and sincerely regretted his actions. Since then, there have been no issues between Mr. Werta and Mr. Heilmann. Indeed, contrary to the Complaint's current suggestion that Yeshiva did not take action, ***Mr. Heilmann himself thanked the University for its "fast response."*** (Ex. E.) Thus, not only was this incident promptly and thoroughly addressed and resolved, but it was also over and done with ***two years before*** Mr. Heilmann's dismissal from the University for his academic failures and is utterly irrelevant to that dismissal.

Following this incident, Mr. Heilmann began to visit the University's Counseling Center regularly, which continued throughout his academic career at Yeshiva. The University's Counseling Center is intended to provide short-term support to students who may be struggling with issues such as mental health. Typically, students meet with a counselor, such as Dr. Yedidya Levy, a few times. After a few visits, students either cease meeting with the Yeshiva counselors or are recommended to visit a private psychologist or therapist. Mr. Heilmann, however, did not visit a mere few times. Mr. Heilmann instead was a frequent visitor, meeting with Dr. Levy regularly for over a year. Once again, realizing that Mr. Heilmann required extra direction and support, Yeshiva went out of its way to make exceptions for Mr. Heilmann and continued to



support him through the Counseling Center despite him having far exceeded the normal limitations on student support through this Center.

In December 2022, Mr. Heilmann notified Dean Fred Sugarman that he was struggling in his calculus class and was at risk of failing.  (Ex. F.)  He claimed that he joined the course late and had "other struggles" this semester.  (*Id.*)  Yeshiva's General Academic Advisor, Ms. Silbermintz, confirmed that Mr. Heilmann had a "major meltdown" during his calculus exam after his harassment complaint against another student (*id.*), but also expressed concern that his risk of failing was likely also caused by the fact that Mr. Heilmann was frequently absent from class, with the reasons being often "unclear," and that he was "unable to manage his time and stay in touch with reality."  (*Id.*)  Nonetheless, the University allowed Mr. Heilmann to drop the course to avoid having a failing grade on his transcript.

### C.      Mr. Heilmann Continues to Struggle Throughout 2023 and Early 2024.

Despite the University's hopes that Mr. Heilmann's drama had passed, he provided them with more issues.  In February 2023, Mr. Heilmann struggled to keep up in his Hebrew class.  Graciously, his professor "worked intensely with Yisrael [Heilmann] on time management, workload and his missed work," adding that "Rachmanus[3] is the only word."  (Ex. G.)  Professor Davis attempted to work with Mr. Heilmann to complete his required assignments and quizzes, and even exempted him from a quiz.  (*Id.*)  Yeshiva staff then met with Mr. Heilmann to put him in the best position to pass his Hebrew class.

These issues were not isolated to this Hebrew class.  In March 2023, Mr. Heilmann was removed from his Finance class due to "unraveling" behavior, leading Yeshiva officials to contemplate whether he needed to drop this class as well.  (Ex. H.)  University officials on an "At Risk" Committee (which convenes to review students with academic issues that place them at risk of failure in order to focus on such students to help them be successful) had developed the sense that, no matter what, Mr. Heilman "seem[ed] to be unraveling," had a "victimhood perception," and felt that "things are not fair, particularly to him."  (*Id.*)  Once again, the University went out of its way to meet with Mr. Heilmann to determine how he could be best accommodated, and to ensure that Dean Fred Sugarman would meet with him to help him succeed.  (*Id.*)

In December 2023, Mr. Heilmann continued to express frustrations with other students.  In his Complaint (Compl., p. 2), Mr. Heilman falsely alleges that it was at this point in December 2023 that Dr. Yedidya Levy (a psychologist with Yeshiva's Counseling Center who met often with Mr. Heilmann – and *not* the University's housing administrator as alleged in the Complaint) told him that he needed to vacate his dorm because of his age (37) and that he was too old to live in University housing.  (*Id.*)  This is simply false and represents yet another example of his inability to "stay in touch with reality," as previously identified.  In fact, based on Dr. Levy's knowledge of Mr. Heilmann and the repeated issues he seemed to have with other students (nearly all of whom were typically college aged 18-21 year olds -- more than 15 years younger than Mr. Heilmann), Dr. Levy merely suggested to Mr. Heilmann that he might consider whether living in a dormitory with students who were far younger than him would be a good idea for himself, and might not be in Mr. Heilmann's best personal interest socially and mentally, but that the choice was his own.

---

[3]      "Rachmanus" is a Yiddish term that means compassion or pity, and as used refers to someone that is in need of real pity.



At no time did Dr. Levy or any University official direct Mr. Heilmann to leave his dormitory, or state that he could not be in the dormitory because of his age, or state that the University would force him to move.  It was merely a light suggestion to help Mr. Heilmann's deteriorating state.  Mr. Heilmann chose not to take that suggestion, and he remained in the dormitory without issue from the University.

Likewise unstated by Mr. Heilmann's Complaint is that throughout this time, Yeshiva also continued to grant him his requested disability accommodations each semester.  (*See* Ex. I.)

**D.    Mr. Heilmann's Complaints to the University Regarding his "Assault" by Mr. Amar and the University's Immediate Investigation.**

On or about March 21, 2024, Mr. Heilmann got into a physical altercation with another student, Mr. Amar.  Although the Complaint alleges that this started because he "found" his computer charger in Mr. Amar's backpack, this is a misstatement of the facts.  On or about March 13, 2024, Mr. Heilmann, based on nothing but his own speculation, assumed that Mr. Amar stole his Apple laptop charger in the University library.  Mr. Heilmann approached Mr. Amar and asked to borrow the charger in question.  Unsuspicious of any ulterior motive, Mr. Amar lent Mr. Heilmann his laptop charger.  Mr. Heilmann then left the area with the charger, leading Mr. Amar to understandably believe that Mr. Heilmann was stealing his charger.  Mr. Heilmann then brought this issue to the security officer nearby and gave the charger to security, leading to a verbal confrontation between the two students.  While Mr. Heilmann alleges that Mr. Amar began harassing and following Mr. Heilman throughout the next week, in reality, Mr. Amar was merely seeking to get his charger back.  Mr. Amar likewise contacted the University regarding this issue, pleading for immediate assistance.  (Ex. J.)  Over the succeeding days, Associate Dean of Students Joe Bednarsh ("Mr. Bednarsh") conducted a thorough investigation, including interviewing both Mr. Heilman and Mr. Amar.  On March 20, 2024, Mr. Bednarsh informed Mr. Amar and Mr. Heilmann, separately, that his investigation concluded that the laptop charger in fact belonged to Mr. Amar and returned the charger to Mr. Amar.  At the same time, because Mr. Bednarsh saw how upset Mr. Heilmann was, he also told Mr. Heilmann that Yeshiva had purchased a new apple laptop charger for him which he could come pick up.  (Ex. K.)

Suspiciously, later that evening of March 20, 2024, at or around 5:07 pm – several hours ***after*** Mr. Bednarsh's investigation concluded that the charger belonged to Mr. Amar – Mr. Heilmann filed a new report against Mr. Amar with Yeshiva Security claiming ***for the first time*** that during their March 13, 2024 interaction (after Mr. Heilmann "borrowed" Mr. Amar's charger), Mr. Amar (a Jewish student from Israel) had flashed a threatening "Bloods" gang sign at him.  (Ex. L.)  Once again, Yeshiva Security duly documented the complaint and investigated it.  *(Id.)*

Hours later, at roughly 1:00 A.M. on March 21, 2024, Mr. Heilmann and Mr. Amar became involved in an altercation at the University's library which Mr. Heilmann describes in his Complaint as the "assault."  Although Mr. Heilmann claims that Mr. Amar poured a water bottle on him, this fact is in dispute, as the Yeshiva University Security Department Incident Report indicates that it was Mr. Heilmann that poured a water bottle on Mr. Amar.  (Ex. M.)  Mr. Amar then allegedly pushed Mr. Heilmann to the ground, where Mr. Heilmann allegedly hit his head.  Mr. Heilmann alleges in his Complaint that Mr. Amar picked up a chair to hit him and continued to kick him while he was on the ground.  (Compl., p. 3.)  Notably, Mr. Heilmann's report to Yeshiva Security did not include a description of this more vicious account.  (*See* Ex. M.)



David E. Powell
December 24, 2024
Page 7

Mr. Heilmann's Complaint bizarrely claims that Yeshiva did not take any action and that Dean of Students Sara Asher ("Dean Asher") repeatedly called him at the hospital and tried to convince Mr. Heilmann not to file a criminal complaint against Mr. Amar. This is yet another example of Mr. Heilmann's report being disconnected from reality, as nothing could be further from the truth. In fact, Yeshiva took swift action to support Mr. Heilmann. Dear Asher called Mr. Heilmann multiple times at the hospital between 3:30 am to 4:00 am in order to ensure that he was getting medical treatment and that he was okay. Dean Asher's notes of her conversation with Mr. Heilmann show that she did exactly what she should have:

> "Spoke to Yisrael [Heilmann] at 4am. **He is worried about university consequences. I told him students are always welcome to call police, it's an important resource.** His language and thoughts was coherent. I told him the hospital isn't so concerned and don't expect to find anything on the scan, I told him he can advocate for himself and ask if scan is necessary. **He appreciated that advice, will talk to the nurse. He otherwise feels well. He spoke with a police at the hospital, he showed him the video where Sapir [Amar] gestured with his hands, what Yisroel understood as a gang sign. The police laughed when watching the video and said he's a clown, not part of a gang. I told [Mr. Heilmann] that the police will contact him again to decide next steps, and he will need to decide what to do. I asked him whether the police at the hospital gave him a resource and he said he has two numbers to call at the police to help him with the follow up. I told him he can continue to use university security as a support and they can help him feel safe.** He said he fell backwards during the incident and bumped his head. He acknowledged that the doctor said it could be worse as he didn't see bleeding. **I offered him an alternative room temporarily but he said he's ok where he is, especially because Sapir isn't there tonight, and his roommate misses him."**

(Ex. N (emphasis added).)

The very next day, March 22, 2024, Yeshiva issued a no-contact order to both Mr. Amar and Mr. Heilmann, which prevented Mr. Amar from interacting with Mr. Heilmann going forward. (Ex. O.) Further, because Mr. Heilmann and Mr. Amar lived in the same dormitory, Mr. Amar was required to leave the dormitory, further eliminating any potential future altercations. And, despite having previously advised Mr. Heilmann verbally that he could file any criminal complaint that he wished, Dean Asher followed up with him in writing, on April 2, 2024, upon learning that he was claiming that she was pressuring him to drop the charges against Mr. Amar. Dean Asher stated in no uncertain terms "[d]ear Yisrael, [i]t has come to my attention that you feel the University is telling you to drop the charges against Sapir. **As I have told you from the beginning, it is up to you whether or not you want to press charges**. If someone at the University has told you otherwise, please let me know." (Ex. P; Compl., p. 49.)

Mr. Heilmann's bizarre characterization of his interaction with Judith Lopez ("Ms. Lopez") and Dr. Levy of Yeshiva's Counseling Center on March 25, 2024, alleging that they "made explicit threats against [his] safety and the safety of [his] loved ones," prevented him from leaving the office for 10-12 minutes, and made "chilling threats, stating that [his] family could be killed anywhere in Germany if [he] did not drop the charges against Sapir Amar," among other things



(*see* Compl., p. 5) is wildly removed from reality. As noted above, Mr. Heilmann routinely visited the Counseling Center throughout his time at Yeshiva. At no point did the University ever mandate Mr. Heilmann to speak with anyone at the Counseling Center. Instead, following the incident with Mr. Amar, Mr. Heilmann visited Dr. Levy and Ms. Lopez on his own to discuss the altercation, where he was angry and emotional. Mr. Heilmann alternated between saying that he could not talk about the assault and attempting to talk about the assault. Dr. Levy and Ms. Lopez attempted to calm Mr. Heilmann down and refocus him, suggesting that Mr. Heilmann focus on his studies, and not let this altercation deter him from getting his degree. Dr. Levy and Ms. Lopez likewise made it clear that whether or not Mr. Heilmann brought criminal charges against Mr. Amar was entirely his decision, though they suggested that he should consider what would be best for his own mental health. Of course, Ms. Lopez never made physical contact with Mr. Heilmann and never, explicitly or implicitly, made any threats against his safety, nor was Mr. Heilmann *ever* confined or locked in an office or prevented from leaving at will. His allegations are not only false; they are ridiculous.

Indeed, Mr. Heilmann emailed Dr. Levy and Ms. Lopez a few days later, on April 1, 2024 saying that he did not wish to continue seeing the Counseling Center, but noting that "**I, hereby, value the time we shared and the experiences we had together; however, I feel it is necessary for me to focus on other aspects of my life at this time** . . . **I want to express my gratitude for your understanding and cooperation in this matter. I wish you all the best in your future endeavors and hope that you find happiness and fulfillment in your journey ahead.**" (Ex. Q (emphasis added).) That is hardly the language of someone writing to people who had made "chilling threats" to his and his family's safety.

Further underscoring the voluntary nature of Mr. Heilmann's interactions with Ms. Lopez and Dr. Levy, Mr. Heilmann *again* visited the Counseling Center on or about April 8, 2024. Here, Mr. Heilmann began screaming in the waiting room, demanding to speak with Dr. Levy in a counseling session, without an appointment. Due to his disruptive and inappropriate behavior, Mr. Heilmann was asked to leave the Counseling Center, with the caveat that if he wants to speak with Dr. Levy going forward, he makes an appointment. Dean Asher was also forced to warn Mr. Heilmann that such conduct was unacceptable and would not be countenanced. (Ex. R.)

### E. Mr. Heilmann is Reasonably Accommodated for His Alleged Injuries But Refuses to Take His Exams.

Shortly after the March 21st incident, on April 1, 2024, Mr. Heilmann contacted Dean Fred Sugarman about his injuries and health impacting his ability to attend classes. Dean Sugarman attempted to help him with various suggestions, including advising him to first speak with his professors, suggesting that he take a medical leave of absence, and then to speak with various Yeshiva resources as to how the University could help him. Mr. Heilmann responded that "I will follow your advice. **Thank you and I appreciate your respectful manners towards me!!**" (Ex. S; Compl., p. 38 (emphasis added).) The next week, on April 8, 2024, Dean Sugarman followed up with Mr. Heilmann and addressed a number of issues, including his request for an accommodation for his injuries, writing "[a]ccommodations due to your injuries. I believe you initially asked for 6-8 weeks of accommodations due to medical appointments and your current health status for classes this term. If you wish to go forward with this request, you do not need to visit our counseling center. **Requests for accommodations are handled through our Office of Disability Services. Information about the process is on their website -- https://www.yu.edu/student-life/resources-and-services/disability-services [yu.edu]. You**



**would need a note from your provider (it could be a Neurologist) regarding your disability and requested accommodations.**" (Ex. T (emphasis added).)  Later that same day, Mr. Heilmann communicated with Assistant Dean Rabbi Yosef Kalinsky, who likewise noted that he needed to get a doctor's note for his accommodation request.  (Ex. U; Compl., p. 43-44.)

Despite being told in early April 2024 that he must submit a doctor's note substantiating his accommodation request, Mr. Heilmann continuously delayed this process, often not answering Ms. Kelsen for weeks at a time.  Finally, on May 9, 2024 -- less than one week before the Spring 2024 final exams period began -- Mr. Heilmann submitted confirmation from his doctor recommending an accommodation of deferring his exams for three months.  (Ex. V.)  Yeshiva promptly reviewed the medical documents and granted Mr. Heilmann this accommodation, allowing him to defer all four of his final exams until on or around September 6, 2024 -- almost four months later.  (Ex. W.)  Mr. Heilmann agreed to such accommodations.

In August 2024, with the deferred exam dates approaching, Yeshiva reminded Mr. Heilmann that his final exams would begin on September 6, 2024.  (Ex. X, p. 2.)  Mr. Heilmann responded then that his "injuries are much more severe and complex" than previously anticipated. (*Id.*)  In an effort to work with Mr. Heilmann, Yeshiva verbally offered him the ability to withdraw from his classes and not take the exams.  Mr. Heilmann did not accept this offer.  (*Id.*)

Over the next month, Yeshiva continued to ask Mr. Heilmann for medical documentation so they can determine what accommodations were necessary.  (Ex. Y.)  Mr. Heilmann continued to claim that he could not take his exams because of his injuries.  However, when Mr. Heilmann finally submitted medical documentation, this was proven to be false.  In fact, Mr. Heilmann's own doctor cleared him to resume all educational activities without limitation, noting that the period of his restriction ended as of August 23, 2024.  (*See* Ex. Z.)  Thus, Mr. Heilmann no longer had any disability, and was able to take his exams.  Yeshiva went out of its way to schedule his exams so that he could remain a student in good standing, but Mr. Heilmann simply failed to cooperate. Indeed, right up to the day before he was scheduled to begin his exams, Yeshiva staff attempted to work with Mr. Heilmann to arrange his exams.  (Ex. Y.)  When he refused to do so, Yeshiva Dean Rebecca Cypess ("Dean Cypess") sought to help him by giving him additional options, even permitting him to withdraw from his classes to avoid failing them (despite that the date to withdraw from classes had long since passed), but he failed to do that either.  (Ex. AA.)

### F.    Mr. Heilmann Is Dismissed from the University Because He Failed to Meet His Academic Requirements.

Following Mr. Heilmann's refusal to accept Yeshiva's accommodations and refusal to take *any* of his final examinations, he failed all of his Spring 2024 academic courses.  On October 1, 2024, Mr. Heilmann was dismissed from Yeshiva based on his failure to comply with the University's policies that all students must earn 12 credits in each semester and that all students must maintain a minimum GPA of 2.0.  (Ex. BB.)  Mr. Heilmann failed to maintain 12 credits for *two consecutive* semesters and his Spring 2024 semester GPA was 0.47.  (*Id.*)

On October 17, 2024, Mr. Heilmann appealed his dismissal from Yeshiva and demanded to be reinstated.  In this correspondence, Mr. Heilmann alleged that Yeshiva's decision was retaliatory in nature.  (Ex. CC.)



On November 4, 2024, after a considerable review of the evidence, the University upheld its decision to dismiss Mr. Heilmann. (*Id.*) Dean Cypess explained Yeshiva's decision in great detail, responding to all of Mr. Heilmann's false and irrelevant allegations. First, Dean Cypess reiterated that Mr. Heilmann was dismissed due to his academic failures. Then, Dean Cypess explained that his discrimination complaints against other students is completely irrelevant to his dismissal. Put simply, Mr. Heilmann's dismissal was the result of his academic failures, completely separate from any alleged altercations with other students, who never acted as an employee or agent of the University.

**LEGAL ARGUMENT**

**I.      MR. HEILMANN'S DISCRIMINATION CLAIMS MUST BE DISMISSED AS A MATTER OF LAW.**

Mr. Heilmann asserts discrimination claims under the NYSHRL, which prohibits discrimination in education on the basis of age, citizenship or immigration status, disability, and national origin. N.Y. Exec. Law § 296(4). Courts analyze claims of discrimination in education under the NYSHRL alongside similar claims under its federal counterparts. *See, e.g.*, *Bhatnagar v. Parsons Sch. of Design at the New Sch.*, 2021 U.S. Dist. LEXIS 107411, at *5 (S.D.N.Y. June 8, 2021) (granting defendant educational institution's motion to dismiss claims of national origin discrimination under Title VI and NYSHRL); *Bahl v. N.Y. Coll. Of Osteopathic Med. Of N.Y. Inst. Of Tech.*, 683 F. Supp. 3d 224, 232 (E.D.N.Y 2023) ("Courts interpret the NYSHRL coextensively" with the Rehabilitation Act and Americans with Disability Act). Even though age is not a protected category under Title VI, courts still analyze NYSHRL age discrimination claims under the Title VI framework. *Minto v. Molloy Univ.*, 715 F. Supp. 3d 422, 431 (E.D.N.Y. 2024). That analysis is "guided by the analysis developed under Title VII," which applies the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Koumantaros v. City Univ. of N.Y.*, 2007 U.S. Dist. LEXIS 19530, at *23 (S.D.N.Y. Mar. 15, 2007); *see also Minto v. Molloy Coll.*, No. 16-CV-276, 2019 U.S. Dist. LEXIS 165670, at *22 (E.D.N.Y. Sep. 26, 2019).

Discrimination may be proven by direct or indirect evidence. *Minto*, 715 F. Supp. 3d at 431. Indirect evidence generally requires proof that the university treated similarly situated comparators outside the plaintiff's protected class more favorably than it treated plaintiff. *Id.*

Under Title VI, in the absence of direct evidence of discriminatory intent, Mr. Heilmann must show: "(1) [he] is a member of a protected class; (2) [he] suffered an adverse action in pursuit of [his] education by [the educational institution]; (3) [he] was treated differently from similarly situated students who are not members of the protected class; and (4) [he] was qualified to continue in [his] educational pursuit." *Koumantaros*, 2007 U.S. Dist. LEXIS 19530, at *24 (dismissing claims of discriminatory dismissal); *see Johnson v. N.Y. Univ.*, 2018 U.S. Dist. LEXIS 140680, at *14 (S.D.N.Y. Aug. 20, 2018); *Williams v. Pace Univ.*, 192 F. Supp. 3d 415, 422 (S.D.N.Y. 2016).

On a disability discrimination claim, Mr. Heilmann must allege that: (1) he is a qualified individual with a disability; (2) Yeshiva is subject to the relevant law; and (3) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by the public entity. *Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015). Under the third prong, an "educational institution may be



found liable if it fails to offer reasonable accommodations for a student's known disability unless the accommodation would impose an undue hardship on the operation of its program, or fundamentally alter the nature of the service, program, or activity." *Carrow v. State Univ. of N.Y. at Potsdam*, 2018 U.S. Dist. LEXIS 197504, at *8 (N.D.N.Y. Nov. 20, 2018) (dismissing disability discrimination claims against an educational institution).

### A.    Mr. Heilmann's Age Discrimination Claim Fails as a Matter of Law.

Put simply, Mr. Heilmann's age discrimination claim must be dismissed because he did not suffer any adverse action and was not treated differently from any other student.[4]

Despite Mr. Heilmann's claim that he was moved from his dormitory because of his age, this is simply false.  Mr. Heilmann was never instructed that he must vacate his dormitory for any reason, let alone his age, by the end of the Spring 2024 semester.  Yeshiva does not, and has never, had any policy that prohibits a student from living in Yeshiva dormitories because of their age.  Mr. Heilmann's allegations to the contrary lack any basis, and like the rest of his bizarre assertions, are simply disconnected from reality.  Indeed, the only comment to him by Dr. Levy -- who was not responsible for the dormitories, but instead was in the Counseling Center -- merely suggested to Mr. Heilmann that he might consider whether living in a dormitory at the age of 34 with other students who were typically 19-21 years old was best for him, given that he was clearly struggling to get along with other students.  Indeed, Yeshiva accepted Mr. Heilmann to the University and into the dormitories when he was nearly 33 years old, further negating any suggestion that his age had anything to do with Yeshiva's decisions.  It is well-settled that a party's prior favorable treatment of a plaintiff rebuts any inference of discrimination on the basis of their protected classification. *See, e.g.*, *Figueroa v. New York Health & Hosp. Corp.*, 500 F. Supp. 2d 224, 236 (S.D.N.Y. 2007) (prior positive actions towards plaintiff undercut any inference of discrimination); *Crawford-Mulley v. Corning Inc.*, 194 F. Supp. 2d 212, 221 (W.D.N.Y. 2002) (allegation of discriminatory animus undercut by earlier favorable actions towards plaintiff), *aff'd*, 2003 U.S. App. LEXIS 739 (2d Cir. Jan. 17, 2003). Thus, because Yeshiva did not take any adverse action against Mr. Heilmann, which is a required element of a NYSHRL discrimination claim, it cannot have discriminated against him at all. *Koumantaros*, 2007 U.S. Dist. LEXIS 19530, at *24.

### B.    Mr. Heilmann's Claim of Discrimination Based on His German National Origin or Immigration Status Fails as A Matter of Law.

Mr. Heilmann's national origin and citizenship discrimination claims fail because he cannot establish the third or fourth elements of his claims.  Put simply, Mr. Heilmann does not allege any differential treatment from American citizen-students, does not put forth any evidence of animus, and was not qualified to continue in his educational pursuit.

Mr. Heilmann cannot show that he was treated differently from similarly situated, American students. *Bhatnagar*, 2021 U.S. Dist. LEXIS 107411, at *9-10 (dismissing national origin claim where plaintiff failed to plausibly allege "a reasonably close resemblance of the facts and

---

[4]    Mr. Heilmann does not claim he was dismissed because of his age, but rather was removed from his dormitory because of his age.  Thus, the relevant adverse action is whether Mr. Heilmann was forced to move, not whether he was wrongfully dismissed from the University.

 **Seyfarth**

circumstances of their case and others similarly situated") (internal quotations omitted). His academic probation and dismissal followed the procedures set forth in the Academic Catalog. Students must take at least 12 credits within a given semester and must maintain a GPA of 2.0. Mr. Heilmann did not maintain 12 credits for two consecutive semesters and his GPA was a lowly 0.47. The fact that Mr. Heilmann could not maintain the basic requirements to remain a student at Yeshiva has nothing to do with his national origin or citizenship, as these conditions are standard practice for all students, including similarly situated, American students.

Nor can Mr. Heilmann provide any evidence of animus toward him because of his German national origin or citizenship. Yeshiva accepted Mr. Heilmann into the University knowing that he was German citizen. In fact, Yeshiva worked with Mr. Heilmann to ensure he met his visa requirements before attending the University. As noted above, a party's prior favorable treatment of a plaintiff rebuts any inference of discrimination on the basis of their protected classification. *See, e.g.*, *Figueroa*, 500 F. Supp. 2d at 236; *Crawford-Mulley*, 194 F. Supp. 2d at 221.

Mr. Heilmann also cannot show that he was qualified to continue in his educational pursuit. Mr. Heilmann displayed consistent acts of unprofessional conduct with Yeshiva faculty and staff over the course of multiple semesters. Mr. Heilmann continuously changed his major, frequently forcing Yeshiva officials to meet with him to help put him on track to graduate. Mr. Heilmann's professors, on multiple occasions, complained about his behavior. (*See, e.g.*, Ex. G.) This continued disregard for his studies culminated in his refusal to take his makeup examinations that would have prevented him from failing his courses.

Mr. Heilmann's disputes with other students are completely irrelevant to his Complaint. Mr. Heilmann, throughout the entire Complaint, never once alleges that the University made any comments or gave him any tangible reason to believe they were treating him differently in these conflicts because of his citizenship or national origin. And, the University immediately acted in response to his complaints to ensure that they were responsibly handled. Put simply, there are no facts to plausibly support a claim of anti-German or anti-immigrant discrimination.

### C.    Mr. Heilmann's Disability Claim of Discrimination Fail as a Matter of Law.

Mr. Heilmann's disability discrimination claim likewise must be dismissed because Yeshiva granted Mr. Heilmann his requested reasonable accommodation due to his disability[5] (as it had granted his prior requests for accommodations throughout his academic career) and dismissed him for legitimate and non-discriminatory reasons.

A university is only required to grant accommodations when they are "plainly reasonable." *Dean*, 804 F.3d at 189 (quoting *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015)). When an accommodation is not reasonable, courts "defer to an academic institution's decision that a particular accommodation is not reasonable when it has 'diligently assessed the available options and then made an academic judgment . . . that to accommodate the student would work a change in the substance of its . . . program, and impose an undue hardship on its academic

---

[5]    Yeshiva notes that Mr. Heilmann was already familiar with the University's accommodation policies, and how to request accommodations. Consistent with Yeshiva policy, Mr. Heilmann submitted testing accommodation requests in multiple previous semesters due to his ADD and dyslexia. Each of these requests were granted.



program.'" *Lipton v. New York Univ. Coll. Of Dentistry*, 865 F. Supp. 2d 403, 409 (S.D.N.Y. 2012) (quoting *Powell v. Nat'l Bd. Of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir. 2004)).  Further, "institutions of higher learning must have the widest range of discretion in making judgments as to the academic performance of students."  *Lipton*, 865 F. Supp. 2d at 409 (internal citations omitted).

After the altercation with Mr. Amar, the University engaged, in good faith, with Mr. Heilmann to offer generous accommodations.  Once Mr. Heilmann finally submitted medical documentation supporting his accommodation request in May 2024, Yeshiva offered a reasonable accommodation by allowing Mr. Heilmann to postpone all of his Spring 2024 final exams by almost four (4) months.  This accommodation was consistent with University policy and allowed Mr. Heilmann to complete his exams without any detriment to his GPA.  However, the University made it abundantly clear in May 2024 (as well as set forth in the Academic Calendar) that the make-up exams were scheduled for September 6, 2024, and the course exams must be completed by September 13, 2024.  Mr. Heilmann acknowledged and agreed to take the exams by the deadline in September.  Mr. Heilmann was not excluded, but rather invited to continue to participate in the University's services and programs.

To the extent that Mr. Heilmann's disability claims arise from the requested accommodations in September 2024, he fails to meet a single prong.  Mr. Heilmann, in September 2024, was no longer an individual with a disability.  Mr. Heilmann's own doctor's note dated September 5, 2024 specifically stated that his restriction lasted only through August 23, 2024, and that he was able to fully resume educational activities without any restrictions.  (Ex. Z.) Despite this doctor's note stating that Mr. Heilmann could take his exams, he informed the University that his alleged injuries forbid him from following through on his reasonable accommodation.  Mr. Heilmann backtracked on the previous accommodation agreement for no legitimate reason and asked for additional accommodations such as a retroactive leave of absence and a proactive leave of absence for the Fall 2024 semester.  However, such requests violate Yeshiva's accommodation policies, and because Mr. Heilmann was on a student visa, Yeshiva was not allowed to grant retroactive leave of absences.  Thus, Mr. Heilmann's last-ditched accommodation requests were not reasonable as there were no further accommodations for the University to grant other than the continued offer to take his make-up exams in September, as previously agreed to.  Because Mr. Heilmann refused to take his exams, thus failing all of his Spring 2024 courses, he was ultimately dismissed from the University for a non-discriminatory reason.

## II.    MR. HEILMANN'S  CLAIM OF RETALIATION FAILS AS A MATTER OF LAW AND MUST LIKEWISE BE DISMISSED.

Mr. Heilmann also asserts a retaliation claim under the NYSHRL, which prohibits retaliation for opposing discrimination in education.  N.Y. Exec. Law § 296.7.  In order to assert a claim of retaliation, Mr. Heilmann must show: (1) he participated in a protected activity; (2) the University knew of the protected activity; (3) he suffered an adverse action in pursuit of his education by the University; and (4) a causal connection between the protected activity and the adverse action.  *See Johnson*, 2018 U.S. Dist. LEXIS 140680, at *14.

Here, Yeshiva provides a well-documented, legitimate and non-discriminatory reason for the adverse actions at issue, so "the burden shifts back to the plaintiff to prove 'that the desire to retaliate was the but-for cause of the challenged employment action.' Although 'but-for' causation does not require a showing that retaliation was an employer's sole motive, showing that retaliation



was 'simply a 'substantial' or 'motivating' factor in the employer's decision' is insufficient to prove a retaliation claim." *Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 340 (S.D.N.Y. 2020) (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015), then quoting *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013)).

Mr. Heilmann cannot connect any discriminatory motive to his dismissal from the University. As clearly outlined in the decision letter, Mr. Heilmann failed to maintain 12 credits and had an 0.47 GPA, which clearly violates the University's policy. Yeshiva, throughout Mr. Heilmann's entire academic career, worked with Mr. Heilmann to support him in his academic pursuit. The University worked with Mr. Heilmann to grant all reasonable accommodations requests and clearly outlined what was required for him to pass his classes. A clear causal connection exists in this case – but it connects to Mr. Heilmann's inability to complete his coursework, and not to any protected activity. Mr. Heilmann simply cannot show that he would not have been dismissed but for his various complaints, when the University has such compelling evidence to support the legitimate, non-discriminatory reasons for his dismissal.

## CONCLUSION

For the foregoing reasons, Mr. Heilmann's Complaint is meritless, and we respectfully request that the NYSDHR find no probable cause and dismiss the Complaint in its entirety.

Respectfully submitted,

SEYFARTH SHAW LLP

Dov Kesselman
Ian Capell

# EXHIBIT A



# NON-DISCRIMINATION AND ANTI-HARASSMENT POLICY & COMPLAINT PROCEDURES

**(including Title IX Sexual Harassment, Sexual Abuse/Assault, Stalking, Domestic Violence, Dating Violence, and Other Sexual Misconduct)**

**Azrieli Graduate School of Jewish Education and Administration -- Benjamin N. Cardozo School of Law -- Bernard Revel Graduate School of Jewish Studies -- Ferkauf Graduate School of Psychology -- The Katz School of Science and Health -- Stern College for Women -- Sy Syms School of Business -- Wurzweiler School of Social Work -- Yeshiva College**

(August 2022)



**NON-DISCRIMINATION AND ANTI-HARASSMENT POLICY
& COMPLAINT PROCEDURES**

**(including Title IX Sexual Harassment, Sexual Abuse/Assault, Stalking, Dating Violence, Domestic
Violence, and Other Sexual Misconduct)**

## I.  POLICY STATEMENT

Yeshiva University is committed to maintaining an academic, work and living environment in which all individuals are treated with respect and dignity.  Everyone at the University has the right to work and learn in an environment that promotes equal opportunities for all. Thus, this Policy prohibits discriminatory practices, harassment and sexual misconduct of any kind. Where discrimination, harassment or sexual misconduct has occurred, the University will act promptly to stop it, prevent its recurrence, and discipline and/or take other appropriate action against those responsible.

Yeshiva University is further guided by the timeless religious values and principles of the Torah and Jewish thought.  In addition to its commitment to serving as the premier orthodox Jewish institution of higher education and secular thought, Yeshiva University is dedicated to advancing the moral and material betterment of society in the service of G-d.  The University's commitment to non-discrimination and anti-harassment is not only in compliance with law, but derives from its religious values and principles.

**Equal Employment Opportunity**

It is the policy of the University to ensure equal employment opportunity without discrimination or harassment on the basis of race, religion, color, creed, age, national origin or ancestry, sex, marital status, physical or mental disability, veteran or disabled veteran status, genetic predisposition/carrier status, sexual orientation, gender identity and expression, citizenship status, sexual and other reproductive health decisions or decision-making, or any other characteristic protected by any applicable law, ordinance or regulation.  The University prohibits and will not tolerate any such discrimination or harassment.  This Policy is one component of the University's commitment to a discrimination-free work environment.

**To Whom Applicable**

This Policy applies to all University faculty, administration (whether supervisors, administrators, senior or otherwise, and managers), athletic personnel, and other staff, whether full-time or part-time (hereinafter collectively, "*University employees*"), non-employees working at the University (such as employees of contracted service providers, volunteers, and interns), applicants for employment, students and visitors, and covers their treatment of each other as well as others with whom they come into contact at the University and/or at University-sponsored and affiliated activities and events.

The University's disciplinary authority may not extend to third parties who are not students or employees of the University; however, a complaint that such a person engaged in a violation of this Policy will be investigated in accordance with this Policy as will a complaint of Other Sexual Misconduct made to the University by a third party if such complaint is connected to the University's educational programs or

activities. At the time of filing a complaint of Title IX Sexual Harassment, a complainant must be participating in, or attempting to participate in, the University's education programs or activities.

The sexual harassment by any employee of the University of any non-employee working at the University is prohibited by this Policy.

With regard to discrimination, harassment, sexual abuse/assault, stalking, dating violence and domestic violence, as herein defined, this Policy supersedes all other procedures and policies set forth in other University documents.

**Where Applicable**

This Policy is intended to protect all aforementioned people and applies to conduct that occurs on University premises and/or at University-sponsored and affiliated activities and events, whether on University premises or at other locations, including, but not limited to, overnight trips, sporting events and practices, study abroad programs, service learning programs, internships and external business meetings, and to all forms/uses of technology by all individuals covered by this Policy.

The prohibition against Title IX Sexual Harassment (see **Section II**) applies to conduct that occurs in the United States in the University's education programs and activities. Education programs and activities include locations, events or circumstances where the University exercised substantial control over both the person accused of misconduct and the context in which the harassment occurred, and also includes any building owned or controlled by a student organization that is officially recognized by the University.

Conduct that occurs outside of the University's education programs and activities or that occurs outside of the United States or at locations, events, or under circumstances where the University does not exercise substantial control over both the person accused of misconduct and the context in which the harassment occurred, although not covered by the Title IX Sexual Harassment policy, may be covered by the University's Other Sexual Misconduct policy (see **Section II**) if the University determines that the behavior, or the continued presence of the accused perpetrator, impairs, obstructs, substantially interferes with or adversely affects the mission, processes or functions of the University. Calls, texts, emails, and social media usage by employees can constitute unlawful workplace harassment, even if they occur away from the workplace premises or not during work hours.

Discrimination, harassment or sexual misconduct in any form (including sexual harassment, sexual abuse/assault, stalking, domestic violence and dating violence) is a violation of this Policy and will be dealt with seriously, promptly and thoroughly. If any of the principles and procedures in this Policy are inconsistent with those contained in another University policy, the principles and procedures in this Policy will control.

## II.    <u>DEFINITIONS</u>

**Unlawful Discrimination or Harassment**

Unlawful Discrimination or Harassment includes discrimination or harassment based on race, religion, color, creed, age, national origin or ancestry, sex, marital or partnership status, physical or mental disability, veteran or disabled veteran status, genetic predisposition/carrier status, sexual orientation, gender identity and expression, citizenship status (non-citizen or immigration status), sexual and other reproductive health decisions or decision-making (in the case of employees), or any other characteristic protected by any applicable law, ordinance, or regulation. Applicable laws that prohibit such discrimination and harassment include, but are not limited to, the following: Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color or national origin; Title VII of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, national origin, sex

4

and religion; New York State Human Rights Law, which prohibits discrimination on the basis of age, race, creed, color, national origin, sexual orientation, sex, domestic violence victim status, arrest record, conviction record, predisposing genetic characteristics, military status, familial status, marital status or disability; Title IX of the Higher Education Act of 1972 ("*Title IX*"), which prohibits discrimination on the basis of sex; and Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability.

This Policy prohibits discrimination against or harassment of any individual based upon that individual's membership in a protected class, regardless of whether it rises to the level of unlawful discrimination or harassment.  In addition, this Policy protects all others listed in "To Whom Applicable" above, even if they are not members of a protected class, such as when one is discriminated against or harassed based on an inaccurate assumption that such person is a member of a protected class.

Examples of conduct that may violate this Policy include the use of epithets, slurs, jokes, stereotyping, or intimidating or hostile acts directed at any individual because of his/her protected class status, as well as the failure to provide equal consideration, acknowledgment or access to educational opportunities to equally qualified individuals.  Harassment does not have to include intent to harm or be directed at a specific target.  Prohibited harassment may involve a single episode or ongoing behavior depending on the severity of the issue.  Further, this Policy forbids not only verbal harassment but also harassment in any medium, including email and electronic social media.

Discrimination and harassment can take many forms.  Prohibited conduct includes, but is not be limited to, behaviors commonly recognized as sexual harassment, sexual abuse/assault, other physical violence, threatening behavior and stalking.  Sexual harassment, including sexual abuse/assault ("*sexual violence*"), is a form of sex discrimination prohibited by Title IX and other laws.  All of these behaviors are prohibited regardless of the relationship or gender of the parties involved, and thus any such harassment that occurs in a dating or domestic relationship is specifically prohibited by this Policy.

Sexual abuse/assault, stalking, domestic violence and dating violence are prohibited by this Policy as well as federal and state laws; anyone found responsible by the University for such conduct will face serious disciplinary sanctions, up to and including suspension or expulsion from the University for students, and termination of University employment for employees.

**Title IX Sexual Harassment**

Sexual Harassment, including sexual abuse/assault, is a form of sex discrimination prohibited by Title IX,  Title VII of the 1964 federal Civil Rights Act, the New York State Human Rights Law, and the New York City Administrative Code.  Sexual harassment is offensive and includes harassment on the basis of sex, sexual orientation, gender identity and the status of being transgender.  Sexual harassment in any form is prohibited and constitutes a violation of this Policy.  The University may be liable for harm to victims of sexual harassment by University employees and others, and harassers may also be individually subject to liability.

Sexual harassment refers to any *unwelcome* or *unwanted* sexual advances, requests for sexual favors, or other verbal, physical, demonstrative, or electronic conduct or communication of a sexual nature, or which is directed at an individual because of that individual's sex, and includes the following:

1.    **Hostile Environment Harassment**

Hostile Environment Harassment is unwelcome sexual conduct that a reasonable person would find so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education programs or activities. Hostile environment harassment can occur even if, in the case of a University employee or non-employee working at the University, the

5

# EXHIBIT B

## Abigail Kelsen

| | |
|---|---|
| **From:** | Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> |
| **Sent:** | Friday, July 22, 2022 1:36 PM |
| **To:** | Abigail Kelsen |
| **Subject:** | Fwd: accommodations at YU |
| **Attachments:** | Medical certificate Yisrael Heilmann Dyslexia and ADHD.pdf; Medical Certificate, hearing loss,Yisrael Heilmann.pdf; Intake Form Yisrael Heilmann.pdf |

Good morning Abigail,

how are you?

Attached is the medical certificate translated by an sworn german-english translator, according to  and the intake form.

Is this document sufficient? It was signed by two specialized doctors.

Please let me know if you have any questions.

Shabbat shalom

Yisrael Heilmann

On Thu, Jun 9, 2022 at 4:14 PM Abigail Kelsen <akelsen@yu.edu> wrote:

Hi Yisrael,


I am glad that we were able to speak yesterday.


All disability related documentation including the form that I sent to you as well as the translated report should be sent to me via this email address please.


Please do not hesitate to reach out with any additional questions or concerns.


Be well,

Abby Kelsen

1

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Wednesday, June 08, 2022 2:23 PM
**To:** Abigail Kelsen <akelsen@yu.edu>
**Subject:** Re: accommodations at YU

Hi Abby,

Thank you so much for helping me and getting in touch with me!

When do I need to hand in the translated document?

I will fill out the form and send it back to you asap.

Thank you so much

Yisrael Heilmann

On Wed, Jun 8, 2022 at 7:51 PM Abigail Kelsen <akelsen@yu.edu> wrote:

Hi Yisrael, I am glad that we were able to speak by phone.

Attached please find the Intake Form that we mentioned over the phone.

I look forward to hearing from you and to meeting you when you get to campus.

Be well,

2

## CERTIFIED TRANSLATION

**Dr med. Can Hisarli**
Specialist for Child and Adolescent Psychology
Specialist for Psychiatry and Psychotherapy

Bahnhofstraße 8
86150 Augsburg

Augsburg, 06.02.2015

[Handwritten: Duplicate]

**Specialist medical certificate to be presented to the school**





| Als vom Präsidenten des Landgerichts München I öffentlich bestellter und beeidigter Übersetzer für die englische Sprache bestätige ich: Vorstehende Übersetzung der mir als pdf. vorgelegten Urkunde ist richtig und vollständig. | In |
|---|---|
| München, den 20.07.22 | Munich, 20.07.22 |

# EXHIBIT C

## Abigail Kelsen

| | |
|---|---|
| **From:** | Abigail Kelsen |
| **Sent:** | Monday, August 01, 2022 2:16 PM |
| **To:** | Yisrael Zephaniah Heilmann [student] |
| **Subject:** | accommodation letter |
| **Attachments:** | Scanned from a Xerox Multifunction Printer.pdf |

Hi Yisrael, I hope that this email finds you well.

Attached please find a copy of your accommodation letter for the Fall 2022 semester.  Each semester that you will be requesting accommodations you will need to obtain an updated letter from Disability Services.

Please share this letter with your professors during the first week of class so that they know you are eligible to receive accommodations.

One week before each exam, you must notify Disability Services of your upcoming exam (date, time, name or professor) so that we can make the necessary arrangements on your behalf re exam administration.

Please do not hesitate to reach out with any questions or concerns.

I look forward to meeting you on campus soon.

Be well,
Abby Kelsen

1

# YESHIVA UNIVERSITY
## Office of Disability Services

**Beren Campus**
215 Lexington Avenue, Suite 520
New York, NY 10016
(646) 592-4132

**Wilf Campus**
500 West 185th Street, Suite 412
New York, NY 10033
(646) 592-4280

## REQUEST FOR ACCOMMODATIONS

### FALL, 2022 SEMESTER

The following student has provided adequate documentation that entitles him/her to reasonable accommodations in compliance with the Americans with Disabilities Act.

**Name:**        **Stephen Heilman**

**University ID:**        **800754574**

As such, please provide this student with the following accommodation(s):

- Time plus half for exams and quizzes
- Testing in a reduced distraction location

Thank you for your cooperation. If you have any questions, please do not hesitate to contact me.

Office of Disability Services
Abigail Y. Kelsen

**\*The information provided to you in this memo is confidential in nature and should not be shared with other staff, students, or personnel. Thank you for your cooperation in this matter.**

# EXHIBIT D

Student Name: _____ School: _____

Telephone: _____ E-mail: _____

**Disability Office - Contact Notes**

| | |
|---|---|
| 9/20/2022 | ear infection |
| | after class → exhausted from medication |
| | Thursday - got sick |
| | attends class, can't hear anything |
| he inquired abt policies re missed ex or doctors appt on day of exam | got worse/better/worse — can get notes from classmates |
| | couldn't do H/w or prepare. |
| I informed him its @ discretion of professor | Professor Silberminty referred him to ODS |
| | completely down [strikethrough] from being sick |
| | concerned abt becoming deaf |
| | Bio — [strikethrough] Rothstein? |
| | English — Silberminty |
| | Scientific Lit - Camara |
| he said he can send doctors note to ODS tonight | math - Stern — exam Thursday |
| | — ear is problematic, last time it took 3 weeks to heal |
| | severe, sudden |
| | homework to be done over 8-9 days → Thursday |
| | Thursday is exam + HW due — instructed him to reach out to prof re situation + inquire if extension is possible |

A Su...a...a...mirez PA
Case 1:25-cv-04277-AT-RWL    Document 1    Filed 05/20/25    Page 81 of 179
Aftercare Dept: 855-624-8963

## Diagnoses and Orders

### 1. Acute right otitis media
H66.91: Otitis media, unspecified, right ear
- A HEALTHY LIFESTYLE: CARE INSTRUCTIONS
- Augmentin ES-600 600 mg-42.9 mg/5 mL oral suspension - Take 10 mL twice a day by oral route for 10 days.    Qty: 200 mL
  Refills: 0    Pharmacy: CVS 17797 IN TARGET
- RAPID SARS COV 2 AG, QL IA, RESPIRATORY SPECIMEN

RAPID SARS COV 2 AG, QL IA, RESPIRATORY SPECIMEN
- Result:
  - Rapid COVID-19 Antigen (Internal Control Positive): **Negative**

## Patient Instructions
Thank you for visiting CityMD. There are two ways to view your lab results: :
   1.  The **My Summit Health** app is available to all patients 18 and older in the App Store and Google Play. First-time app users will need to create an account; please note you'll need to select a login and password for the app versus just using your patient portal login credentials. Your lab results will be posted to the My Summit Health app as soon as they're available.
   2.  Via **email**, as soon as lab results are available. If you don't receive an email within the estimated time frame, give our Aftercare team a call at 855-624-8963.

### Otitis Media (adult)
Your Care Instructions:
An ear infection may start with a cold and affect the middle ear (otitis media). It can hurt a lot. Most ear infections clear up on their own in a couple of days. Most often you will not need antibiotics. This is because many ear infections are caused by a virus. Antibiotics don"t work against a virus. Regular doses of pain medicines are the best way to reduce your fever and help you feel better.
Follow-up care is a key part of your treatment and safety. Be sure to make and go to all appointments, and call your doctor if you are having problems. It"s also a good idea to know your test results and keep a list of the medicines you take.
How can you care for yourself at home?
Take pain medicines exactly as directed.
If the doctor gave you a prescription medicine for pain, take it as prescribed.
If you are not taking a prescription pain medicine, take an over-the-counter medicine, such as acetaminophen (Tylenol), ibuprofen (Advil, Motrin), or naproxen (Aleve). Read and follow all instructions on the label.
Do not take two or more pain medicines at the same time unless the doctor told you to. Many pain medicines have acetaminophen, which is Tylenol. Too much acetaminophen (Tylenol) can be harmful.
Plan to take a full dose of pain reliever before bedtime. Getting enough sleep will help you get better.
Try a warm, moist washcloth on the ear. It may help relieve pain.
If your doctor prescribed antibiotics, take them as directed. Do not stop taking them just because you feel better. You need to take the full course of antibiotics.
When should you call for help?
Call your doctor now or seek immediate medical care if:
You have new or increasing ear pain.
You have new or increasing pus or blood draining from your ear.
You have a fever with a stiff neck or a severe headache.
Watch closely for changes in your health, and be sure to contact your doctor if:
You have new or worse symptoms.
You are not getting better after taking an antibiotic for 2 days.

# EXHIBIT E

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Thursday, December 1, 2022 10:32:45 AM
**To:** Sara Asher <Sara.Asher@yu.edu>

**Subject:** Re: Helping a student

Dear Professor,

Thank you so much for the fast response.

I could come after class around 2:45 pm. Unfortunately, I have a driving lesson from 12 to 1:30 and a class from 1:30 to 2:45.

Thank you

Yisrael Heilmann

On Wed, Nov 30, 2022 at 6:21 PM Sara Asher <Sara.Asher@yu.edu> wrote:
> Dear Yisrael,
> I am glad you reached out to Dr. Nissel. Let's find time to talk tomorrow because this sounds very important to discuss.
> I am available tomorrow 12-3:30 and my office is in Rubin hall, first floor.
> What time can work for you?
> Best,
> Dr. Asher
>
> Dr. Sara Asher
> Interim Dean of Undergraduate Students
> Yeshiva University

# EXHIBIT F

**From:** Fredric M. Sugarman <fred.sugarman@yu.edu>
**Sent:** Thursday, December 22, 2022 5:48 PM
**To:** Norma Silbermintz <silbermi@yu.edu>; Sara Asher <Sara.Asher@yu.edu>
**Cc:** Abigail Kelsen <akelsen@yu.edu>
**Subject:** RE: Urgent question regarding problems in course

Dear All,

Practical matter: I will allow a W grade up until Monday.  Tuesday starts the Final Exam period so this is puts a hard stop to any/all drops.  So …Calc I …I wouldn't advocate a retest for a few reasons:

Instructor would have to prepare a new final – extra work right now is not what the faculty needs
Too late to resolve by Monday

With the practical being written …what do you recommend?  It sounds like the student has many issues which need discussion and a plan but simply staying with Calc I …I will honor whatever you think is correct.  Just let me know.

Longer term …glad to be involved if I can be of help.

Happy Chanukah to you all,
Fred

**From:** Norma Silbermintz <silbermi@yu.edu>
**Sent:** Thursday, December 22, 2022 5:15 PM
**To:** Sara Asher <Sara.Asher@yu.edu>; Fredric M. Sugarman <fred.sugarman@yu.edu>
**Cc:** Abigail Kelsen <akelsen@yu.edu>
**Subject:** Fw: Urgent question regarding problems in course

2

To you and Dr. Asher only, and cc'ing Abby:

Sara, this is the student I wanted to talk to you about.

He's "atypical", to say the least, and he experienced some bona fide harrassment from another YU student a few weeks ago which sent him into a downward spiral. He had a major meltdown during my exam yesterday, and I spoke to Abby about it today—he needs to take his exams in a reduced distraction location, for his sake, but also to forestall disruption to the class. He has been absent a lot, but his reasons are not always clear to me, and he's inconsistent in his explanations.

As far as I know, he was doing okay in Calc, so I assume that he had another meltdown during the exam.

If it is reasonable to ask the professor to allow him to retake his exam for a low passing grade (C-), that would be great, and I guess, also to consider a W.

More importantly, we need to address whether or not YU is the right place for him. He's 32, from Germany, and from what I see, unable to manage his time and stay in touch with reality. I've recommended multiple times that he meet with Lainee, but he never connected.

On the plus side, his English is decent, he has some transfer credits from Machon Lev (which he has not yet transferred) and identifies as observant. He considers himself close with Beny Rofeh, so any larger discussions should include Beny.

Thanks,
Norma


--
**Professor Norma Silbermintz**
**Academic Advising**
*Coordinator of Academic Affairs*
*for International Students*

500 WEST 185TH STREET FURST HALL 509 - NEW YORK, NY 10033
Silbermi@yu.edu
Zoom conferences by appointment:

https://us02web.zoom.us/j/3048111752


**From:** Fredric M. Sugarman <fred.sugarman@yu.edu>
**Sent:** Thursday, December 22, 2022 4:09 PM
**To:** Yisrael Zephaniah Heilmann [student] <yheilman@mail.yu.edu>
**Subject:** RE: Urgent question regarding problems in course

Apologies not needed.

I will get back to you. Please don't worry too much.

Fred

3

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Thursday, December 22, 2022 4:01 PM
**To:** Fredric M. Sugarman <fred.sugarman@yu.edu>
**Subject:** Re: Urgent question regarding problems in course

Yes, for sure. My ID800754574.

There were a lot of things going on this semester. I think when I explain it to you then you will understand. it a lot and not so easy to explain it by email. I tried my best until now, but the best would be to retake the course next semester.

By the way, I really apologize; I wrote in the previous email your first name. Please take my apologies, I wrote the email quite fast and exchanged the names.

Regards

Yisrael Heilmann

On Thu, Dec 22, 2022 at 3:47 PM Fredric M. Sugarman <fred.sugarman@yu.edu> wrote:

One last question: Your ID#?

I will get back to you.

Fred

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Thursday, December 22, 2022 3:42 PM
**To:** Fredric M. Sugarman <fred.sugarman@yu.edu>
**Subject:** Re: Urgent question regarding problems in course

Shalom Professor,

What is the class? Calculus
The problem is that I wanted to know what my options were because I did not get so well in the class and probably have a big risk of failing it. I unfortunately joined to course late in the semester and was sick, were I missed a lot of material I could not make up.

What are my option? Is there a chance to speak to you in person?

Regards

Yisrael Heilmann

On Thu, Dec 22, 2022 at 3:35 PM Fredric M. Sugarman <fred.sugarman@yu.edu> wrote:

Dear Yisrael,

Thanks for the email. Questions:

What is the class?
What is the problem?

4

Let me know and we can meet if needed.

Shabbat shalom,
Fred

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Thursday, December 22, 2022 3:27 PM
**To:** Fredric M. Sugarman <fred.sugarman@yu.edu>
**Cc:** Sara Asher <Sara.Asher@yu.edu>
**Subject:** Re: Urgent question regarding problems in course

Shalom Professor. Sugarman,

How are you?  I am Yisrael, a first-year YC student. Professor Asher gave me your Email. I should reach out to you asap because of problems in one course I take.

When is it possible to have a meeting?

Regards,

Yisrael Heilmann

# EXHIBIT G

## Abigail Kelsen

| | |
|---|---|
| **From:** | Abigail Kelsen |
| **Sent:** | Thursday, February 23, 2023 9:35 AM |
| **To:** | Sigalit Davis |
| **Cc:** | Zafrira Lidovsky-Cohen; Osnat Bishko |
| **Subject:** | RE: [EXT] - Hebrew online exam |

Sigalit, to you and the Hebrew program – thank you.

If you don't mind following up with Yisrael directly, I think it will help to streamline the process.

Again, many thanks!

Best,
Abby

**From:** Sigalit Davis <sigalit.davis@yu.edu>
**Sent:** Wednesday, February 22, 2023 4:50 PM
**To:** Abigail Kelsen <akelsen@yu.edu>
**Cc:** Zafrira Lidovsky-Cohen <lidovsky@yu.edu>; Osnat Bishko <bishko@yu.edu>
**Subject:** Re: [EXT] - Hebrew online exam

Hi Abby,

All set. As per my instructions from the head of the Hebrew program and protocol of the Hebrew department: I will schedule time for Yisrael to take the quiz and open the final U2 assignment for him for 24hrs to submit his work. Happy to coordinate time with him directly.

I will also exempt him for now from U1 final quiz and assignments with the understanding that he has to submit future assignments and quizzes on time, otherwise that "excuse" will turn into a "0".

I hope these accommodations are agreeable,
Please let me know of you'd like to notify Yisrael or shall I.
Thank you,
Best wishes,

Sigalit

Sent from my iPhone

On Feb 22, 2023, at 2:18 PM, Abigail Kelsen <akelsen@yu.edu> wrote:

Hi Sigalit, thank you for your email and for your assistance with this situation. I appreciate the collaboration!

1

Usually, if students want to use noise cancelling ear-phones at an exam, they bring them themselves. I doubt that the library has them to lend to students, but I honestly don't know.

Please let me know what I can do to help...I look forward to hearing from you.

Many thanks!

Best,
Abby

**From:** Sigalit Davis <sigalit.davis@yu.edu>
**Sent:** Wednesday, February 22, 2023 2:13 PM
**To:** Abigail Kelsen <akelsen@yu.edu>
**Subject:** Re: [EXT] - Hebrew online exam

Dear Abby

I appreciate your help on this matter.

I too worked intensely with Yisrael on time management, work-load, and his missed work. Rachmanus is the only word.

I will ask my Supervisor to allow him to take the last U2 Quiz and submit in real-time ( on zoom with me there,) his Unit 2 final assignment ( writing and recording.) - I do not know that it is fair to do all 3 exams but will definitely pass along the request. Okay?

I wonder, if I may ask- Does the library/IT have noise cancelling ear-phones he can borrow? - research supports that students w/ADHD profile using those successfully. Some benefit from using "white noise" as well.
Thank you again, Abby,
Will keep you informed,
Have a great day,

Sigalit

Sigalit Davis
Heb2@YU
Sent from my iPhone


On Feb 22, 2023, at 1:27 PM, Abigail Kelsen <akelsen@yu.edu> wrote:


Hi Sigalit, I hope that all is well.

Yisrael shared the message below with me. As you wrote, it is his responsibility to find a quiet location for the online exams. He and I spoke about different quiet options on campus that he might be able to utilize.

2

I also encouraged him to test earlier in the week, rather than waiting until shortly before the exam closes.

He mentioned that he missed the exam on 3 modules – (too much noise in the dorm…didn't know he could test elsewhere…was afraid that the noise would flag his exam for Integrity concerns…logged on late etc.).  I am not sure if there is additional information that I am missing – but is it possible for him to take the exams for those missed modules?

I look forward to hearing from you.

Thank you in advance,
Abby Kelsen


**From:** yisraelheilmann@gmail.com <yisraelheilmann@gmail.com>
**Sent:** Wednesday, February 22, 2023 12:53 PM
**To:** Abigail Kelsen <akelsen@yu.edu>
**Subject:** [EXT] - Hebrew online exam

**External Email**

Attach the email

Sent from my iPhone
<image0.png>

3

# EXHIBIT H

3/15/2023
Student At-Risk meeting

Heilman, Yisrael
Finance prof kicked him out of class due to behavior concerns
He needs to drop his Finance class
As per Lainee (and prior conversation with Norma) – he seems to be unraveling
victimhood perception -feels that things are not fair, particularly to him
Fred to meet with him

# EXHIBIT I

# YESHIVA UNIVERSITY
## Office of Disability Services

**Beren Campus**
215 Lexington Avenue, Suite 520
New York, NY 10016
(646) 592-4132

**Wilf Campus**
500 West 185th Street, Suite 412
New York, NY 10033
(646) 592-4280

### REQUEST FOR ACCOMMODATIONS

FALL, 2022 SEMESTER

The following student has provided adequate documentation that entitles him/her to reasonable accommodations in compliance with the Americans with Disabilities Act.

**Name:        Stephen Heilman**

**University ID:        800754574**

As such, please provide this student with the following accommodation(s):

- Time plus half for exams and quizzes
- Testing in a reduced distraction location

Thank you for your cooperation. If you have any questions, please do not hesitate to contact me.

*Abigail Kelsen*

Office of Disability Services
Abigail Y. Kelsen

**\*The information provided to you in this memo is confidential in nature and should not be shared with other staff, students, or personnel. Thank you for your cooperation in this matter.**

# YESHIVA UNIVERSITY
## Office of Disability Services

**Beren Campus**
215 Lexington Avenue, Suite 505
New York, NY 10016
(646) 592-4132

**Wilf Campus**
500 West 185th Street Suite 412
New York, NY 10033
(646) 592-4280

### REQUEST FOR ACCOMMODATIONS

#### Summer, 2023

The following student has provided adequate documentation that entitles him/her to reasonable accommodations in compliance with the Americans with Disabilities Act.

**Name:  Yisrael Heilman**

**ID:    800754574**

As such, please provide this student with the following accommodation(s):

- Time plus half for exams, quizzes, and in-class written assignments

Thank you for your cooperation. If you have any questions, please do not hesitate to contact me.

*Abigail Kelsen*

Abigail Kelsen, LMSW, LCSW
Assistant Director, Office of Disability Services

# YESHIVA UNIVERSITY
## Office of Disability Services

**Beren Campus**
215 Lexington Avenue, Suite 505
New York, NY 10016
(646) 592-4132

**Wilf Campus**
500 West 185th Street Suite 412
New York, NY 10033
(646) 592-4280

## REQUEST FOR ACCOMMODATIONS

### FALL, 2023

The following student has provided adequate documentation that entitles him/her to reasonable accommodations in compliance with the Americans with Disabilities Act.

**Name:  Yisrael Heilman**

**ID:    800754574**

As such, please provide this student with the following accommodation(s):

- Time plus half for exams, quizzes, and in-class written assignments
- Testing in a reduced distraction location

Thank you for your cooperation. If you have any questions, please do not hesitate to contact me.

*Abigail Kelsen*

Abigail Kelsen, LMSW, LCSW
Assistant Director, Office of Disability Services

**\*The information provided to you in this memo is confidential in nature and should not be shared with other staff, students, or personnel. Thank you for your cooperation in this matter.**

 Outlook

---

## Re: Accommodations for finals Spring 2023

**From** Abigail Kelsen <akelsen@yu.edu>

**Date** Mon 1/22/2024 5:55 PM

**To** Yisrael Zephaniah Heilmann [student] <yheilman@mail.yu.edu>

**Cc** Eric Crispin <eric.crispin@yu.edu>

Hi,

Testing in a reduced distraction was included as an approved accommodation on your Spring 2024 accommodation letter.

If you wish to utilize this accommodation, you need to notify Eric one week prior to an exam/quiz and provide him with the following information:

Name of Professor
Name of Course
Date and Time of Exam or Quiz

There will be a different form for requesting this accommodation for finals - which will be emailed to students later in the semester.

Please let me know if you have any questions.

Best,
Abby

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Monday, January 22, 2024 5:08 PM
**To:** Abigail Kelsen <akelsen@yu.edu>
**Cc:** Eric Crispin <eric.crispin@yu.edu>
**Subject:** Accommodations for finals Spring 2023

Shalom Abigail, hola Eric

how are you?

I, hereby, request a noise reduced location for all midterms, quizzes and the final for the Bio lecture course this semester.

I ask you to confirm that I do all midterms, quizzes and the final of the Bio lecture at your office.

Thank you,

Sincerely,

# EXHIBIT J

**From:** Joe Bednarsh <joe.bednarsh@yu.edu>
**Sent:** Tuesday, March 19, 2024 5:07 PM
**To:** Sapir Amar <samar1@mail.yu.edu>
**Cc:** Fredric M. Sugarman <fred.sugarman@yu.edu>; Sara Asher <Sara.Asher@yu.edu>
**Subject:** RE: Charger follow up

Sapir, 9:30 is the only time I have. Not 9:00.

Joe Bednarsh
Associate Dean of Students
Deputy Title IX Coordinator
Yeshiva University
Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]
Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

**From:** Sapir Amar <samar1@mail.yu.edu>
**Sent:** Tuesday, March 19, 2024 3:06 PM
**To:** Joe Bednarsh <joe.bednarsh@yu.edu>
**Cc:** Fredric M. Sugarman <fred.sugarman@yu.edu>; Sara Asher <Sara.Asher@yu.edu>
**Subject:** Re: Charger follow up

Yes tomorrow at 9:00am works for me.

1

Thank you in advance and see you tomorrow,
Sapir Amar

On Tue, Mar 19, 2024 at 2:02 PM Joe Bednarsh <joe.bednarsh@yu.edu> wrote:

Just to confirm, I can meet at 9:30, I have a meeting at 9am.

Joe Bednarsh

Associate Dean of Students

Deputy Title IX Coordinator

Yeshiva University

Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

---

**From:** Sapir Amar <samar1@mail.yu.edu>
**Sent:** Tuesday, March 19, 2024 2:01 PM
**To:** Fredric M. Sugarman <fred.sugarman@yu.edu>; Joe Bednarsh <joe.bednarsh@yu.edu>; Sara Asher <sara.asher@yu.edu>
**Subject:** Re: Charger follow up

Dear Mr. Bednarsh,

Good afternoon!

Yes, let's meeting tomorrow at 9:00am, so that you can assure the details of this case today, so that you can speak with Yisrael and test him to see if he actually is able to tell you the destails of the charger.

2

I'm am not going to contact any other faculty, nor deans, nor rabbi, and wait patiently for you to make the judgement and please Hashem may you make the decision right. Hopefully you'll understand that the charger is mine.

I'm very sorry how the emails took off route in the last hour, was not my intention to include Dean Sugarman just to ensure that I can get my charger back but just keep them informed about this situation that I'm very worried, frustrated and not calm because of this other student lying and calming that this charger, which is my charger, is his charger.

Sorry for the inconvenience and see you tomorrow.

Best regards,

Sapir Amar

On Tue, Mar 19, 2024 at 1:41 PM Joe Bednarsh <joe.bednarsh@yu.edu> wrote:

Sapir,

We need to meet in person to work this out, but you also need to have patience and let the process play out. I will not decide based on demands but rather the details that I am able to uncover and corroborate. Please refrain from further language of that kind.

I can meet you tomorrow morning at 9:30. Will that work?

Best

Joe

Joe Bednarsh

Associate Dean of Students

3

Deputy Title IX Coordinator

Yeshiva University

Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

---

**From:** Sapir Amar <samar1@mail.yu.edu>
**Sent:** Tuesday, March 19, 2024 1:35 PM
**To:** Joe Bednarsh <joe.bednarsh@yu.edu>
**Cc:** Fredric M. Sugarman <fred.sugarman@yu.edu>; Sara Asher <Sara.Asher@yu.edu>
**Subject:** Re: Charger follow up

I cannot meet at 3:00pm. I have classes. I'm already in a class and needs to be dealing with these messages.

I'm not sending anymore emails. Please return the charger.

See you later,

Sapir

On Tue, Mar 19, 2024 at 1:28 PM Joe Bednarsh <joe.bednarsh@yu.edu> wrote:

Sapir,

It appears email is not the proper forum for this discussion. Please come see me at 3pm in my office.

Joe

4

Joe Bednarsh

Associate Dean of Students

Deputy Title IX Coordinator

Yeshiva University

Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

---

**From:** Sapir Amar <samar1@mail.yu.edu>
**Sent:** Tuesday, March 19, 2024 1:25 PM
**To:** Joe Bednarsh <joe.bednarsh@yu.edu>
**Cc:** Fredric M. Sugarman <fred.sugarman@yu.edu>; Sara Asher <Sara.Asher@yu.edu>
**Subject:** Re: Charger follow up

Mr. Bednarsh I'm not taking an aggressive tone, I'm already crying to get my personal property back! I don't want to get to President Berman or open a police report on this!! Common, are you supporting a wrong act of a student in campus of stealing? Come on!?!? STOP it! Please return my charger today.

Dean Sugarman sorry for involving you in this situation but I am being hold back from recieving my own personal charger of my iPad. A student named Yisrael Heilmann took my charger as I lended it for him for 5 minutes and the university is not giving me the charger back since we had to get involve YU security in this ridiculous act of Yisrael as he claimes that the charger is his…which I swear to God, yes Hashem please help me get the charger back!

I don't need to make "noice" to get my charger back!! Please help me Dean Sugarman's and Dean Asher as you get involved with this situation since Yisrael morally, ethically and against the Torah values stole my iPad charger!! I need my charger back ASAP please.

Very sorry for all this inconvenience, it can be very easy if you just return me the charger back without complicating it too much Mr. Berdnarsh. Can I please claim my charger back?

5

Thank you in advance and I want to come pick my charger today,

Sapir Amar

On Tue, Mar 19, 2024 at 12:58 PM Joe Bednarsh <joe.bednarsh@yu.edu> wrote:

Sapir,

It's not helpful to take an aggressive tone nor is it helpful to add additional people to the conversation. I am not an adversary; I am trying to help. You need to separate yourself from your frustration when you write to me.

I am looking for things like dents or scratches or other marks on the charger that could help me determine that proper ownership of the charger. Are you aware of any?

Best

Joe

Joe Bednarsh

Associate Dean of Students

Deputy Title IX Coordinator

Yeshiva University

Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

6

**From:** Sapir Amar <samar1@mail.yu.edu>
**Sent:** Tuesday, March 19, 2024 12:45 PM
**To:** Fredric M. Sugarman <fred.sugarman@yu.edu>; Joe Bednarsh <joe.bednarsh@yu.edu>; Sara Asher <sara.asher@yu.edu>
**Subject:** Re: Charger follow up

**I told you everything in person, my time is running on this emails and can't be dealing with sending emails back and forth.**

My charger is an original charger from Apple, the new USBC charger, of a white color, its cable is white and spiral!

These are all the info! It has a very small Apple logo on the bottom (that's my main **identification** of the charger, the Apple symbol on the bottom of the charger (where you plug it in into the outlet - the side of the charger that connects to the outlet of the electricity has an Apple sign!!)

Yisrael has to identify all these symbols, to show you that this charger is not his. But rather mine, as I'm telling you all the identification signals.

**I need my charger to be hand back to me back today, please!!!**

Thank you!

Sapir Amar

On Tue, Mar 19, 2024 at 12:38 PM Joe Bednarsh <joe.bednarsh@yu.edu> wrote:

Hi Sapir,

Please respond to my email about the description of the charger and any identifying characteristics.

As I mentioned to you earlier, I am trying to finish this today so demands to see the charger are not helpful.

7

Best

Joe

Joe Bednarsh

Associate Dean of Students

Deputy Title IX Coordinator

Yeshiva University

Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

---

**From:** Sapir Amar <samar1@mail.yu.edu>
**Sent:** Tuesday, March 19, 2024 12:35 PM
**To:** Joe Bednarsh <joe.bednarsh@yu.edu>
**Subject:** Re: Charger follow up

Also, I want to know please who is holding to my charger as of now!?

I want to see the charger today in my eyes!

Thank you so much,

Sapir Amar

On Tue, Mar 19, 2024 at 12:20 PM Sapir Amar <samar1@mail.yu.edu> wrote:

My storage in my phone is full and as a result it does not work for me to send the receipt to your email. I'll show it in person, it's a personal detail that I cannot send to you since it has my payment info and all that, I showed you in person, if you need a picture I'll allow you to take it for you to have it as a proof, even though I showed you the receipt in our meeting, so I don't know how much you need it. If you'll need it for some reason, which I want to know the reason to be specified in this email, I'll show you the email (I cannot send it because of my personal payment info there).

Thank you,

Sapir

On Tue, Mar 19, 2024 at 11:15 AM Sapir Amar <samar1@mail.yu.edu> wrote:

Yes, I'kk send it soon just I am still in the meeting.

I will tell you every small identification on the charger so that you know it's mine. If needed I'll come back to your office to tell you about the sign.

Thank you!

Sapir Amar

On Tue, Mar 19, 2024 at 10:59 AM Joe Bednarsh <joe.bednarsh@yu.edu> wrote:

Hi Sapir,

Can you please describe to me the charger in as much detail as possible. Specifically, I'm looking for any identifying marks that might help me determine the proper owner.

Thanks

Joe

Joe Bednarsh

Associate Dean of Students

Deputy Title IX Coordinator

Yeshiva University

Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

10

# EXHIBIT K

**From:** Joe Bednarsh
**Sent:** Wednesday, March 20, 2024 2:42 PM
**To:** Yisrael Zephaniah Heilmann [student] <yheilman@mail.yu.edu>
**Cc:** David Massaro <david.massaro@yu.edu>
**Subject:** iPad Charger

Good afternoon,

I know, this incident has been difficult for you and has caused much frustration. I have made a determination based on the likelihood that the charger is yours or Sapir's. I believe it is more likely than not likely Sapir's charger and as such, I will be returning it to him. That said, and since this has been so difficult to decide, I have purchased you a new charger that will work with your iPad. It's my hope that this gesture will help you move forward and be able to get your work done on your device. It's supposed to arrive today and assuming it does, you can pick up the new charger from David who sits at the front of my office suite.

On another note, I strongly suggest that you do not leave any valuables in the library when you leave as you run the risk of losing them.

All the best and Purim Sameach
Joe

Joe Bednarsh
Associate Dean of Students
Deputy Title IX Coordinator
Yeshiva University

1

Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]
Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

**From:** Sapir Amar <samar1@mail.yu.edu>
**Sent:** Wednesday, March 20, 2024 4:02 PM
**To:** Joe Bednarsh <joe.bednarsh@yu.edu>
**Subject:** Re: iPad Charger

Dear Mr. Bednarsh,
Good afternoon!

I appreciate your understand and sorry for all the fustration and misunderstanding here.
I wish you, your family and all your beloved ones an easy fast, happy purim, and Good shabbes!

Thank you,
Sapir Amar

On Wed, Mar 20, 2024 at 2:42 PM Joe Bednarsh <joe.bednarsh@yu.edu> wrote:


Good afternoon,


I know, this incident has been difficult for you and has caused much frustration. I have made a determination based on the likelihood that the charger is yours or Yisrael's. I believe it is more likely than not likely your charger and as such, I will be returning it to you. It's my hope that this will close this chapter and you move forward and be able to get your work done on your device. You can pick up the charger from David who sits at the front of my office suite.

1

I strongly suggest that you do not discuss this issue with Yisrael any longer.

All the best and Purim Sameach

Joe

Joe Bednarsh

Associate Dean of Students

Deputy Title IX Coordinator

Yeshiva University

Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

Joe Bednarsh

Associate Dean of Students

2

Deputy Title IX Coordinator

Yeshiva University

Phone (646) 592-4615

Students – Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

Non Students - Schedule a meeting with me HERE [nam02.safelinks.protection.outlook.com]

# EXHIBIT L pt. 1

# YESHIVA UNIVERSITY
## SECURITY DEPARTMENT
## INCIDENT REPORT WC

INCIDENT #

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| YU RELATED | YES | SELECT LOCATION | WILF CAMPUS | DATE REPORTED | 3/20/2024 | DAY | WEDNESDAY | TIME | 5:07pm |

| | | | | | |
|---|---|---|---|---|---|
| TYPE OF INCIDENT | HAND GESTURE | DATE OF INCIDENT | 3/13/2024 | DAY WEDNESDAY | TIME 9:10pm |

| | | | | | | |
|---|---|---|---|---|---|---|
| PLACE OF OCCURRENCE | INSIDE | STREET LOCATION | 2520 Amsterdam Avenue | BUILDING NAME | Gottesman Library | RM N/A | FL N/A |

IF GRADUATE SCHOOL INDICATE: N/A

| | | | | | |
|---|---|---|---|---|---|
| INFORMATION ON COMPLAINANT ONLY | STUDENT | NAME(S) | Yisrael Heilmann | DORM RM | Muss Hall Room : 364 | ID NUMBER | 800 754 574 |

| | | | | |
|---|---|---|---|---|
| DEPARTMENT | Yeshiva College | DORM TEL HOME TEL | (786)-508-9774 | DEPT TEL, OFFICE EXT. | N/A |

**DETAILS OF INCIDENT**

**CONTINUE ON NEXT PAGE**

On Wednesday March 20th, 2024 the above mentioned Yeshiva College student came to add a follow -up statement on a prior complaint he had made against another YU student about a week ago. Mr Yisrael Heilmann states that during a verbal dispute he and Sapir Amar had over a missing iphone charger in the Gottesman Library he noticed that Sapir Amar had made several gestures with his hands which implicated as if he was a gang member. Mr Yisrael Heilmann recorded a part of the verbal altercation and was able to catch one of the gestures on video which is attached to this report along with a statement and pictures. Mr Yisrael Heilmann states that at this point he is in fear of his safety since he and Mr Sapir Amar live on the same floor of his dormitory. He asked for a room change as per the request of his mother. Avi Feder the Director Of Housing was contacted and briefed on the new details of this on-going investigation. He stated that he would get in contact with the Yeshiva University Dean Of Students Joe Bednarsh to see if he could be relocated. Mr Yirael Heilmann was updated on what the Director Of Housing stated. END OF REPORT

| | | | |
|---|---|---|---|
| REPORT PREPARED BY | Anderson Guzman | NAME OF PERSON(S) NOTIFIED | Assistan Director Of Security : Alan Asusta |

**FOR WILF CAMPUS SECURITY OFFICE USE ONLY**

REVIEWED BY

CHECK BOX IF EMAILED
- ☐ VP, ADMINISTRATIVE SERVICES
- ☐ DEAN OF STUDENT
- ☐ DIR. OF HOUSING
- ☐ FACILITIES SERVICES
- ☐ MAINTENANCE
- ☐ OTHER (INDICATE)

| EMAIL | REVISED 4/19 | Print Form | Reset Form |
|---|---|---|---|

# EXHIBIT L pt. 2



# YESHIVA UNIVERSITY SECURITY
## Incident Statement Form

Name of Person Providing Statement: __YISRAEL  Heilmann__

Cell Phone: __3474898828__ Other Phone: _____ Email: __yheilman@mail.yu.edu__

Date of Incident: __03/13/2024__ Time of Occurrence _____ a.m. __09:30__ p.m.

Type of Incident (accident, crime, etc.): __Threat with gang signs__

STATEMENT: — Student Samir Aman threaten me, Yisrael Heilmann, with "Blood" gang sign, it was recorded on tape. Wat only me also my family fear for life now. I take this incident very serious and getting the police involved, 34. ~~Sou~~ Precinct. I and my family is seriously concerned about my balty, because this student live in the same floor then me! And he walks around at campus.

Page __1__ of __1__ (Please use additional forms if necessary)

Signature _____

Date __03/20/__ Time __5:07 pm__
2024

# EXHIBIT M

# YESHIVA UNIVERSITY
## SECURITY DEPARTMENT
## INCIDENT REPORT WC

**INCIDENT #**

C2024-018

| YU RELATED | YES | SELECT LOCATION | WILF CAMPUS | DATE REPORTED | 03/21/2024 | DAY | THURSDAY | TIME | 1:00 AM |
|---|---|---|---|---|---|---|---|---|---|

| TYPE OF INCIDENT | Assault 3 Student Arrested | | | DATE OF INCIDENT | 03/21/2024 | DAY | THURSDAY | TIME | 1:07AM |
|---|---|---|---|---|---|---|---|---|---|

| PLACE OF OCCURRENCE | INSIDE | STREET LOCATION | 2520 Amsterdam Ave | BUILDING NAME | Gottesman Library | RM | N/A | FL | 4th Fl |
|---|---|---|---|---|---|---|---|---|---|

| IF GRADUATE SCHOOL INDICATE | N/A |
|---|---|

| INFORMATION ON COMPLAINANT ONLY | STUDENT | NAME(S) | Yisrael Zephaniah Heilmann | DORM RM | Muss 364 | ID NUMBER | 800754574 |
|---|---|---|---|---|---|---|---|

| DEPARTMENT | | DORM TEL HOME TEL | | DEPT TEL, OFFICE EXT. | |
|---|---|---|---|---|---|

**DETAILS OF INCIDENT**

**CONTINUE ON NEXT PAGE**

On Thursday March 21, 2024 at 1:07AM, NYPD (Vehicles 390 & 4144) from the 34th Pct. were observed on 185th Street and Amsterdam Ave.

I, Olegario Rodriguez, responded and observed Yisrael Zephaniah Heilmann(800754574, D.O.B 4/29/1989) and Sapir Amar (800692167, D.O.B 4/7/1999) on the 185th Street plaza speaking to the officers. They were both recently involved in an ongoing dispute regarding an apple charger that had started in the Gottesman Library on March 13th, 2024.

Mr. Heilmann alleges that while he was in the 4th floor library Mr. Sapir caused him to fall and hit his head on the floor and then Mr. Sapir proceeded to kick him while he was on the ground. Mr. Sapir was overheard reporting to the officers that Mr. Heilmann had emptied a water bottle on him.

An FDNY Ambulance#2157 arrived and put Mr. Heilmann in the ambulance and he was transported to Columbia Presbyterian Medical Center for further evaluation.

P.O. Rios(Badge#3132) placed Sapir Amar under arrest and charged him with Assault.
At the time of this report, no witnesses have come forward that observed any physical altercation between them.

The 5th floor librarian Carla Hanauer(999969220) was on the floor at the time and heard them arguing but did not see them physically fighting. A student Moshe Davidovics(800730339, teL#(901)-438-4415), reported to me that he heard the argument but did not see any physical altercation between them. Both persons provided Incident statements. (See Attached)

NYPD Complaint#(61#) is 2024-034-001811.

| REPORT PREPARED BY | Olegario Rodriguez | NAME OF PERSON(S) NOTIFIED | Paul Murtha, Avi Feder, Alan Asusta |
|---|---|---|---|

## FOR WILF CAMPUS SECURITY OFFICE USE ONLY

| REVIEWED BY | |
|---|---|

☐ CHECK BOX IF EMAILED

☐ VP, ADMINISTRATIVE SERVICES  ☐ DEAN OF STUDENT  ☐ DIR. OF HOUSING  ☐ FACILITIES SERVICES

☐ MAINTENANCE  ☐ OTHER (INDICATE)

EMAIL

REVISED 4/19

Print Form    Reset Form



# YESHIVA UNIVERSITY SECURITY
## Incident Statement Form

Name of Person Providing Statement: Moshe Davidovics

Cell Phone: 901-438-4415 Other Phone: _____ Email: mdavido1 @ mail.yu.edu

Date of Incident: March 21, 2024 Time of Occurrence ___|___ a.m. _____ p.m.

Type of Incident (accident, crime, etc.): Disagreement

STATEMENT: I heard 2 people loudly arguing. When I walked over I saw one person sitting in his normal seat and one person who normally sits all the way across the room in a yelling match. The one in his normal seat was covered in water. The one in his normal seat was telling the other individual repeatedly to leave him alone and wanted to ~~deactivate~~ end the situation but the other individual persisted. I did not ~~further~~ gather what the argument was about or if there was any physical contact. The non-wet individual then threatened to call the police (which seemed very uncalled for) and proceeded to get on the phone.

Page ___ of ___ (Please use additional forms if necessary)

Signature _____ Date 3/21/24 Time 1:30 Am



# YESHIVA UNIVERSITY SECURITY
## Incident Statement Form

Name of Person Providing Statement: _Carla Hanauer_

Cell Phone: _(347-931-1607)_ Other Phone: _212-942-6454_ Email: _hanauer@ycho..co_

Date of Incident: _3-21-24_    Time of Occurrence _1 am_ a.m. _____ p.m.

Type of Incident (accident, crime, etc.): _Argument (loud)_

STATEMENT: _I happened to walk around on 4th floor and as I was calling elevator I heard excitable loud arguing and went to that corner. I didn't observe physical contact but one said he pushed me or rather attacked me and the other claimed it from the other person. One was very loud + the other's voice hardly came through from excitement or terror. One said I"ll call Security, the other said I'll call the police._

Page ___ of ___ (Please use additional forms if necessary)

Signature _Carla Hanauer_    Date _3-21-24_ Time _1:42 am_

# EXHIBIT N

**Subject:** Israel Heilman- notes from 3am 3/21

Israel Heilman

Nurse at 3:28am

Doing well, tylenol, zofran, doing a CT, oriented, alert, he's worried about the legal piece, doctor said mild tenderness on back of neck, he fell on hands but hands ok, will do Ct scan but they aren't concerned.

1

Spoke to Yisrael at 4am

He is worried about university consequences. I told him students are always welcome to call police, it's an important resource. His language and thoughts was coherent. I told him the hospital isn't so concerned and don't expect to find anything on the scan, I told him he can advocate for himself and ask if scan is necessary. He appreciated that advice, will talk to the nurse. He otherwise feels well. He spoke with a police at the hospital, he showed him the video where Sapir gestured with his hands, what Yisroel understood as a gang sign. The police laughed when watching the video and said he's a clown, not part of a gang. I told yisroel that the police will contact him again to decide next steps, and he will need to decide what to do. I asked him whether the police at the hospital gave him a resource and he said he has two numbers to call at the police to help him with the follow up. I told him he can continue to use university security as a support and they can help him feel safe.

He said he fell backwards during the incident and bumped his head. He acknowledged that the doctor said it could be worse as he didn't see bleeding.

I offered him an alternative room temporarily but he said he's ok where he is, especially because Sapir isn't there tonight, and his roommate misses him.


Dr. Sara Asher
Dean of Students
Yeshiva University

# EXHIBIT O

**Paul Murtha**

| | |
|---|---|
| **From:** | Sara Asher |
| **Sent:** | Friday, March 22, 2024 2:34 PM |
| **To:** | Paul Murtha |
| **Cc:** | Jose L Morales |
| **Subject:** | Fw: No contact order |

**Dr. Sara Asher**
Dean of Students
Yeshiva University
215 Lexington Avenue
New York, New York 10016

**From:** Sara Asher <Sara.Asher@yu.edu>
**Sent:** Friday, March 22, 2024 2:28 PM
**To:** Sapir Amar [student] <samar1@mail.yu.edu>
**Subject:** No contact order

I am writing to confirm that, effective immediately, you are prohibited from having direct or indirect contact with Yisrael Heilmann. This No Contact Order prohibits all verbal, written, electronic, or any other means of contact. You also are prohibited from contacting Yisrael Heilmann indirectly or directly through friends or other people. Any violation of this No Contact Order will result in disciplinary action, up to and including dismissal from the University. This No Contact Order is not to be interpreted as a finding of any violation of any University policy, is not a disciplinary sanction, and does not preclude any disciplinary action from being taken as a result of any past interactions. This No Contact Order shall remain in place until it has been terminated, in writing, by me following a determination that the order is no longer warranted or necessary. Please contact me at sara.asher@yu.edu if you have any further questions. A similar No Contact Order has been issued to Yisrael Heilmann.

Dr. Sara Asher
Dean of Students
Yeshiva University

1

**Paul Murtha**

---

From:          Sara Asher
Sent:          Friday, March 22, 2024 2:35 PM
To:            Paul Murtha
Cc:            Jose L Morales
Subject:       Fw: No contact order

**Dr. Sara Asher**
Dean of Students
Yeshiva University
215 Lexington Avenue
New York, New York 10016

---

**From:** Sara Asher <Sara.Asher@yu.edu>
**Sent:** Friday, March 22, 2024 2:28 PM
**To:** Yisrael Zephaniah Heilmann [student] <yheilman@mail.yu.edu>
**Subject:** No contact order

I am writing to confirm that, effective immediately, you are prohibited from having direct or indirect contact with Sapir Amar. This No Contact Order prohibits all verbal, written, electronic, or any other means of contact. You also are prohibited from contacting Sapir Amar indirectly or directly through friends or other people. Any violation of this No Contact Order will result in disciplinary action, up to and including dismissal from the University. This No Contact Order is not to be interpreted as a finding of any violation of any University policy, is not a disciplinary sanction, and does not preclude any disciplinary action from being taken as a result of any past interactions. This No Contact Order shall remain in place until it has been terminated, in writing, by me following a determination that the order is no longer warranted or necessary. Please contact me at sara.asher@yu.edu if you have any further questions. A similar No Contact Order has been issued to Sapir Amar.

Dr. Sara Asher
Dean of Students
Yeshiva University

1

# EXHIBIT P

**From:** Sara Asher <Sara.Asher@yu.edu>
**Sent:** Tuesday, April 2, 2024 9:20 AM
**To:** Yisrael Zephaniah Heilmann [student] <yheilman@mail.yu.edu>
**Subject:** Follow up

Dear Yisrael,
It has come to my attention that you feel the University is telling you to drop the charges against Sapir.  As I have told you from the beginning, it is up to you whether or not you want to press charges. If someone at the University has told you otherwise, please let me know.
Best,
Dr Asher

Dr. Sara Asher
Dean of Students
Yeshiva University

2

# EXHIBIT Q

Yisrael Heilmann

On Apr 1, 2024, at 8:00 AM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:

To whom to may concern,

I hope this letter finds you well. I am writing to kindly request that all future communication between us cease. While I appreciate our past interactions, I believe it is best for both of us to move forward separately.

In the meanwhile, I have joined a protective victims program with help of the 34th Precinct and can't communicate or share information not related to my degree with university staff, students and persons affiliated with YU at all. This is a condition of being in the protective program. Additional to that condition it came to our knowledge that a YU- Cordozo-Law-School  affiliated lawyer defeated the attacker and YU student in criminal court. We have determined that YU does not have neutrality in this case as promised on March,21, 2024.

I, hereby, value the time we shared and the experiences we had together; however, I feel it is necessary for me to focus on other aspects of my life at this time. Therefore, I kindly ask that you respect my decision and refrain from contacting me in any form, including emails, text messages, calls, or any other means of communication.

6

I want to express my gratitude for your understanding and cooperation in this matter. I wish you all the best in your future endeavors and hope that you find happiness and fulfillment in your journey ahead.

Thank you for your attention to this request.

Sincerely,

Yisrael Heilmann

On Mar 25, 2024, at 9:25 PM, Judith E Lopez <jlopez@yu.edu> wrote:

Hope all is well with you.
When you need to speak with Dr. Levy, please reach out.
All the best,
Judith

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Monday, March 25, 2024 5:00 PM
**To:** Judith E Lopez <jlopez@yu.edu>
**Subject:** Re: Tuesday Session at FH520

No and End
Thx
Sent from my iPhone

On Mar 25, 2024,

7

at 1:01 PM, Judith E Lopez <jlopez@yu.edu> wrote:

Please confirm your decision regarding your appointment for tomorrow:

***Tuesday***

***3/26/2024***

***In person FH520***

**DECISION:**

***Yes = Keeping it.***

8

*No =
cancell
ing*

*End =
cancel
all
future
sessio
ns =
REACH
ING
OUT IF
NEEDE
D*

Please
let me
know
your
decisio
n.

P/N
Filing
Period

All the
best,

*Judith
Lopez
Secret
ary for
Wilf
Couns
eling
Center
at
FH520*
[jlopez
@yu.e
du](mailto:jlopez@yu.edu)
*Off
#646*

9

*592
4200
Fax
#646
685
0395*

# EXHIBIT R

**From:** Sara Asher
**Sent:** Thursday, April 11, 2024 9:11 AM
**To:** Yisrael Zephaniah Heilmann [student] <yheilman@mail.yu.edu>
**Subject:** Note

Yisrael – I was informed that you were disruptive earlier this week at the Counseling Center.  While I understand that you may be going through something now, I want to remind you that communicating with staff in a disruptive manner is against our expectations, and our policies prohibit recordings of conversations and meetings without the consent of the other parties.  ([https://www.yu.edu/sites/default/files/inline-files/Undergraduate%20Student%20Bill%20of%20Rights-Disciplinary%20Procedures%20%2800053990xA0726%29.pdf [yu.edu]](https://www.yu.edu/sites/default/files/inline-files/Undergraduate%20Student%20Bill%20of%20Rights-Disciplinary%20Procedures%20%2800053990xA0726%29.pdf)).
These policies are put in place to benefit the campus community.
Thank you for understanding.
Best,
Dr Asher

# EXHIBIT S

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>
To: "Fredric M. Sugarman" <fred.sugarman@yu.edu>
Cc: Yedidya Levy <yedidya.levy@yu.edu>

Tue, Apr 2, 2024 at 5:46 PM

Dear Dean,

I hope you had a great morning.

There is no need to meet tomorrow, because my doctor's appointment was unfortunately rescheduled to tomorrow morning.

Right now, I am overloaded caused by the attack on 03/21. But I will follow your advice.

Thank you and I appreciate your respectful manners towards me!!

Yisrael Heilmann

> On Apr 1, 2024, at 5:49 PM, Fredric M. Sugarman <fred.sugarman@yu.edu> wrote:
>
> Dear Yisrael,
>
> I understand the predicament and the difficulties you face. Please make an appointment to meet with Dr. Levy, our counseling director. Talk to him about what's going on and what accommodations you might need.
>
> Once your meet with him, I will see what he recommends in terms of completing this term.
>
> Be well and I've cc'd Dr. Levy.
>
> FS

# EXHIBIT T

## Abigail Kelsen

| | |
|---|---|
| **From:** | Fredric M. Sugarman |
| **Sent:** | Monday, April 8, 2024 10:10 AM |
| **To:** | Yisrael Zephaniah Heilmann [student] |
| **Subject:** | Some Updates |

Dear Yisroel,

I hope you had a good Shabbos.

I want to clarify three issues in order to help you with your work for the remainder of the term:

1. Accommodations due to your injuries. I believe you initially asked for 6-8 weeks of accommodations due to medical appointments and your current health status for classes this term. If you wish to go forward with this request, you do not need to visit our counseling center. Requests for accommodations are handled through our Office of Disability Services. Information about the process is on their website -- https://www.yu.edu/student-life/resources-and-services/disability-services. You would need a note from your provider (it could be a Neurologist) regarding your disability and requested accommodations. (Please note that we generally do not permit absences from class for 6-8 weeks, but all of that would be discussed during the interactive process.)

2. As per our class rules – each instructor has an attendance requirement which you need to understand. If your condition causes you to miss more classes than what is allowed, you can receive a lower grade or even not pass a class. Please check with your instructors about their requirements and how you stand.

3. I don't know what you mean about "privat universities can make mandatory by law for students to use their university own counsel center." We are not requiring you to go to our counseling center. You need to submit documentation from your doctor to request a reasonable accommodation.

Regards,
FS

1

# EXHIBIT U

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                    Mon, Apr 8, 2024 at 3:49 PM
To: Yosef Kalinsky <kalinsky@yu.edu>
Cc: moshe.niren@yu.edu

> Good afternoon Rabbi Kalinsky,
>
> I hope your day is going well. I have an urgent health issue that impacts my ability to attend morning classes. Do you have a few minutes today to talk in person about this issue, this is an urgent time sensitive matter.
>
> Have a good day,
>
> Yisroel Heilmann
>
>

---

**Yosef Kalinsky** <kalinsky@yu.edu>                    Mon, Apr 8, 2024 at 5:32 PM
To: "Yisrael Zephaniah Heilmann [student]" <yheilman@mail.yu.edu>

Sorry that I missed you today I between meetings.

Do you have a doctors note that you can share with me via email?

> On Apr 8, 2024, at 9:49 AM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:
>
> Good afternoon Rabbi Kalinsky,
>>
>> I hope your day is going well. I have an urgent health issue that impacts my ability to attend morning classes. Do you have a few minutes today to talk in person about this issue, this is an urgent time sensitive matter.
>>
>> Have a good day,
>>
>> Yisroel Heilmann
>>
>>

---

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                    Mon, Apr 8, 2024 at 5:46 PM
To: Yosef Kalinsky <kalinsky@yu.edu>

Yes can I speak to you before
Sent from my iPhone

> On Apr 8, 2024, at 11:32 AM, Yosef Kalinsky <kalinsky@yu.edu> wrote:
>
> Sorry that I missed you today I between meetings.
>
> Do you have a doctors note that you can share with me via email?

# EXHIBIT V

**From:** Fredric M. Sugarman <fred.sugarman@yu.edu>
**Sent:** Friday, May 10, 2024 8:50 AM
**To:** Abigail Kelsen <akelsen@yu.edu>
**Cc:** William Stenhouse <stenhous@yu.edu>; Esther Sasson <eksasson@yu.edu>
**Subject:** FW: documentation from Yisrael Heilman

Dear Abby,

Based on this note (which Dr. Stenhouse can review and comment on), Yisrael can be deferred for all his exams.  He cannot choose one or two to take and two to defer.  The note is specific – he cannot concentrate and take exams.

If Dr. Stenhouse agrees, we can give him deferral exams on 9/6 (official deferral date) and the days after for the remainder.

1

In terms of registration – he can register for no more than 13 credits.  He is currently on probation and having 4 Incompletes indicates that he has not made satisfactory progress yet so probation holds.

One last favor: Yisrael needs to write ycfinalexams@yu.edu and specify the four tests he is deferring.  He does not need to attach a note.

Shabbat shalom,
Fred

---

**From:** Abigail Kelsen <akelsen@yu.edu>
**Sent:** Friday, May 10, 2024 8:40 AM
**To:** Fredric M. Sugarman <fred.sugarman@yu.edu>
**Subject:** documentation from Yisrael Heilman

Good morning, Fred.

Please see attached for Yisrael.

I look forward to hearing from you.

Best,
Abby

2

**YESHIVA UNIVERSITY**
**Office of Disability Services**

**Beren Campus**
215 Lexington Avenue, Suite 505
New York, NY 10016
(646) 592-4132

**Wilf Campus**
500 Amsterdam Avenue, Suite 412
New York, NY 10033
(646) 592-4280

## VERIFICATION OF DISABILITY FORM FOR MEDICAL PROVIDERS

**Purpose:** The student named below has indicated that s/he has a disability and will require reasonable accommodations to participate in a program or activity at Yeshiva University. The information you provide will be used to determine the nature and severity of the student's condition and the appropriateness of requested accommodations or services. **Please take the time to complete this form in its entirety.** Contact the Office of Disability Services with any questions. All information provided to us is kept confidential in accordance with the Family Educational Rights and Privacy Act (FERPA). A signed consent for release of information should be completed by the student prior to the release of this form. Thank you for your assistance.

*Please note: For hearing disabilities, please attach the most recent audiogram.*
*For visual disabilities, please attach acuity information.*

**Student Name:**
Yisrael Heilmann

**Medical Diagnosis(es) (DSM-V if relevant):** Unspecified Focal Traumatic Brain injury
Post - Traumatic Headache    w/ loss of
consciousness of
**Onset of Condition(s):**                                  30 mins or less

4/2/24

**Current Status of Condition(s) (e.g. Active, Progressing, Controlled, In Remission):**

progressing

**How long is this condition(s) likely to persist (be as specific as possible: e.g., lifetime, one academic year; one semester; one month):**

10 days to 3 months

**What are the student's current functional limitations?**

unable to sit w/o feeling dizzy
difficulty concentrating

Please describe the current impact that the disability will have on the student's ability to attend and/or participate in class:

unable to sit for long periods of time

Identify any accommodations you believe may be necessary in order for the student to participate in the University's programs, activities and services:

delay exam

Anticipated duration of need for accommodation:

2 months

Additional information:

Sx are subjective, patient reports above symptoms, CT head negative

Name of Medical Professional:

Asma Jani

License #:

317.447 -1

Please indicate State:

New York

Address:

18 W 18th st, New York, NY

Telephone:

646.248.6700

Signature (verifying that you are not related to the student by blood or marriage):

Date:  5/9/24

11/17

# EXHIBIT W

 Outlook

## Deferral Examinations

**From** Fredric M. Sugarman <fred.sugarman@yu.edu>

**Date** Mon 5/13/2024 1:16 PM

**To**    Yisrael Zephaniah Heilmann [student] <yheilman@mail.yu.edu>

**Cc**    Ariella Suchow <ariella.suchow@yu.edu>; Abigail Kelsen <akelsen@yu.edu>; William Stenhouse <stenhous@yu.edu>

Dear Yisrael,

You have been approved to take deferral exams on Friday, September 6 @ 930am, Deans Office.  I will give you a fuller schedule since multiple exams are involved and cannot all be completed in one day.

I do hope you feel better and can continue with your work,
Fred

# EXHIBIT X

On Aug 6, 2024, at 5:53 PM, Fredric M. Sugarman
<fred.sugarman@yu.edu> wrote:

Dear Yisrael,

Faulty logic ...your BA comes before you consider a Masters
or a job.  You have to complete the Spring term first.

Let me know by next week; appreciated.

One last note – I am retiring at the end of August so you will
need to work the exams through with Mr. Pitsirikos and Dean
Stenhouse.  Right now ...need to know by next week how you
are going to move forward.

Be well,
Fred

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Tuesday, August 6, 2024 9:25 AM
**To:** Fredric M. Sugarman <fred.sugarman@yu.edu>
**Subject:** Re: DEFERRAL EXAMS FOR SPRING 2023

Dear Dean,

i currently looking into the options I have, I want to  minimize the
damage.

A " W" is not an option, because it would make me ineligible for a
Master degree, for exmaple or  would be huge disadvantage on the
job market  compering  to others.

I try to find a solution until next week.


Sincerely,

Yisrael Heilmann


On Aug 5, 2024, at 11:03 PM, Fredric M. Sugarman
<fred.sugarman@yu.edu> wrote:


Dear Yisrael,

Sorry to hear your health struggles are ongoing.
While we have some time prior to your scheduled
deferral exams, I do need to know a final answer
by next week on whether or not you can take the
exams.  It would not benefit you to keep this
situation going on into the new term.

Please let me know a final decision by next week
and hopefully feel better,
Fred

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Monday, August 5, 2024 1:42 PM
**To:** Fredric M. Sugarman <fred.sugarman@yu.edu>
**Subject:** Re: DEFERRAL EXAMS FOR SPRING 2023

Dear Dean,

I will reach out to you as soon as I have more concrete answers but the injuries are much more severe and complex as expected. Its more than questionable if I can take this exams on September.

I am consulting right now the options I have.

Sincerely,

# Yisrael Heilmann

On Aug 5, 2024, at 6:15 PM, Fredric M. Sugarman <fred.sugarman@yu.edu> wrote:


Dear Students,

Hope you've been having a good summer break.  I am sending this email as a reminder about your Deferral exams which will be held on Friday, September 6 at 9:30am.  Other reminder emails will be sent on a weekly basis and I've cc'd your instructors so they have time to prepare a new exam for you.

Please note: a few of you have multiple deferral exams.  In these cases, Mr. Pitsirikos and Dean Stenhouse will work to schedule these exams on separate dates and as expeditiously as possible.

Please hit REPLY ALL to confirm that you've received this note and will be present on September 6th for your exam.

Regards,
Fred

# EXHIBIT Y

On Sep 5, 2024, at 6:36 PM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:

The required documents are already couple of days in my hands , there is an assessment which specific data's have to be published and which not .

Many informations has been sealed . It confidential…
Sent from my iPhone

Sent from my iPhone

On Sep 5, 2024, at 5:00 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Thank you, Nicholas.

Yisrael, you have received our instructions many times by now, so you know what documentation is required. If you do

not plan to take your final exams, you must either submit the documentation that we have specified or accept the W's on your transcript no later than September 13. That deadline will not change.

Thank you,
Rebecca Cypess

---

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

---

**From:** Nicholas Pitsirikos <pitsirik@yu.edu>
**Sent:** Thursday, September 5, 2024 4:40 PM
**To:** Yisrael Zephaniah Heilmann [student] <yheilman@mail.yu.edu>
**Cc:** Sara Asher <Sara.Asher@yu.edu>; Rebecca Cypess <rebecca.cypess@yu.edu>; William Stenhouse <stenhous@yu.edu>
**Subject:** Re: MakeUp Finals Schedule

Thanks Yisrael for the swift response.

Let me please ask that you discuss this right away with Deans Asher and Cypess, since clearance will ultimate come from them, not your doctor. Your doctor can certify your medical condition, but how or if this impacts your final exam makeups—this is an academic decision that can only be made by our deans.

Nicholas Pitsirikos
Academic Administrator
Office of the Dean
Yeshiva College
Belfer Hall, Room 518
2495 Amsterdam Avenue
New York, NY 10033
646-592-4435
pitsirik@yu.edu

# EXHIBIT Z

 **COMPLETE** NEUROLOGICAL CARE

### CNC of Broadway
225 Broadway New York, NY 10007
P:(800) 200 - 8196        F:(212) 349 - 2767

Date: 9/5/2024

To Whom It May Concern:

Mr. Yisrael Heilmann was seen in our neurology practice since 04/03/2024-present, he has been diagnosed with a ███████████ and was unable to focus on school work at that time, 03/21/2024-08/23/2024.

At this time he is feeling better and is neurologically cleared and is able to resume all previous activities, he may continue with his school studies with no restrictions.

He was seen today at our office for neurological care.

If you have any questions feel free to contact us at (800) 200 - 8196

Thank You,

Shulamit Manahimov, NP

COMPLETE NEUROLOGICAL CARE
225 BROADWAY, SUITE 705
NEW YORK, NY 10007
(P) 800-200-8196
(F) 212-962-2050

# EXHIBIT AA



## Re:urgend MakeUp Finals Schedule/ Document under HIPAA

8 messages

Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>                                      Tue, Sep 10, 2024 at 8:12 PM
To: Jennifer Golden <jgolden1@yu.edu>

Mrs. Golden,

What does it means regarding my Visa?

See email below.

Sincerely,

## Yisrael Heilmann

On Sep 10, 2024, at 2:03 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Yisrael,
I am sorry, but I inquired with your instructors and most of them informed me that you stopped attending classes in the middle of the Spring 2024 semester. As a result, I cannot verify that you were attending your classes in Spring 2024.
Rebecca Cypess

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Tuesday, September 10, 2024 12:28 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Re: MakeUp Finals Schedule/ Document under HIPAA

Mrs. Cypess,

I was asking you to get confirmation regarding attendance last spring, nothing more.

I was attending all classes until the final, lab even with one arm functioning....

I just need your confirmation.

I still miss this information.

Thank you very much!

Sincerely,

## Yisrael Heilmann

On Sep 10, 2024, at 11:01 AM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Dear Yisrael,

Thank you for sharing the letter from your medical provider. The letter states that you were cleared to return to school activities starting August 23, 2024; this means there is no reason why you should not have taken your make-up exams by Friday, September 6, 2024, which was the designated make-up date. Mr. Nicholas Pitsikiros wrote to you to confirm that you would take at least one exam on that date, but you declined, even though the letter from your medical provider does not say you should be excused from exams.

Regarding your message of yesterday afternoon, you were given the option to withdraw from all your classes or none of them. Picking and choosing is not an option.

If you want to withdraw from ALL your Spring 2024 and Summer 2024 courses, you may inform us by 5:00PM on September 10, 2024. Otherwise, in keeping with school policies laid out in the Undergraduate Catalog, your Incomplete grades "will default to an F grade or to a grade designated by the faculty member based on work completed."

Sincerely,
Rebecca Cypess

---

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Thursday, September 5, 2024 7:45 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>; Sara Asher <Sara.Asher@yu.edu>; William Stenhouse <stenhous@yu.edu>; Nicholas Pitsirikos <pitsirik@yu.edu>
**Subject:** Re: MakeUp Finals Schedule/ Document under HIPAA

To whom it may concern

Please
<image1.jpeg>
note:

> Under New York State law, as well as federal regulations such as the Health Insurance Portability and Accountability Act (HIPAA), I am entitled to strict confidentiality regarding my medical information. New York State law ensures that medical records and diagnoses are protected and that such sensitive information can only be disclosed with explicit consent or as legally required. Therefore, I must request that the university accept a general verification of my medical condition rather than disclosing specific diagnostic details.
> This request is in alignment with privacy protections afforded by state and federal laws, and it is crucial to maintaining the confidentiality of my personal health information.
>
> Additional to that, also Under New York State law, as well as federal regulations such as the Health Insurance Portability and Accountability Act (HIPAA), I am entitled to strict confidentiality regarding my medical information. Specifically, New York State's rights for victims of crime, including assault, are protected under the New York State Crime Victims Board regulations and various statutes that safeguard victims' privacy. These laws ensure that personal health information, including specific diagnoses, is kept confidential and disclosed only with explicit consent or as legally required. Therefore, I respectfully request that the university accept a general verification of my medical condition rather than disclosing specific diagnostic details. This request is in alignment with these privacy protections and is essential to maintaining the confidentiality of my personal health information.

On Sep 20, 2024, at 7:31 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Yisrael,

I am writing in response to your allegation that we changed our deadline to resolve your incompletes from the prior semesters.

When you first approached us during the Spring 2024 semester about your inability to take your exams on their scheduled dates, we gave you the option to withdraw from all the classes (despite being past the University deadline to withdraw) or to defer all the exams until the designated make-up date in September. Taking the exams by the designated make-up date would have allowed your professors to resolve the Incomplete grades by September 13. Here is the exact language from that message, with the relevant passage higlighted:

- You must resolve the Incomplete grades for the courses for which you registered, or the Incomplete grades will be changed to the grade that you would have earned in the course without completing the exams and any other missing coursework.
  - o Dean Sugarman recommended that you take W (Withdrawal) grades for the four courses in Spring 2024 for which you deferred final exams. Given your situation, we will permit this even though the deadline to withdraw from those classes has long past.  This remains our best advice.
  - o If you decline to take W grades in those four courses from Spring 2024, Yeshiva University policy stipulates that ==you must take the deferred exams by the designated makeup date== so as to resolve your Incomplete grades no later than September 13, 2024. Likewise, Yeshiva

University policy stipulates that you must resolve your Incomplete from Summer 2024 no later than September 13, 2024.

- If a medical doctor or clinical psychologist provides us with appropriate written documentation that you cannot take the exams at that time, we will delay the exams by one semester.
- However, if a medical doctor or clinical psychologist notifies us that you are unable to take your deferred exams due to medical concerns, that person must also provide appropriate written documentation that you are medically cleared to take courses and complete them fully and successfully in Fall 2024. If you do register for courses in Fall 2024, you must complete them in accordance with all Yeshiva University policies or drop them in accordance with the deadlines set in the university's Academic Calendar to avoid tuition and/or grade liability.

All exams were to be taken by the designated make-up date, which is clearly given in our Academic Calendar as September 6, 2024, in order for the instructors to have sufficient time to review them and give you a final grade in the course by September 13, 2024 which is the University deadline to resolve Incomplete grades for the Spring/Summer semesters as set forth in the Academic Calendar.

Dean Sugarman first reminded you in the beginning of August about the September 6th make-up date, and also told you that Mr. Pitsirikos and Dean Stenhouse would work out a schedule if a student – like you - had more than one exam to take.  There was never a change in any deadline (except letting you schedule your exams over a few days instead of making you take them all on September 6th) which is clearly set forth in the Academic Calendar Microsoft Word - 2024-25 UG Academic Calendar v14 042224 (yu.edu) [yu.edu], and Mr. Pitsirikos was in contact with you about scheduling the exams by the September 13th deadline (and even offered for you to take the last of the four exams on that date).

We told you that if you provided us with appropriate written documentation that you could not take the exams at that time, we would again have delayed all of your exams by one semester (such time to be determined by us, and not dictated by you) – but then you would also have needed to supply appropriate written documentation that you were medically cleared to take courses and complete them fully and successfully in Fall 2024. We stated all this clearly in our earlier communications.

You provided us with documentation on September 5th that you were cleared as of August 24, 2024 so it was expected for you to take all the exams by the designated make-up date. You did not take the exams (and rejected our gracious offer for you to withdraw), and your instructors have now calculated your grades and submitted them to the Registrar to include in your records.

To be clear, we are not engaging, nor have we ever engaged,  in any retaliation against you.  We have always supported you, and continue to support you, and advised you that you have the right to pursue all claims, including going to the police, in connection with the incident.  We have also provided reasonable accommodations to you in connection with the incident by deferring your exams, but without proper documentation you were not entitled to continue to defer them.

Regarding your questions about your attendance record, some of your instructors have told me that you stopped attending class in the middle of the semester and in some cases (viz. Chemistry Lab) stopped handing in assignments well before your injury.

Sincerely,
Rebecca Cypess

_____
Rebecca Cypess [yu.edu], PhD

The Mordecai D. Katz and Dr. Monique C. Katz Dean

4

# EXHIBIT BB



October 1, 2024

**DISMISSAL: YC**
**DEAN:** Cypess
**Email:** rebecca.cypess@yu.edu

Dear Yisrael Heilman,

We regret to inform you that you are being dismissed as a student as of October 1, 2024 due to your unsatisfactory academic performance in the Fall 2023 and Spring 2024 semesters.

As set forth in the Undergraduate Catalog for Men – Academic Information and Policies – Academic Probation and Dismissal: "Students whose semester or cumulative average falls below 2.000 or who fail to earn 12 credits two semesters in succession or three semesters non-consecutively, are dismissible from the school without further notice."

In Fall 2023 you earned 11 credits, and in Spring 2024 you earned 2 credits. Your Spring 2024 GPA is 0.47. Given your insufficient credit earnings in two consecutive semesters, both Fall 2023 and Spring 2024, and your Spring 2024 semester GPA, you meet the criteria for dismissal.

You have the right to appeal the dismissal in writing. This appeal must be addressed to Dean Cypess (at the email address listed above) and must be made within 10 business days of receipt of this letter. **Appeals arriving after 10 business days will be returned to you with no action taken so it is imperative you meet this appeal deadline.** You will be notified of the decision on the appeal in writing.

As an international student, you should reach out to the Office of International Services to understand your next steps. You should also reach out to the Office of Student Finance to discuss any refunds which may be due to you.

Sincerely yours,

Dr. Sara Asher
Dean of Students

CC:
Dean Cypess
Office of Student Finance
Office of the Registrar (Wilf)
Yeshiva College Academic Advising
Undergraduate Torah Studies

# EXHIBIT CC

**From:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Sent:** Monday, November 4, 2024 12:13 PM
**To:** Yisrael Zephaniah Heilmann [student] <yheilman@mail.yu.edu>; Sara Asher <Sara.Asher@yu.edu>
**Subject:** Re: Appeal

Mr. Heilmann,

I have received your appeal of your dismissal.  After a careful review of the facts and the points you raised, I have determined that your dismissal is appropriate and justified.  The following sets forth my responses to the points you raised.

1.  **Retaliation and Violations of Yeshiva University Policy**

As you note, the University prohibits retaliation against students who report incidents of harassment and discrimination.  Your dismissal is in no way connected to any reports you may have made, and we have previously told you (see my September 20th email to you) that we are not engaging, nor have we ever engaged, in any retaliation against you.

As clearly set forth in the dismissal letter, your dismissal was based on your insufficient credit earnings in two consecutive semesters (you only earned 11 credits for Fall 2024, and 2 credits for Spring 2024 and per our policies you were required to earn 12 credits in each semester), and on your Spring 2024 semester GPA of 0.47 (per our policies the required GPA is 2.0).   It was your own failure to comply with our credit and GPA requirements which led to your dismissal, and not any retaliation on our part.  You did not take your deferred exams when required, despite repeated reminders from us, and you did not provide the required paperwork to further defer them.  In fact, you provided a note on September 5th from your doctor clearing you to return to school as of August 24, 2024.  You did not accept our gracious offer on several occasions to withdraw after the University deadline.

Your allegation regarding the retaliatory nature of the termination of your I-20 seems to be inapplicable to your dismissal which was based on your failure to meet credit and GPA requirements.  However, as has been previously communicated to you on several occasions, after we checked with your instructors about your progress in their classes and found out that you were not attending school full-time during the Spring 2024 semester, we were legally required to report your F-1 status termination to the government. We cannot retract that termination.  It was your responsibility to maintain your F-1 status, and you received information from the Office of International Services about maintaining your F-1 status when you completed your F-1 check. This included a statement referring to requesting Reduced Course Load authorization: "A student must be authorized for a reduced course of study in SEVIS before dropping classes that will result in part-time enrollment."  Reduced Course Load information is also posted on their website.  As Ms. Golden told you, after the incident you just told her that you were ok but did not tell her you were having trouble attending classes because of the incident. If so, she would have reminded you about the option of applying for a medical Reduced Course Load.  (Note that as we previously told you, some of your instructors informed us that you stopped attending class in the middle of the semester and in some cases (viz. Chemistry Lab) stopped handing in assignments well before your injury.)

2.  **Procedural Violations of SEVIS Termination and Immigration Law**

As stated above, it was your responsibility to maintain your F-1 status, and we were legally required to report your F-1 status termination when we found out you were not attending school full-time.  We provide reasonable accommodations to our students with disabilities, as we did with you in deferring your Spring semester exams based upon your doctor's note at that time.  We informed you that if you wanted an additional deferral of your exams, you would need to provide another doctor's note for that request.  However, the only documentation that you provided was the above-referenced note on September 5th from your doctor clearing you to return to school as of August 24, 2024.  In addition,  we would have provided assistance to you during the Spring 2024 semester in applying for a medical Reduced Course Load if you would

have asked for it, or even told Ms. Golden that you were having trouble attending classes.  We did not deny you any accommodations because you did not apply for them.

3.  **Failure to Provide Reasonable Accommodations**

As stated above, we provide reasonable accommodations to our students with disabilities, as we did with you in deferring your Spring semester exams.  However, the disabled student must comply with the requirements to receive an accommodation, including seeking accommodations and providing appropriate documentation, which you never did.

4.  **Pattern of Negligence and Harassment**

Your allegation about our negligence also appears to be inapplicable to your dismissal.  However, I do not even know what pattern of negligence you are referring to.  Sapir Amir was a student and was not acting as an employee or agent of the University when he allegedly assaulted you.  Immediately following the incident, we took appropriate action and a no contact order was issued for both you and Sapir. (Per FERPA we cannot elaborate further on the protective measures we took.)

Regarding the incident in November 2022 that you reported to us, we also investigated it and spoke to you and the other student and took appropriate action.    (Also, per FERPA we cannot elaborate on the protective measures we took.)

Regarding your report of "another racial harassment" on September 7, 2024, Dean Joe Bednarsh reached out to you on several occasions (most recently on October 7th and earlier on September 10th, September 12th, and September 25th), to discuss the incident but you did not make yourself available to him.  He nonetheless reviewed the pertinent security tapes and also spoke to two of the alleged perpetrators.  However, he did not find evidence of harassment or discrimination.  He reminded the two students of our non-retaliation policy and told them to avoid interactions with you - although they noted that on September 8th you tried to engage with them on several occasions and even followed them.

We believe that we properly handled and addressed all of your reports and took appropriate protective measures.

5.  **Legal Demands and Consequences for Non-Compliance**

- As we have said already, we cannot reverse the termination of the I-20, and Ms. Golden has communicated with you several times already about your options.

- As we have said already, you declined to withdraw from your classes despite our numerous gracious offers, and you did not take the final exams when scheduled (and did not submit proper paperwork to further defer them).  Your dismissal stands.

- We cannot back-date accommodations and you never complied with the requirements to obtain them (other than deferring your Spring semester exams).

- We did not engage in any retaliation or negligence, and have always fully supported you, academically and otherwise.  We investigated and took appropriate action each time you reported an incident to us.

- We believe our policies are appropriate, and reasonable accommodations are properly provided to our students.  We provide a safe and supportive environment for all of our students, and indeed provided countless hours of support to you during your tenure at the University.

We wish you luck in your future endeavors, but unfortunately we will not reinstate you as a student.

Sincerely,

Rebecca Cypess

_____

Rebecca Cypess [yu.edu], PhD

The Mordecai D. Katz and Dr. Monique C. Katz Dean

Undergraduate Faculty of Arts and Sciences

Yeshiva University

rebecca.cypess@yu.edu

(646) 592-4801

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Wednesday, October 16, 2024 11:59 PM
**To:** Sara Asher <sara.asher@yu.edu>; Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Appeal

**Yisrael Heilmann.**                                          **10/17/2024**

**Yeshiva University**

Please note:

First of all, this letter, and any communications related to it, shall not be construed as a waiver of any of my legal rights or claims under federal or state law, including but not limited to the protections afforded by **Section 504 of the Rehabilitation Act of 1973**, **Title VI of the Civil Rights Act of 1964**, and any applicable student protection policies under Yeshiva University's guidelines.

Secondly, this letter is submitted for the purposes of seeking an equitable and fair resolution in good faith. It is not intended, nor may it be used, as evidence of any admission, waiver of rights, or concession of guilt in any current or future legal or administrative proceedings. Any attempt by Yeshiva University to use this communication in a manner adverse to my interests shall be considered retaliatory and inconsistent with established federal protections, including but not limited to protections against retaliation under **Title IX of the Education Amendments of 1972** and **Section 504 of the Rehabilitation Act of 1973**.

4

Furthermore, I acknowledge my obligation to cooperate fully with law enforcement authorities as mandated by law. Under **18 U.S.C. § 1510**, obstructing an official investigation is a federal offense in the U.S. In Germany, **Section 138 of the German Penal Code (StGB)** requires individuals to report serious crimes.

Additionally, influencing or victimizing a witness or victim of a crime is a crime in both jurisdictions. In the U.S., this is addressed under **18 U.S.C. § 1512** (witness tampering), while in Germany, **Section 244 of the StGB** prohibits witness intimidation. I commit to upholding these legal obligations and protections.

***Last but not least, "I am committed to resolving this matter amicably and in good faith. While I assert my rights and seek immediate reinstatement of my academic status and SEVIS record, I hope to engage in constructive dialogue with the university to address these issues effectively. I believe that through open communication, we can find a fair and equitable resolution that upholds both my rights and the university's commitment to maintaining a safe and supportive learning environment."***

To whom it may concern,

I am writing to formally appeal my dismissal from Yeshiva University, as outlined in your letter dated October 1, 2024. This dismissal is not only procedurally flawed and legally unsound, but it also appears to be retaliatory in nature. The university has neglected substantial evidence related to my case. I hereby demand the immediate reinstatement of my academic status and SEVIS record, as well as a thorough review of the university's actions that demonstrate clear violations of both institutional policies and federal law. If these issues are not resolved, I will escalate the matter through all legal and public channels available to me.

## 1. Retaliation and Violations of Yeshiva University Policy

Yeshiva University's own policies prohibit retaliation against students who report incidents of harassment or violence. As stated in the **Yeshiva University Student Handbook** under **Student Rights and Responsibilities**:

> "Yeshiva University is committed to maintaining a learning environment free from all forms of harassment and discrimination and will not tolerate retaliation against any student who reports such incidents."

The timeline of events clearly demonstrates retaliation following my formal complaints and notification of legal action:

- **September 7, 2024**: I informed the university of another racial harassment and the university's mishandling of the situation. Following this notification, my SEVIS record was abruptly terminated just three days later. In an email, Jennifer Golden, Director of the Office of International Services, misleadingly stated:

  "You did not apply for a Reduced Course Load, and therefore, we have no choice but to terminate your SEVIS status."

This is factually incorrect, as I was never offered the opportunity to apply for a Reduced Course Load (RCL) despite my documented circumstances and communication with the university.

- **September 10, 2024**: The retaliatory nature of the university's actions became evident with the abrupt termination of my SEVIS status under false pretenses. This action is a direct violation of **Title IX** protections against retaliation and a breach of Yeshiva University's own policies.

5

The **Yeshiva University Policy on Non-Discrimination and Anti-Harassment** further affirms:

> "The University prohibits discrimination or harassment of any kind and is committed to a process that encourages reporting of such behavior without fear of retaliation."

The university's failure to adhere to these policies not only undermines student trust but also exposes it to significant legal liabilities.

## 2. Procedural Violations of SEVIS Termination and Immigration Law

The university's actions reflect significant violations of **8 C.F.R. § 214.2(f)**, which governs the status of F-1 international students. My I-20 was terminated on **September 10, 2024**, citing "Otherwise Failing to Maintain Status" under the false pretext that I had failed to apply for a Reduced Course Load (RCL). This is categorically untrue:

- **Reduced Course Load (RCL) Requirement**: At no point was I offered the option of an RCL, nor was my situation properly evaluated in accordance with university policy.

According to the **Yeshiva University Student Handbook**, the institution is required to make reasonable accommodations for students:

> "Students with documented extenuating circumstances may apply for a Reduced Course Load (RCL) and should be provided necessary accommodations to continue their studies without penalty."

Despite this policy, I was denied any accommodations, and my SEVIS status was terminated without due process, violating **Title IX** and **8 C.F.R. § 214.2(f)(6)(iii)**.

## 3. Failure to Provide Reasonable Accommodations

The university policy clearly asserts:

> "The University shall ensure that students have equal access to educational programs, services, and activities."

Despite my communications with the university regarding the events and their impact on my academic progress, no appropriate accommodations were made.

## 4. Pattern of Negligence and Harassment

The assault I endured on **March 21, 2024**, was not an isolated incident but part of a broader pattern of negligence by Yeshiva University:

- **March 21, 2024 Assault**: On that day, I was assaulted by **Sapir Amar**, who subjected me to physical violence, theft, and slurs, leading to hospitalization, with serious physical injuries. Despite substantial evidence, including a **police report**, **video footage**, and **witness statements**, the university failed to take protective measures. On investigation in this case is still ongoing.
- Racial harassments on November 2022 and September, 7, 2024.

The **Yeshiva University Policy on Harassment** states:

"All allegations of harassment will be taken seriously and investigated promptly, ensuring that victims are protected from further harm."

The university's inaction in response to my complaints represents a serious breach of this policy.

## 5. Legal Demands and Consequences for Non-Compliance

The actions taken against me by Yeshiva University violate federal law, including **Title IX**, **ADA**, and **8 C.F.R. § 214.2(f)**. I am demanding the following corrective actions:

- **Immediate Reinstatement of SEVIS and Academic Status**: The wrongful termination of my SEVIS record and dismissal must be reversed. My I-20 must be reinstated, and my academic status restored without penalty.
- **Reevaluation of Academic Records**: My academic record must be adjusted to reflect the university's failure to provide necessary accommodations. Any failing grades resulting from this must be expunged.
- **Formal Apology and Compensation**: The university must issue a formal apology for its retaliatory actions and negligence. I might seek financial compensation for damages incurred, including legal costs.
- **Policy Changes**: The university must implement measures to ensure future students are not subjected to similar mistreatment, including strict enforcement of non-retaliation policies and improved accommodations for students.

If these demands are not met within **5 days, from today October 17, 2024** , I will take the following actions:

- **Potential Legal Action**: At my discretion, pursuing a lawsuit against Yeshiva University for retaliation, negligence, and violations of federal law, seeking compensatory and punitive damages.
- **Reporting to Federal Authorities**: At my discretion, report the university's wrongful termination of my SEVIS record to relevant federal authorities, which may result in sanctions against the university.
- **Engagement with the Press**: At my discretion, also engage media outlets to bring public attention to these serious violations, ensuring the university's failures are brought to light.

## Conclusion

This situation is not just a matter of personal distress; it raises significant concerns about Yeshiva University's commitment to maintaining a safe and equitable educational environment. I strongly urge you to address these issues seriously and promptly. If the university fails to respond adequately to my demands, I will not hesitate to escalate this matter by engaging with media outlets to bring public attention to these serious violations. Additionally, I am prepared to pursue legal recourse, including filing complaints with federal authorities and exploring further legal action.

Should any new evidence or relevant circumstances arise that could significantly affect the outcome of my case, I hereby reserve the unequivocal right to submit a subsequent appeal in accordance with Yeshiva University's established policies regarding fairness, transparency, and the thorough review of academic decisions. This reservation of rights is made in accordance with **Section 504 of the Rehabilitation Act of 1973** (29 U.S.C. § 794), which prohibits discrimination against individuals with disabilities in any program receiving federal financial assistance; **Title IX of the Education Amendments of 1972** (20 U.S.C. § 1681), which ensures protection against sex-based discrimination in educational institutions; and the **Americans with Disabilities Act (ADA)** (42 U.S.C. § 12101 et seq.), which requires reasonable accommodations for students with disabilities, ensuring equal access to educational programs.

Additionally, this appeal process is supported by **the Family Educational Rights and Privacy Act (FERPA)** (20 U.S.C. § 1232g), which protects the privacy of student education records and grants students the right to seek to amend their records under certain circumstances. It is also in line with the university's obligations under **the Clery Act** (20 U.S.C. § 1092(f)), which mandates timely warnings and reporting of campus safety incidents.

*Furthermore, I trust that the institution will uphold these principles to ensure justice and fairness in my case and will take all necessary steps to investigate any new evidence fairly and impartially, in line with established university policies and applicable federal laws.*

Thank you for your immediate attention to this matter. I look forward to your prompt response.

Reinstating me promptly would not only address my concerns but could also help mitigate any potential media scrutiny and federal investigations related to the March 21 assault, excluding any current or upcoming criminal investigations by any law enforcement agency involving individuals connected to the incident.

Sincerely,

Yisrael Heilmann

8

Heilmann v. Yeshiva Univ., Seyfarth Shaw LLP, Kesselman & Capell | Defamation Complaint | Case No. [TBD] | U.S. District Court – Southern District of New York

# *Exhibit* **B**

**Title**: *Seyfarth Shaw LLP Response Letter (April 9, 2025)*

**Description**: This is a formal letter sent by Dov Kesselman of Seyfarth Shaw LLP to Mr. Yisrael Z. Heilmann, dated April 9, 2025. The letter responds to Mr. Heilmann's allegations of defamation and retaliation arising from statements made in a December 24, 2024 NYSDHR position statement. Seyfarth Shaw asserts that all statements made in the NYSDHR proceedings are protected by absolute privilege under New York law and federal case law, citing precedents such as *Sanderson v. Leg Apparel*, *Kamdem-Ouaffo v. Balchem Corp.*, and *Morales v. City of New York*. The letter further claims Mr. Heilmann's retaliation claims under NY Exec. Law § 296(7) lack legal merit and threatens to seek costs and sanctions if litigation proceeds.

**Seyfarth**

**Seyfarth Shaw LLP**
620 Eighth Avenue
New York, New York 10018
**T** (212) 218-5500
**F** (212) 218-5526

dkesselman@seyfarth.com
**T** (212) 218-5507

www.seyfarth.com

April 9, 2025

**VIA E-MAIL**

Yisrael Z. Heilmann
447 Broadway, 2nd Floor #945
New York, NY 10013
yzh2@protonmail.com

      Re:     <u>Response to Individual Defamation and Retaliation Claims Against Seyfarth Shaw and Its Attorneys</u>

Dear Mr. Heilmann:

      We are in receipt of your letter, dated April 1, 2025 (but emailed on April 3, 2025), in which you allege that my colleague, Mr. Capell, and I made defamatory statements against you in retaliation for your Complaint with the New York State Division of Human Rights ("NYSDHR") against our client, Yeshiva University. Such allegations, much like many of the allegations levied against our client since the inception of this matter, are totally without basis in fact or in law. Without attempting to respond to each and every claim made in your letter, and without responding with all of the information that we may have, we briefly address the claims of each individual.

      Contrary to your assertions in your letter, courts routinely reject these kinds of claims because filing a position statement with the NYSDHR is subject to **absolute privilege**. *See Sanderson v. Leg Apparel LLC*, No. 19-cv-8423 (GHW), 2020 U.S. Dist. LEXIS 234190, at *25 (S.D.N.Y. Dec. 14, 2020) (holding that plaintiff's defamation claim is futile because statements made during "NYSDHR proceedings are absolutely privileged"); *Kamdem-Ouaffo v. Balchem Corp.*, No. 17-CV-2810 (KMK), 2018 WL 4386092, at *19 (S.D.N.Y. Sept. 14, 2018) ("[T]he statement was directly related to one of the issues that the Division of Human Rights and EEOC had been asked to decide . . . [a]ccordingly, [the d]efendants cannot be liable for defamation even if the statement was false."); *Morales v. City of New York*, No. 14-cv-7253, 2016 U.S. Dist. LEXIS 105328, at *24 (S.D.N.Y. Aug. 9, 2016) (holding that an NYSDHR position statement is "entitled to absolute immunity"); *Daniels v. Alvarado*, No. 03-CV-5832, 2004 U.S. Dist. LEXIS 3893, 2004 WL 502561, at *7-8 (E.D.N.Y. Mar. 12, 2004) (dismissing defamation claim based on employer's submission to the Division of Human Rights, which was protected by absolute privilege).

      The case you cite, *Stega v. New York Downtown Hospital* is not on point and courts will easily distinguish it. There, the Court held that the Food and Drug Administration's process did not allow plaintiff any notice of the investigation or a right to attend a hearing. Therefore, it lacked the judicial safeguards required for absolute privilege. 31 N.Y.S. 3d 661 (2018). The NYSDHR has been held, time and time again, to have such safeguards. *See, e.g.*, *Sanderson*, 2020 U.S. Dist. LEXIS 234190, at *25.

317166605v.2

Yisrael Z. Heilmann<br>April 9, 2025<br>Page 2

Similarly, statements made by counsel in the course of judicial proceedings are subject to a privilege that "is so broad that it 'embraces anything that may possibly be pertinent or which has enough appearance of connection with the case…." *Barber v. Premo*, 2021 NY Slip Op. 51291(U), 2021 N.Y. Misc. LEXIS 7048, at *27 (Albany Cty. Sup. Ct. Sept. 29, 2021) (citing *Baratta v. Hubbard*, 136 A.D.2d 467, 469 (1st Dep't 1988)).

Moreover, asserting a retaliation claim under N.Y. Exec. Law § 296(7) for filing a position statement in defense of a NYSDHR complaint is entirely baseless and not supported by any law. Neither this Firm, nor Yeshiva, have taken any remotely adverse actions against you since you filed your NYSDHR Complaint, which is a required element under the law. *Zheng-Smith v. Nassau Health Care Corp.*, 20-3544-cv, 2021 U.S. App. LEXIS 27084, at *8 (2d Cir. Sept. 9, 2021) (upholding dismissal of N.Y. Exec. Law § 296(7) claim).

In short, your letter and the baseless threats contained therein are frivolous and bad faith. In the event you file a lawsuit against us or our firm or in any other way continue your attempts at harassment, we will seek all costs and fees incurred in responding to any unmeritorious filing and may seek monetary and other sanctions against you.

Very truly yours,

SEYFARTH SHAW LLP

Dov Kesselman

317166605v.2